# EXHIBIT 1

Dockets.Justia.com

Schedule 1.1(a)
Assets
(Page 1 of 4)

I.  All rights and ownership of UNIX and UnixWare, including but not limited to all versions of
UNIX and UnixWare and all copies of UNIX and UnixWare (including revisions and updates
in process), and all technical, design, development, installation, operation and maintenance
information concerning UNIX and UnixWare, including source code, source documentation,
source listings and annotations, appropriate engineering notebooks, test data and test results,
as well as all reference manuals and support materials normally distributed by Seller to end-
users and potential end-users in connection with the distribution of UNIX and UnixWare, such
assets to include without limitation the following:

### UNIX Source Code Products

A.  UnixWare 2.0 as described in the UnixWare 2.0 Licensing Schedule and those
products listed as "prior" products on such schedule (includes source code updates
where appropriate - i.e. UnixWare product family).

B.  UNIX SVR4.1 ES as described in the UNIX SVR4.1 ES Licensing Schedule and
those products listed as "prior" products on such schedule

C.  UNIX SVR4.0MP as described in the UNIX SVR4.0 MP Licensing Schedule and
those products listed as "prior" products on such schedule.

D.  Ancillary SVRx Products (a final list of which shall be developed by the parties prior
to the Closing)

### Binary Product Releases

A.  UnixWare 2.01 Product Family as described by the Novell UnixWare 2.01 Part/Price
List

B.  UnixWare 2.0.x update releases

C.  UnixWare 1.1 Product Family as described by the Novell UnixWare 1.1 Part/Price List

D.  UnixWare 1.1.x - update releases

### Products Under Development

A.  UnixWare 2.1 (Eiger) - contains NetWare UNIX Client and Server capabilities

B.  UnixWare 2.1 Oracle Parallel Server (OPS)

C.  UnixWare 2.03 - maintenance update under development

D.  UnixWare 2.0.x/2.1 Enhanced Mode Merge

E.  UnixWare 2 Internet Server

CONFIDENTIAL                                                    SCO1185950

Schedule 1.1(a)
Assets
(Page 2 of 4)

## Other Technology

A.  UnixWare system/HBA/etc. Test/Certification Suites Used by Novell Labs
B.  UnixWare "OS Branding" Test Suites
C.  UnixWare "OS Compatible" Requirements
D.  Gaede Performance Test suite
E.  ARTUS, Bart, Buster Internal UNIX Test suites and test harnesses
F.  UnixWare Training/Education Courseware
G.  Requirements, Design, and Test Specifications for UnixWare 2
H.  Technical Support Update Manager
I.  Marketing collateral/information in electronic form
J.  ODI Transmogrification software

II.  All of Seller's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business.

III.  All of Seller's rights pertaining to UNIX and UnixWare under any software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertain to the Business (to the extent that such contracts are assignable), including without limitation:

A.  Joint Development with third parties:

1.  In-Process development agreements
2.  Past development agreements with on-going pricing discounts
3.  Past development agreements without ongoing pricing discounts
4.  Joint development agreements in which Seller didn't get full rights to the code developed.

B.  Third party software license agreements - Those agreements in which Seller pays per copy fees for technology/products which are shipped with or to be used with UNIX System and/or UnixWare.

C.  Joint marketing agreements - Marketing programs with customers.

D.  End user MLA agreements - Agreements to allow end users to copy binary products for internal use only. Associated with these agreements are support requirements.

E.  UNIX-only VAR agreements - UNIX Masters VARs

SDW::ODMA\PCDOCS\SQL2\89406\1

CONFIDENTIAL

SCO1185951

Schedule 1.1(a)
Assets
(Page 3 of 4)

F.    Support agreements - End user support agreements (i.e., TMAC, NALCOMIS)

G.    Microsoft agreement (Xenix Agreement) - Xenix compatibility and per copy fee
      agreement.  Seller will agree to discuss with SCO Seller's interpretation of this
      agreement.

H.    Microsoft Agreement (Extra-Ordinary Discount) - Microsoft's additional discount
      beyond 80%.

I.    Strategic Relationship Agreements (i.e.  MTA, ECPA, MBA, etc.)

J.    Out-sourced development (i.e., India) - Development agreements with third parties
      (Wipro and HCL) and India Development Center.  IDC is a Seller subsidiary.

K.    Out-sourced Support Agreements

L.    Software and Sublicensing Agreements - This includes the source code and
      sublicensing agreements that Seller has with its OEM, End User and Educational
      customers.  The total number of these agreements is approximately 30,000.

M.    OEM Binary Licensing Agreements - OEM distribution of UnixWare with Seller's
      agreement to include some OEM added value into future releases of UnixWare.

IV.   All copies of UNIX and UnixWare, wherever located, owned by Seller.

V.    Intellectual property - Trademarks UNIX and UnixWare as and to the extent held by Seller
(excluding any compensation Seller receives with respect of the license granted to X/Open regarding
the UNIX trademark).

VI.   All contracts relating to the SVRX Licenses listed below:

      - UNIX System V Release 4.2 MP, Intel386 Implementation
      - #UNIX System V Release 4.2 MP International Edition, Intel386 Implementation
      - UNIX System V Release 4.2, Intel386 Implementation
      - #UNIX System V Release 4.2 International Edition, Intel386 Implementation
      - UNIX System V Release 4.1 ES, Intel386 Implementation
      - #UNIX System V Release 4.1 ES International Edition, Intel386 Implementation

SDW::ODMA\PCDOCS\SOL2\39406\1

CONFIDENTIAL    SCO1185952

Schedule 1.1(a)
Assets
(Page 4 of 4)


- UNIX System V Release 4.0 MP, Intel386 Implementation
- #UNIX System V Release 4.0 MP International Edition, Intel386 Implementation
- UNIX System V Release 4.0 MP, Intel386 Version 4 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 4 Implementation
- UNIX System V Release 4.0, Intel386 Version 3 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 3 Implementation
- UNIX System V Release 4.0, Intel386 Version 2 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 2 Implementation
- UNIX System V Release 4.0, Intel386 Version 1 Implementation
- #UNIX System V Release 4.0 International Edition, Intel386 Version 1 Implementation
- UNIX System V/386 Release 3.2 and #UNIX System V/386 Release 3.2 International Edition
- UNIX System V Release 3.2 and #UNIX System V Release 3.2 International Edition
- UNIX System V Release 3.1 and #UNIX System V Release 3.1 International Edition
- UNIX System V Release 3.0 and #UNIX System V Release 3.0 International Edition
- All prior releases and versions of UNIX System V Release 2.1
- #All prior releases and versions of UNIX System V Release 2.1 International Editions
- All prior releases and versions of UNIX System V Release 2.0
- #All prior releases and versions of UNIX System V Release 2.0 International Editions
- All prior UNIX System releases and versions preceding UNIX System V Release 2.0
- #All prior UNIX System releases and versions preceding UNIX System V Release 2.0 International Editions

VII.    Such office furniture and personal computers or work stations as may be currently used by the employees of Seller hired by Buyer pursuant to Section 4.13 hereof.

# EXHIBIT 2

## BILL OF SALE

Reference hereby is made to that certain Asset Purchase Agreement by and between The Santa Cruz Operation, Inc. and Novell, Inc. dated as of September 19, 1995, as amended by Amendment No. 1 to Asset Purchase Agreement dated as of December 6, 1995 (together, the "Agreement"). Capitalized terms used in this Bill of Sale and not otherwise defined shall have the meanings ascribed to such terms in the Agreement.

In accordance with Article 1.1(a) of the Agreement, Seller, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby transfer, convey, sell, assign and deliver to Buyer, without recourse, representation or warranty except as otherwise expressly provided in the Agreement, all of the Assets. Excepted from the transfer of Assets pursuant to the preceding sentence are the rights reserved by Seller pursuant to that certain Technology License Agreement between Seller and Buyer dated as of December 6, 1995.

Seller does not sell to Buyer and Buyer does not purchase from Seller any interest in any of Seller's assets other than the Assets.

This Bill of Sale shall be binding upon the successors and assigns of Seller and shall inure to the benefit of the successors and assigns of Buyer as permitted under the Agreement.

It is acknowledged and agreed that this Bill of Sale is intended only to document the sale and assignment of the Assets to Buyer, and that the Agreement is the exclusive source of the agreement and understanding between Seller and Buyer respecting the Assets. Nothing in this Bill of Sale shall limit, expand or otherwise affect any of the representations, warranties, agreements or covenants contained in the Agreement. If any provision of this Bill of Sale is construed to conflict with any provision of the Agreement, the provision of the Agreement shall control.

IN WITNESS WHEREOF, Seller has cause this Bill of Sale to be duly executed as of the 6th day of December, 1995.

NOVELL, INC.

By: _____

Title: Senior Vice President - Corporate Development

Acknowledged this 6th day of December, 1995:

THE SANTA CRUZ OPERATION, INC.

By: _____

Title: Chief Executive Officer

E:\PUBLIC\SDW\0145678.01

SCO1185881

# EXHIBIT 3

Document # 121505

## DEED OF ASSIGNMENT

THIS AGREEMENT is made this 13th day of November one thousand nine hundred and ninety eight

BETWEEN Novell, Inc. a corporation organised under the laws of Delaware, of 1555 North Technology Way, Orem, Utah 84097-2395, USA (hereinafter called "the Assignor") of the one part

AND X/Open Company Limited, a British company of Apex Plaza, Forbury Road, Reading, Berkshire, RG1 1AX (hereinafter called "the Assignee") of the other part

WHEREAS

1    The Assignor is the Proprietor of the trade marks referred to in the Schedule hereto (hereinafter referred to as "the said trade marks")

2    It has been agreed between the parties that the Assignor shall assign to the Assignee the said trade marks

### NOW IT IS HEREBY AGREED AS FOLLOWS

1    For good and valuable consideration and the sum of One Dollar ($1.00) now paid to the Assignor by the Assignee (the receipt whereof the Assignor hereby acknowledges) the Assignor hereby assigns unto the Assignee all property, right, title and interest in the said trade marks with the business and goodwill attached to the said trade marks TO HOLD the same unto the Assignee absolutely

2    This assignment includes the right of the assignee to bring action and claim relief and damages in respect of any infringement of said trade marks which occurred prior to the date of this assignment

**TRADEMARK**
**REEL: 001920 FRAME: 0796**

## SCHEDULE

| COUNTRY | TRADE MARK | NUMBER |
|---------|------------|--------|
| USA | UNIX | 1392 203 |
| USA | UNIX | 1390 593 |
| USA | UNIX SYSTEM LABORATORIES | 1780 785 |

IN WITNESS WHEREOF the parties hereto have executed this agreement in accordance with their respective constitutions the day and year first above mentioned.

FOR AND ON BEHALF OF

Novell, Inc.

Richard C. Rife
Vice President &
Assistant Corporate Secretary

IN THE PRESENCE OF

FOR AND ON BEHALF OF

X/Open Company Limited

IN THE PRESENCE OF

S Thompson

RECORDED: 06/22/1999

# EXHIBIT 4

LAW OFFICES

# ANDERSON & KARRENBERG

A PROFESSIONAL CORPORATION

THOMAS R. KARRENBERG
FRANCIS J. CARNEY
STEVEN W. DOUGHERTY
SCOTT A. CALL
JOHN P. MULLEN
JON V. HARPER
NATHAN B. WILCOX
STEPHEN P. HORVAT
SHAYNE R. KOHLER
JENNIFER R. ESHELMAN
HEATHER M. SNEDDON
JOHN A. BLUTH

700 BANK ONE TOWER
50 WEST BROADWAY
SALT LAKE CITY, UTAH 84101-2006

TELEPHONE (801) 534-1700
TELECOPIER (801) 364-7697
www.aklawfirm.com

JOHN T. ANDERSON
Of Counsel

May 21, 2004

*VIA FACSIMILE (813-287-8234)*

David L. Partlow, Esq.
Transworld Center, Suite 210
4100 West Kennedy Boulevard
Tampa, Florida 33609-2244

   Re: Objection to Subpoena to Novell dated May 13, 2004 in *X/Open Company v. Gray*, Opposition No. 122.524.

Dear Mr. Partlow:

  Our office represents Novell, Inc. and this letter constitutes Novell's Rule 45 objection to the Subpoena dated May 13, 2004 and served on May 14, 2004 in the matter of *X/Open Company v. Gray*, Opposition No. 122.524, United States Patent and Trademark Office before the Trademark Trial and Appeal Board (the "Subpoena"), a true and correct copy of which is attached hereto as Exhibit A. I understand that you have spoken to Jennifer Eshelman in my office regarding narrowing the scope of the Subpoena. Novell remains committed to work with you to narrow the scope of the Subpoena to avoid extra expenses to Novell and to your client.

## OBJECTION

  Novell, Inc. ("Novell") by and through its undersigned counsel, hereby objects to the production, inspection and copying of the materials designated in the Subpoena served by Wayne R. Gray, dated May 13, 2004, (the "Subpoena"). *See* Exhibit A. The grounds for Novell's objections are as follows:

A. The Subpoena is Contrary to the Trademark Trial and Appeal Board's Order.

  It is our understanding that X/Open filed a Motion for Protective Order alleging that your client's discovery requests are contrary to the Trademark Trial and Appeal Board's ("TTAB") discovery Order, attached hereto as Exhibit "B", allowing your client to reopen discovery. We agree with X/Open's position on this issue and object to the Subpoena to Novell on that ground.

David L. Partlow, Esq.
May 21, 2004
Page 2

At the very least, Novell's response to the Subpoena should be held in abeyance until TTAB rules on the Protective Order Motion.

B.    <u>Documents from SCO.</u>

In addition, we understand from speaking with Mr. Ryan Tibbitts, counsel for SCO, that he has been in touch with you and that SCO will be providing documents that resolve Mr. Gray's claim, and, in fact, contradict Mr. Gray's position. Although we understand that Mr. Gray may not be willing to concede that the documents that SCO will supply are dispositive of the issue before TTAB, it is Novell's position that SCO's documents will shed a great deal of light on Mr. Gray's claims regarding ownership of the trademark. Accordingly, we invite you to examine SCO's documents to determine whether the Subpoena to Novell, which is extraordinarily broad, can be narrowed substantially and instead directed at resolving any issues that remain after SCO produces the documents referenced above.

C.    <u>The Subpoena is Burdensome and Extremely Broad.</u>

Responding to Mr. Gray's Subpoena in its present form would place extreme burden and undue expenses on Novell. Novell has engaged in a computerized initial keyword search, using the keywords of the Subpoena (e.g., AT&T, Unix, USL Unix Systems Laboratories, Tarantella, X/Open, SCO Santa Cruz Operations, Caldera, SVID System V Interface Definition, etc.), of Novell's computerized records of the files stored in boxes at Novell's Provo file center. The Keyword Search Report lists 1,880 *boxes* of potentially responsive documents. Novell would spend at least $5,000 simply to retrieve these boxes. The added expense to Novell of supervising and engaging in a production of these 1,880 boxes would also be substantial. Such expense would include not only the retrieval of the boxes, but the review of the boxes for privileged or protected documents, supervision of the actual production, including the review of documents by other parties, etc. My initial estimate places these added expenses at at least $30,000. Pursuant to Rule 45, Mr. Gray would be responsible to pay Novell's expenses to produce the boxes, including attorneys' fees incurred in reviewing the documents.

<b>GENERAL OBJECTIONS</b>

1.    Novell objects to the Subpoena to the extent it calls for the inspection and copying of documents which contain information protected from disclosure by the attorney-client privilege and the attorney work product doctrine. In particular, Novell objects to the production of any attorney-client communications or work product referring or relating to the claims set forth in the litigation currently pending in the United States District Court District of Utah titled <u>The SCO Group, Inc. v. Novell, Inc.</u>, Case No. 2:04CV00139.

David L. Partlow, Esq.
May 21, 2004
Page 3

2. Novell objects to the Subpoena in its entirety as overly broad, unreasonably burdensome and oppressive in its repeated requests for "all documents and all communications of any kind." To search for, identify, locate, review and produce "all documents and all communications of any kind", even those that are barely, if at all, relevant, simply because they "refer" to the subject matter of some extremely broad requests would take a large number of employee hours diverting key personnel away from their tasks. An initial keyword search of Novell's computerized records of the files stored in boxes at its Provo warehouse/file center, resulted in a Keyword Search Report listing 1,880 boxes. The production of these documents would be extremely time consuming and expensive for Novell.

3. Novell objects to the Subpoena on the basis that the documents sought can, in many instances, be obtained from SCO's production of documents in this matter.

4. Novell objects to the Subpoena's general instructions to the extent they attempt to impose obligations upon Novell which are contrary to or inconsistent with Rule 45 of the Federal Rules of Civil Procedure.

5. Novell objects to being put to the burden and expense of locating, identifying, collating, reviewing and producing any documents responsive to the Subpoena until such time as arrangements have been made ensuring that Novell will be reimbursed for all costs and expenses of such production activities. Novell objects to the Subpoena in its entirety on the grounds that the party responsible for issuance of the Subpoena has not taken reasonable steps to avoid imposing undue burden or expense upon Novell in responding to the Subpoena

6. Novell objects to the Subpoena to the extent it calls for the production of documents which constitute confidential and proprietary information, trade secrets or other confidential research, development, commercial or financial information of Novell.

7. Novell objects to the time frame of the requests as too broad.

## SPECIFIC OBJECTIONS TO SUBPOENA

Novell also makes the following specific objections to the numbered requests in the Subpoena. The General Objections are deemed incorporated by reference in each of the specific objections below.

Request No. 1:  Provide copies of all documents and all communications of any kind concerning all communications, meetings, and all agreements or understandings (written or oral) with AT&T (defined hereinafter) concerning the Unix marks, Unix business, Unix goodwill, and/or Unix intellectual property (defined hereinafter).

David L. Partlow, Esq.
May 21, 2004
Page 4

<u>Objection to Request No. 1:</u>  Novell incorporates its general objections and specifically objects to Request No. 1 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.

<u>Request No. 2:</u>    Provide copies of all documents and all communications of any kind concerning all communications, meetings, and all agreements or understandings (written or oral) with USL (defined hereinafter) concerning the Unix marks, Unix business, Unix goodwill and/or Unix intellectual property (defined hereinafter).

<u>Objection to Request No. 2:</u>    Novell incorporates its general objections and specifically objects to Request No. 2 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.

<u>Request No. 3:</u>  Provide copies of all documents and all communications of any kind concerning all communications, meetings, and all agreements or understandings (written or oral) with Novell (defined hereinafter) concerning the Unix marks, Unix business, Unix goodwill and/or Unix intellectual property (defined hereinafter).

<u>Objection to Request No. 3:</u>  Novell incorporates its general objections and specifically objects to Request No. 3 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell has performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents.  Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

<u>Request No. 4:</u>  Provide copies of all documents and all communications of any kind concerning all communications, meetings and all agreements or understandings (written or oral) with Tarantella (defined hereinafter) concerning the Unix marks, Unix business, Unix goodwill and/or Unix intellectual property (defined hereinafter).

David L. Partlow, Esq.
May 21, 2004
Page 5

   Objection to Request No. 4:  Novell incorporates its general objections and specifically objects to Request No. 4 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell has performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center for the word Tarantella, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents.  Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

   Request No. 5:  Provide copies of all documents and all communications of any kind concerning all communications, meetings, and all agreements or understandings (written or oral) with The X/Open Company (defined hereinafter) concerning the Unix marks, Unix business, Unix goodwill and/or Unix intellectual property (defined hereinafter).

   Objection to Request No. 5:  Novell incorporates its general objections and specifically objects to Request No. 5 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell has performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents.  Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

   Request No. 6:  Provide copies of all documents and all communications concerning any contracts relating to the Unix marks, including but not limited to licenses, licensing agreements, software agreements and sublicensing agreements.

   Objection to Request No. 6:  Novell incorporates its general objections and specifically objects to Request No. 6 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.

David L. Partlow, Esq.
May 21, 2004
Page 6

<u>Request No. 7:</u>    Provide copies of all documents and all communications concerning Novell's acquisition of Unix System Laboratories, Inc. ("USL").

<u>Objection to Request No. 7:</u>    Novell incorporates its general objections and specifically objects to Request No. 7 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.

<u>Request No. 8:</u>    Provide copies of all documents and all communications concerning SCO's acquisition of the Unix business, goodwill, and Intellectual Property assets from Tarantella. Inc. (Tarantella).

<u>Objection to Request No. 8:</u>    Novell incorporates its general objections and specifically objects to Request No. 8 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell has performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents.  Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

<u>Request No. 9:</u> Provide copies of all documents and all communications of any kind concerning AT&T's development of and ownership of any version and/or edition of the following products or items:

     a.     "System V Interface Definition", also known as SVID;
     b.     "System V Verification Suite", also known as SVVS; and
     c.     "Single UNIX Specification" and/or any alleged predecessor including but not limited to any version or edition of "Spec 1170" and/or any version or edition of the "X/Open Portability Guide" also identified as "XPG"

<u>Objection to Request No. 9:</u>    Novell incorporates its general objections and specifically objects to Request No. 9 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the

David L. Partlow, Esq.
May 21, 2004
Page 7

request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.

Request No. 10: Provide copies of all documents and all communications of any kind concerning USL's development of and ownership of any version and/or edition of the following products or items:

      a.    System V Interface Definition", also known as SVID;
      b.    "System V Verification Suite", also known as SVVS; and
      c.    "Single UNIX Specification" and/or any alleged predecessor including but not limited to any version or edition of "Spec 1170" and/or any version or edition of the "X/Open Portability Guide" also identified as "XPG".

Objection to Request No. 10: Novell incorporates its general objections and specifically objects to Request No. 10 as follows: the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached). Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.

Request No. 11: Provide copies of all documents and all communications of any kind concerning Novell's development of and ownership of any version and/or edition of the following products or items:

      a.    Definition", also known as SVID;
      b.    "System V Verification Suite", also known as SVVS; and
      c.    "Single UNIX Specification" and/or any alleged predecessor including but not limited to any version or edition of "Spec 1170" and/or any version or edition of the "X/Open Portability Guide" also identified as "XPG".

Objection to Request No. 11: Novell incorporates its general objections and specifically objects to Request No. 11 as follows: the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached). Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.

Request No. 12: Provide copies of all documents and communications of any kind concerning SCO's development of and ownership of any version and/or edition of the following products or items:

David L. Partlow, Esq.
May 21, 2004
Page 8

    a.    "System V Interface Definition", also known as SVID;

    b.    "System V Verification Suite", also known as SVVS; and

    c.    "Single UNIX Specification" and/or any alleged predecessor including but not limited to any version or edition of "Spec 1170" and/or any version or edition of the "X/Open Portability Guide" also identified as "XPG".

Objection to Request No. 12:  Novell incorporates its general objections and specifically objects to Request No. 12 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell has performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents.  Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 13:  Provide copies of all documents and all communications of any kind concerning any Unix mark Trademark Re-Licensing business by AT&T, USL, and/or Novell.

Objection to Request No. 13:  Novell incorporates its general objections and specifically objects to Request No. 13 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.

Request No. 14:  Provide copies of all documents and all communications of any kind concerning the Unix mark Trademark Re-Licensing Agreement between Novell and X/Open dated on or about May 10, 1994 and all amendments.

Objection to Request No. 14:  Novell incorporates its general objections and specifically objects to Request No. 14 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell has performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive

David L. Partlow, Esq.
May 21, 2004
Page 9

documents. Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 15:    Provide copies of all documents and all communications of any kind concerning any rule, policy, practice or procedure concerning the quality control or other supervision exercised by Novell as owner and licensor of the Unix marks, over X/Open as licensee concerning X/Open's Unix mark relicensing business from May 1994 to the present, specifically relating to the May 10, 1994 Trademark Re-Licensing Agreement between Novell and X/Open Company and all amendments.

Objection to Request No. 15:    Novell incorporates its general objections and specifically objects to Request No. 15 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents.  Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 16:    Provide copies of all documents and all communications of any kind concerning any payments made by X/Open to Novell pursuant to the Unix mark Trademark Re-Licensing Agreement between Novell and X/Open Company dated on or about May 10, 1994 and all amendments.

Objection to Request No. 16:    Novell incorporates its general objections and specifically objects to Request No. 16 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell has performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents.  Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 17:    Provide copies of all documents and all communications of any kind concerning any rule, policy, practice or procedure concerning the quality control of other

David L. Partlow, Esq.
May 21, 2004
Page 10

supervision employed by SCO as owner and licensor of the Unix marks, over X/Open as licensee concerning X/Open's Unix mark relicensing business from December 1995 to the present, specifically relating to the May 10, 1994 Trademark Re-Licensing Agreement between Novell and X/Open Company and all amendments.

Objection to Request No. 17: Novell incorporates its general objections and specifically objects to Request No. 17 as follows: the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached). Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine. Subject to its objections, Novell performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents. Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 18: Provide copies of all documents and all communications of any kind concerning any payments made by X/Open to SCO pursuant to the Unix mark Trademark Re-Licensing Agreement between Novell and X/Open Company dated on or about May 10, 1994 and all amendments.

Objection to Request No. 18: Novell incorporates its general objections and specifically objects to Request No. 18 as follows: the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached). Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine. Subject to its objections, Novell performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents. Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 19: Provide copies of all documents and all communications of any kind between SCO, Novell, and X/Open, or any of them, concerning the 1995 Unix Asset Purchase Agreement titled "Asset Purchase Agreement by and between Santa Cruz Operation, Inc. and Novell, Inc." dated on or about September 19, 1995 and all amendments.

Objection to Request No. 19: Novell incorporates its general objections and specifically objects to Request No. 19 as follows: the request is overbroad, burdensome, and would impose

David L. Partlow, Esq.
May 21, 2004
Page 11

undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached). Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine. Subject to its objections, Novell performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents. Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 20:    Provide copies of all documents and all communications of any kind concerning the Unix mark Deed of Assignment between Novell as Assignor and X/Open as Assignee dated on or about November 13, 1998 and recorded at the USPTO on June 22, 1999 and all amendments.

Objection to Request No. 20:    Novell incorporates its general objections and specifically objects to Request No. 20 as follows: the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached). Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine. Subject to its objections, Novell performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents. Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 21:    Provide copies of all documents and all communications of any kind concerning the Unix marks, including written or electronic correspondences, memoranda, search reports and all contracts or other written documents that establish Novell's right to ownership of the Unix marks as Assignor in the Deed of Assignment between Novell and X/Open dated on or about November 13, 1998 and recorded at the USPTO on June 22, 1999, including but not limited to chain of title pursuant to 37 C.F.R §3.73(b).

Objection to Request No. 21: Novell incorporates its general objections and specifically objects to Request No. 21 as follows: the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached). Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine. Subject to its objections, Novell performed a keyword search of its computerized records of the files stored in

David L. Partlow, Esq.
May 21, 2004
Page 12

boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents. Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 22:    Provide copies of all documents and all communications of any kind that establish SCO's right to ownership of the Unix marks in a Deed of Assignment between SCO and X/Open, including but not limited to chain of title pursuant to 37 C.F.R. §3.73(b).

Objection to Request No. 22:  Novell incorporates its general objections and specifically objects to Request No. 22 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents. Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 23:    Provide copies of all documents and all communications of any kind concerning the Unix mark acknowledgement statement "Unix is a registered trademark in the United States and other countries, licensed exclusively through X/Open Company Limited", including but not limited to the use, definition, development, first date of use, last date of use, and all dates of use.

Objection to Request No. 23:  Novell incorporates its general objections and specifically objects to Request No. 23 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents. Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 24:    Provide copies of all other documents and all communications of any kind concerning any Unix mark ownership acknowledgement that implies and/or states in any

David L. Partlow, Esq.
May 21, 2004
Page 13

manner, form or format that Unix is a registered trademark of, or is licensed exclusively through, SCO, Novell, or X/Open.

Objection to Request No. 24:  Novell incorporates its general objections and specifically objects to Request No. 24 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents.  Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 25:   Provide copies of all documents and all communications of any kind concerning all pleadings in all State or Federal courts, and the United States Patent & Trademark Office (USPTO) including the Trademark Trial & Appeals Board (TTAB), concerning all Unix marks, Unix business, Unix goodwill and/or Unix intellectual property and concerning all pleadings in which AT&T, Berkley Software Design (BSD), University of California, Apple Computer, Inc., Novell, X/Open, SCO and/or USL are or were a party, including but not limited to the action titled Unix Systems Laboratories, Inc. v. Berkeley Software Design, Inc., No. 92-1667 (D.N.J.).

Objection to Request No. 25:  Novell incorporates its general objections and specifically objects to Request No. 25 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents.  Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 26:   Provide copies of all documents and all communications of any kind with respect to the third parties, excluding actual filings, concerning the action titled X/Open Company Limited v. Wayne R. Gray, USPTO TTAB Opposition Proceeding No. 122,524.

David L. Partlow, Esq.
May 21, 2004
Page 14

Objection to Request No. 26:  Novell incorporates its general objections and specifically objects to Request No. 26 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents.  Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Request No. 27:    Provide copies of all documents and all communications of any kind not produced above, concerning the Unix marks, Unix business, Unix goodwill and/or Unix intellectual property, including but not limited to all issues of AT&T's publication "$ Echo."

Objection to Request No. 27:  Novell incorporates its general objections and specifically objects to Request No. 27 as follows:  the request is overbroad, burdensome, and would impose undue hardship and expense on Novell and the request exceeds and is contrary to the scope of the discovery order entered by TTAB (see attached).  Novell also objects to the extent the request seeks information that is confidential, proprietary and/or subject to trade secret protection, the attorney-client privilege, and/or the work product doctrine.  Subject to its objections, Novell performed a keyword search of its computerized records of the files stored in boxes at its Provo warehouse/file center, which resulted in a Keyword Search Report listing 1,880 boxes with descriptions that indicate that the boxes listed *might* contain responsive documents.  Mr. Gray should narrow his requests in a manner that will reduce the number of responsive documents to a reasonable amount.

Sincerely,

*For:*    John P. Mullen

JPM/klm
Enclosure

cc:    Jim Lundberg, Esq., Associate General Counsel, Novell, Inc.
Ryan Tibbetts, Esq., Counsel for SCO, Inc.

# EXHIBIT 5

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD**

| | |
|---|---|
| X/OPEN COMPANY LIMITED,<br><br>       Opposer/Respondent,<br><br>    v.<br><br>WAYNE R. GRAY,<br><br>       Applicant/Petitioner. | Opposition No. 91122254<br>Application Serial No. 75/680,034<br>Mark: INUX |

## X/OPEN'S OPPOSITION TO GRAY'S MOTIONS TO COMPEL

Opposer X/Open Company Limited ("X/Open") opposes Applicant's Motion to Compel Discovery and Applicant's Motion to Test Sufficiency of Opposer's Responses to Admission Requests (collectively, "motions to compel") for failure to comply with Trademark Rules §§ 2.120(e), 2.120(h), and 2.127(a).

### I.    Introduction

X/Open requests that the Board deny the motions to compel filed by Applicant Wayne R. Gray ("Gray"), with prejudice, because Gray did not make a good-faith effort to resolve the issues presented in his motions, let alone include a statement that he did so in the untimely briefs filed in support of his motions, as required by TBMP §§ 523.02, 524.02; 37 C.F.R. §§ 2.120(e), (h).

X/Open further requests that the Board deny Gray's motions because the lengthy briefs in support of the motions were not filed with the motions, as required by TBMP § 502.02(b); 37 C.F.R. § 2.127(a), but instead were filed 10 days after Gray's motions.

X/Open also requests denial of Gray's briefs as they exceed the 25 page limit mandated by TBMP § 502.02(b); 37 C.F.R. § 2.127(a), as Gray's brief in support of his motion to compel

is 18 pages, with 53 pages of substantive "addenda," exclusive of several hundred pages of

exhibits, and Gray's brief in support of his motion to test X/Open's admission responses is 15

pages, with 67 pages of substantive "addenda," again exclusive of several hundred pages of

exhibits.

In the alternative, should the Board deem Gray to have acted in good faith in filing his

motions and briefs, accept the late filing of his briefs, and allow the briefs as not exceeding the

25 page limit, X/Open requests an additional 40 days to respond to Gray's allegations.

## II.    Facts

On August 23, 2004, the parties filed a joint request to extend the discovery and trial

dates in the opposition.  The request proposed setting December 29, 2004 as the close of

discovery and October 30, 2004 as the due date for X/Open's written discovery responses.  The

dates set forth in the stipulation were granted by the Board on September 17, 2004.

On November 1, 2004 (October 30 being a Saturday), X/Open timely served responses to

Gray's allegedly "limited" discovery requests (Exhibit A), i.e., 149 requests for admission, 49

document requests, and 26 interrogatories (over 75 with subparts), in accordance with the

parties' stipulation.

X/Open served supplemental responses to eight of Gray's requests for admission on

November 19, 2004 (Exhibit B).  At the same time, X/Open provided Gray with a draft

protective order to enable the parties to exchange confidential information, including the

confidential information of third parties (Exhibit C).  To date, X/Open has not received any

specific response to its draft protective order.

X/Open called Gray on December 3, 2004 to propose a further extension of the discovery

and trial dates to allow the parties additional time to produce documents and take depositions.

Gray agreed to the extension.

Hours later, on December 3, 2004, Gray responded to X/Open's discovery responses by claiming that X/Open had "waived" its right to object to Gray's discovery requests because it served responses to those requests on November 1, 2004 instead of 30 days after Gray first served those requests. Gray objected to X/Open's responses to Gray's admission requests in general terms, citing no specific examples of why he believed those responses were inadequate, saying only that "I began to go through these things one at a time to spell them out for you, but upon further reflection I believe we have a fundamental difference in our approach to discovery." Gray also objected to X/Open's responses to Gray's document requests indicating that, subject to X/Open's objections and entry of an appropriate protective order, X/Open would search for and produce responsive documents. Gray's counsel further alleged that a protective order was "unworkable" in this opposition, and threatened to file a motion to compel unless X/Open provided "full and complete" discovery responses, without any objections, by noon on December 8, 2004 (i.e., in less than three business days) (Exhibit D).

The very next day, on December 4, 2004, Gray indicated he had sent X/Open a draft stipulation to extend the discovery and trial dates in the opposition.

X/Open responded to Gray's draft stipulation and ultimatum by proposing changes in the wording of the stipulation and indicating that X/Open had not yet had a chance to fully consider Gray's letter of December 3, 2004, but would respond by December 10, 2004 (Exhibit E).

Gray sent X/Open a revised version of the stipulation to extend the discovery and trial dates on December 8, 2004, and X/Open filed the stipulation electronically on December 9, 2004. The stipulation proposed March 4, 2005 as the new date for the close of discovery, leaving the parties ample time to engage in further discovery.

On December 10, 2004, X/Open responded to Gray's letter of December 3, 2004. X/Open's response was sent by e-mail because Gray's fax machine continuously rang without

answer from before 5:00 p.m. until the time of the e-mail at 6:23 p.m.  X/Open pointed out that the October 30, 2004 deadline for responding to Gray's discovery requests was controlling with regard to Gray's "waiver" allegation, and that this case, like any other case, required a protective order to safeguard confidential information, including third-party confidential information. X/Open also responded to a request by Gray's counsel to show his client a third-party confidential document provided to Gray's counsel by SCO on the condition that it remain "attorney's eyes only" (i.e., a three-way agreement between X/Open, Novell, and SCO dispositive of Gray's allegation that Novell transferred the UNIX mark to SCO and not to X/Open), asking Gray's counsel why he could not simply explain the legal effect of this document to his client without actually showing a copy to his client (Exhibit F).

Less than an hour later, Gray faxed X/Open his motions to compel, adding that "I'll have to complete the supporting briefs this weekend, if I can" (Exhibit G).

In response, X/Open wrote to Gray on December 13, 2004, requesting that Gray withdraw his motions because they were not filed in good faith and contained no detailed explanation of the issues in dispute, and "propos[ing] that you specify your objections to X/Open's discovery responses, which you did not do in your 'motions' or your letter of December 3, instead of engaging in premature and unproductive motion practice" (Exhibit H).

On December 16, 2004, Gray's counsel wrote to X/Open, saying that X/Open could not reach him by fax on December 10, 2004 because "we are simply a small firm . . . and [our fax line] was tied up for quite some time that day," and acknowledging that he did not read X/Open's letter of December 10, 2004 until December 13, 2004.  Nevertheless, Gray's counsel alleged that "we have made the required good faith attempt, and we are willing to let the TTAB decide that issue" (Exhibit I).

X/Open served over 2,400 pages of documents on December 17, 2004 (Exhibit J), including what X/Open currently believes are all of documents in its possession, custody, or control concerning the post-Novell chain of title to the UNIX mark (with the exception of six confidential documents), X/Open's first UNIX specification, and the trademark attribution pages from Novell's and SCO's websites indicating that X/Open owns the UNIX mark.

On December 20, 2004, a full 10 days after the service of Gray's motions to compel and only 10 days before the due date for X/Open's responses to those motions, Gray filed overlength briefs in support of his motions, comprising 33 pages of "briefs," 120 pages of substantive "addenda" (53 pages for Gray's motion to compel and 67 pages for Gray's motion to test admission responses), and several hundred pages of exhibits. The briefs, for the first time, set forth Gray's specific objections to X/Open's discovery responses, primarily in the "addenda" to the briefs. Neither brief included a statement that Gray made a good faith effort to resolve the issues raised in the briefs before filing them.

## III.    Argument

### A.    Gray's Motions to Compel Should be Denied Because Gray Did Not Act in Good Faith Before Filing Them

Motions to compel and to test the sufficiency of admission responses "must be supported by a written statement from the moving party that such party or its attorney has made a good faith effort . . . to resolve with the other party or its attorney the issues presented in the motion, and has been unable to reach agreement. TBMP §§ 523.02, 524.02; 37 C.F.R. §§ 2.120(e), (h).

Gray alleges he acted in good faith in filing his motions, but conclusory allegations of good faith efforts to resolve discovery disputes are insufficient, particularly when the moving party merely propounds broad objections concerning the non-moving party's discovery responses, without any effort to engage in detailed negotiations. For example, in *Giant Food,*

*Inc. v. Standard Terry Mills, Inc.,* 231 U.S.P.Q 626 (T.T.A.B. 1986), the Board explained that it

denied a motion compel in an earlier opinion because:

> [T]he only evidentiary support of *applicant's efforts* submitted by
> applicant with its motion to compel consisted of a copy of a . . .
> [single] letter to opposer's counsel in which applicant characterized
> opposer's responses to certain interrogatories as "non-responsive"
> and the response to another interrogatory as "manifestly evasive".
> Absent additional documentation or other information indicating
> that a good faith effort was in fact made, the Board was well within
> its discretion in denying the motion.

*Id.* at 632 (emphasis in original).

Likewise, Gray's objections, contained in a single letter, were extremely vague (at least

until the service of his untimely briefs), providing no details about Gray's objections to

X/Open's discovery responses and, as such, affording X/Open no opportunity to engage in any

meaningful dialog concerning those objections. Gray, in fact, admitted that he had not even gone

through each of X/Open's discovery responses, clearly demonstrating he had no interest in

resolving his objections through negotiations. It is accordingly of no surprise that Gray can point

to no specific example of a good faith attempt to resolve the issues presented by his motions.

Further, where a discovery dispute exists, the parties are under an obligation to resolve

them, or at least attempt to narrow them, before they burden the Board with motions to compel.

As the Board has admonished:

> [W]here the parties disagree as to the propriety of certain requests
> for discovery, they are under an obligation to get together and
> attempt in good faith to resolve their differences and to present to
> the Board for resolution only those remaining requests for
> discovery, if any, upon which they have been unable, despite their
> best efforts, to reach an agreement. Inasmuch as the Board has
> neither the time nor the personnel to handle motions to compel
> involving substantial numbers of requests for discovery which
> require tedious examination, it is generally the policy of the Board
> to intervene in disputes concerning discovery, by determining
> motions to compel, only where it is clear that the parties have in
> fact followed the aforesaid process and have narrowed the amount

of disputed requests for discovery, if any, down to a reasonable
number.

*Sentrol, Inc. v. Sentex* Systems*, Inc.,* 231 U.S.P.Q. 666, 667 (T.T.A.B. 1986) (noting that

applicant "refused to discuss the discovery dispute or even the proposed protective order to

which applicant has objected without raising any specific objections). Gray followed no such

process of attempting to resolve or narrow his objections.

At the very least, a party is under an obligation to wait for a response to its demands

before burdening the Board. *Sentrol* at 667 (motion to compel denied, in part, because movant

"did not even wait for a reply thereto before filing its motion to compel."). Gray failed to meet

even this minimum standard, opting to file his motions on the evening that X/Open said it would

respond to his objections without checking his e-mail or clearing his fax line (which he knew

was "tied up for quite some time that day").

Gray was clearly more interested in filing his motions than resolving, let alone

narrowing, his alleged objections through negotiations with X/Open, and his motions should be

denied because has not acted with the good faith required by the Board.

**B.     Gray's Motions to Compel Should be Denied Because They Were Not Served
        with Briefs Supporting His Allegations**

Pursuant to TBMP § 502.02(b); 37 C.F.R. § 2.127(a), "Every motion must embody or be

accompanied by a brief."

Combining motions and briefs gives the non-moving party notice of the details of the

moving party's allegations. Gray, however, did not file his briefs until December 20, 2004 (i.e.,

10 days after his motions to compel were served on December 10, 2004). The late filing of

Gray's briefs on December 20, 2004 denied X/Open any opportunity to understand Gray's

objections before that time and left X/Open a mere 10 days to respond those objections.

Gray ignored the Board's requirement that motions must be accompanied by briefs, and his motions should be denied because of the prejudice created by his late filings.

### C.    Gray's Briefs Should be Rejected Because They Grossly Exceed the 25 Page Limit

Although "[e]xhibits submitted with the brief are not counted in determining the length of the brief," briefs in support of motions "may not exceed 25 pages in length." TBMP § 502.02(b); 37 C.F.R. § 2.127(a).

The 120 pages of substantive "addenda" attached to Gray's briefs are not exhibits. They constitute substantive argument outlining Gray's objections to virtually every one of X/Open's discovery responses and constitute an integral part of Gray's briefs, but are presented separately to circumvent the 25 page limit. When the "addenda" are counted, Gray's motion to compel is 71 pages, and Gray's motion to test X/Open's admission responses is 82 pages.

Gray's briefs are grossly overlong, and should be denied for so excessively violating the Board's page limit.

## IV.    Conclusion

For the above reasons, X/Open respectfully requests that Gray's motions to compel be denied, with prejudice, or that, in the alternative, X/Open be given an additional 40 days from the date of the Board's decision to respond to the allegations in Gray's briefs.

Respectfully submitted,

Date:  December 30, 2004

By: _____

Mark Sommers
Evan A. Raynes
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, D.C. 20005-3315

Attorneys for Opposer

# EXHIBIT 6

1

2

3

4                  IN THE UNITED STATES DISTRICT COURT

5           FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

6

7                                              COPY

8

9    _____
                                    )
10   THE SCO GROUP,                 )
                                    )
11                                   )
                                    )
                  Plaintiff,        )
12                                   )
         vs.                         )    Case 2:04-CV-139
13                                   )
                                    )
14   NOVELL, INC.,                  )
                                    )
15                  Defendant.       )
                                    )
16   _____        )

17

18          BEFORE THE HONORABLE DALE A. KIMBALL

19                      MAY 11, 2004

20          REPORTER'S TRANSCRIPT OF PROCEEDINGS

21                    MOTION HEARING

22

23

24

25        Reported by:  KELLY BROWN, HICKEN CSR, RPR, RMR

```
 1                         A P P E A R A N C E S
 2    FOR THE PLAINTIFFS:    HATCH, JAMES & DODGE
 3                           BY: BRENT O. HATCH
 4                               MARK R. CLEMENTS
 5                           Attorney at Law
 6                           10 West Broadway, Suite 400
 7                           Salt Lake City, Utah  84101
 8
 9                           RYAN E. TIBBITTS
10                           SCO GROUP
11                           Attorney at Law
12                           335 South 520 West, 100
13                           Lindon, Utah  84042
14
15    FOR THE DEFENDANT:     MORRISON & FOERSTER
16                           BY:  MICHAEL A. JACOBS
17                                Attorney at Law
18                           425 Market Street
19                           San Francisco, CA  94105-2482
20
21                           ANDERSON & KARRENBERG
22                           BY:  JOHN P. MULLEN
23                                Attorney at Law
24                           50 West Broadway, Suite 700
25                           Salt Lake City, Utah  84101
```

1    THE COURT:  I'd be happy with any help.

2    MR. JACOBS:  May I approach?

3    THE COURT:  Sure.

4    MR. JACOBS:  So I guess I should start out by saying we

5    wouldn't be here if there was a document that SCO had adduced

6    or told you they would adduce that says, "Novell, hereby,

7    transfers the UNIX copyright to SCO."  "Seller, hereby,

8    transfers the UNIX copyright to buyer."  They have not adduced

9    such a writing.

10    One of the questions that comes up in this case is,

11    what did SCO get?  Or as Mr. Hatch put it, how is it possible

12    that for the last eight years parties have been surviving

13    without a copyright dispute arising?  SCO attribute it to a

14    change in management of Novell; we attribute it to a change of

15    business strategy at SCO, one not contemplated by the original

16    agreement.

17    Asset purchase agreement, let's start with the

18    recitals.  This will be important because the term business is

19    defined there.

20    Seller is engaged in a business of developing a

21    line of software products currently known as UNIX and

22    UnixWare.

23    Now let me stop a minute because this gets a little

24    tricky.  UNIX and particularly UNIX System V Release X or

25    SVRX.  UNIX System V Release X was the unit that Novell itself

1    acquired from AT&T Unit System Laboratories, or USL, just a

2    few years before the APA.  UnixWare is a derivative of that, a

3    software program that Novell wrote to try and make UNIX

4    inter-operate well with NetWare, Novell's flagship product.

5          When we talked about UNIX, we're talking about

6    legacy, a legacy program and legacy licenses and a business

7    that by the time the asset purchase agreement, as I'll show

8    you, is from the standpoint of Novell and the acquirer here

9    essentially static.

10          In B, the recitals go on to say that certain assets

11   related to the business are going to be acquired.  So they're

12   not going to acquire, quote, the business, unquote; they're

13   going to acquire certain assets.

14          And then we get to 1.1(A) down at the bottom of the

15   first page, and that is the provision of the promise to convey

16   or the promise to assign, harking back to our distinction

17   between an actual conveyance or promise to convey, this is a

18   promise to convey.

19          At closing date, the seller will convey, et cetera,

20   the included assets -- and if you read across to the next page

21   stating rather the obvious, they're not going to transfer the

22   excluded assets.  We're going to transfer the included assets.

23   We're not going to transfer the excluded assets.

24          Now, we noted in our opening paper, and SCO did not

25   respond to this point, that there is a document -- there is a

1    closing that takes place, and there's documents in any big

2    transaction like this at a closing.

3         THE COURT:  When you say the opening papers, you mean on

4    the motion to dismiss.

5         MR. JACOBS:  Correct.  One of the earlier footnotes.

6         So something happens at the closing, and what

7    happens at the closing is the included assets get transferred,

8    the excluded assets don't.

9         So now flip ahead to, I believe, it is the black

10   clip.

11        THE COURT:  Schedule 1.1(A)?

12        MR. JACOBS:  Exactly.  And this is -- the

13   Schedule 1.1(A) and 1.1(B) are the schedules referred to in

14   that provision right there I just pointed you to.  And the

15   first line is the line that SCO points to:

16        All rights and ownership of UNIX and UnixWare.

17        And that sounds pretty broad.  All rights in UNIX

18   and UnixWare.  And they like that language.

19        Now, if you go to the next page, the page marked

20   Page 34, we're still in the included assets.  We're still in

21   Schedule 1.1(A).  And if you go down to Roman V, there's a

22   heading there for intellectual properties.  So we're still in

23   the included assets.  What intellectual property is being

24   conveyed to SCO in this agreement?  And the answer is a couple

25   trademarks.  No copyrights are shown.  No patents are shown.

1    Just a couple trademarks.

2              Now, if you flip ahead to the excluded assets list,

3    Schedule 1.1(B), you'll see a Roman V there, kind of a

4    parallel provision, right?  Intellectual excluded assets.

5              All copyrights and trademarks except for the

6         trademark UNIX and UnixWare.

7              So we have a mirror image provisions here, the

8    excluded assets, included only -- when it comes to IT, it

9    included UNIX and UnixWare.  The excluded assets include

10   everything.  You see all patents there, of course, except for

11   the trademark UNIX and UnixWare.  So as of the closing, we're

12   plainly not transferring copyrights, and I don't think there's

13   any serious dispute about that.

14             What, then, does SCO get out of this?  If they

15   don't get the copyrights, what do they get?  And I want to

16   turn you now to Article 4 of the agreement, because this is

17   where a lot of the interesting provisions of this agreement

18   come in, and particularly Section 4.16.

19             So this is the heading SVRX licenses.  And as I

20   mentioned, SVRX refers to the legacy business, UNIX System V,

21   SV, Release X, X standing for any numeral.  And it's

22   important, first of all, in 4.16(A) to see what SCO doesn't

23   get with respect to UNIX System V Release X, because in

24   4.16(A), what SCO has with respect to those rights is the

25   rights to administer those legacy licenses remitting

1    STATE OF UTAH          )

2                            ) ss.

3    COUNTY OF SALT LAKE   )

4           I, KELLY BROWN HICKEN, do hereby certify that I am

5    a certified court reporter for the State of Utah;

6           That as such reporter, I attended the hearing of

7    the foregoing matter on May 11, 2004, and thereat reported in

8    Stenotype all of the testimony and proceedings had, and caused

9    said notes to be transcribed into typewriting; and the

10   foregoing pages number from 3 through 45 constitute a full,

11   true and correct report of the same.

12          That I am not of kin to any of the parties and have

13   no interest in the outcome of the matter;

14          And hereby set my hand and seal, this 24th day of

15   June 2004.

16

17

18

19

20   _____

21        KELLY BROWN HICKEN, CSR, RPR, RMR

22

23

24

25

# EXHIBIT 7

Gateway Tower West
15 West South Temple, Suite 900
Salt Lake City, Utah 84101

Facsimile (801) 537-1799
Utah Valley (801) 373-5600

# MADSON  METCALF

Wesley L. Austin
Shareholder

Registered Patent Attorneys
www.mmlaw.com

November 3, 2004

**Via Facsimile (813) 287-8234**
**Confirmation Via U.S. Mail**

David L. Partlow
Josiah E. Hutton
Transworld Center, Suite 210
4100 West Kennedy Blvd.
Tampa, FL 33609-2244

CONFIRMATION COPY

      RE:    SCO Group Deposition/Document Requests
               TTAB Opposition No. 91/122,524
               Our File No.: 3412.7.4

Dear Mr. Partlow:

This letter is written in response to your letter of October 20, 2004 and your follow-up email of October 27, 2004. You requested permission from The SCO Group ("SCO") to share the Confirmation Agreement (marked as attorneys' eyes only) with your client. SCO is willing to give you its permission to share that document with your client provided that (a) only your client, Wayne Gray, has access to the document on a confidential basis, and (b) both Novell and X/Open also consent to this disclosure.

We would also like to hold a brief telephone conference with you regarding the 30(b)(6) deposition and accompanying document requests. Please contact me or my associate Matt Bethards at your convenience to let us know when you are available.

Please do not hesitate to contact me if you have any further questions regarding this matter.

Sincerely yours,

MADSON & METCALF

Wesley L. Austin

WLA:MSB:mjm
cc: The SCO Group (RT, JB)
\\Mmserver\shared\ALLCLIENTS\3412 SCO\X-Open Co - Gray TTAB proceeding\correspondence\Paltrow_ltr_11-3-04.doc

# EXHIBIT 8



**FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP**

1300 I Street, NW ▪ Washington, DC 20005-3315 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

EVAN A. RAYNES
202.408.4114
evan.raynes@finnegan.com

December 10, 2004

David L. Partlow, Esq.                                   **VIA FACSIMILE**
David L. Partlow, P.A.
4100 W. Kennedy Blvd., Suite 210
Tampa, Florida 33609-2244

       X/Open Company Limited v. Wayne R. Gray
       U.S. Trademark Opposition No. 91122524

Dear Mr. Partlow:

      This responds to your letter of December 3, 2004 concerning X/Open's discovery responses.

     1.     Allegations of "Waiver"

      We are at a complete loss to understand why you believe we have "waived" our right to make discovery objections.

      Your letter of August 11 could not have possibly "required" X/Open to serve responses to Gray's discovery requests within 30 days (i.e., by September 10). That letter was not a formal discovery request, only a modification or deletion of 20 of 165 original requests for admissions, 5 of 49 original requests for documents, and 3 of 26 original interrogatories (not including subparts). Nor did your letter set any deadline for responding to Gray's discovery requests, whether revised or not.

      Indeed, your letter stated that your revisions "do not withdraw, replace or supercede any prior discovery requests . . . except as specifically noted in Attachment A [the list of revised requests]," clearly leaving intact the due date for X/Open's discovery responses.

      Moreover, in your letter, you agreed to a 120-day extension of discovery, provided X/Open agree to "a 60 day period at a minimum beyond any response due for [X/Open's] submission of answers to [Gray's] discovery requests." Again, your letter clearly contemplated leaving intact the due date for X/Open's discovery responses.

      Most strikingly, as you know, on August 23, the parties filed a joint stipulation to extend discovery, stating that X/Open's written discovery responses would be due on October 30, unequivocally demonstrating that both X/Open and Gray contemplated X/Open serving its discovery responses on *that* date, not September 10. As you also know, the stipulation was

FINNEGAN
HENDERSON
FARABOW
GARRETT&
DUNNER LLP

David L. Partlow, Esq.
Page 2

approved by the Board on September 17, formally ordering X/Open's discovery responses due on October 30, 2004.

How you can now claim that we have somehow waived our right to object to Gray's discovery requests, ostensibly because of a letter modifying or deleting 28 of 242 original requests and not saying anything about the deadline for responding to those requests, is beyond us. X/Open's responses to Gray's discovery requests were in fact timely served on October 30, 2004, under the terms of the parties' stipulation and the Board's order.

We also do not see how X/Open's confidentiality objections are waived because a protective order is not yet in place, or that X/Open's privilege objections are waived because neither side has yet produced a privilege log. As you know, discovery is not yet closed. In fact, the parties recently filed a stipulated 60-day request for extension of discovery. Further, on November 19, 2004, we sent you a draft Stipulated Protective Order, and to date we have not heard from you regarding the proposed order. Instead of making unfounded accusations of delay and waiver, we propose you work with us in good faith to finalize a protective order that will protect both parties' interests and set dates for the production of privilege logs, the taking of depositions, and other matters.

You ask for "full and complete" responses to Gray's discovery requests. However, as you are well aware, X/Open has already provided timely and detailed written responses to Gray's voluminous requests and, as stated in our telephone conference last week, we will begin producing documents in the near future (hopefully by the end of next week). Moreover, we note that the Board has held that the "Trademark Rules of Practice do not require that the actual production of documents occur prior to the close of the discovery period." Nobelle.com LLC v. Qwest Communications International Inc., 66 USPQ2d 1300, 1308 n.6 (TTAB 2003). Although a party must produce responsive documents prior to trial, there is no requirement that documents be produced within the deadline for serving written responses to discovery or prior to the close of the discovery period. Id. We will begin by producing non-confidential documents, assuming a protective order cannot be worked out. Any confidential documents will be produced only upon entry of a suitable Stipulated Protective Order.

We ask that you also produce documents as soon as feasible and, in any event, well in advance of any deposition of your client. You claim that Gray has produced 2,500 pages of documents but, as far as we can tell, those documents do not relate to Gray's counterclaims.

We will of course vigorously defend any motion to compel the production of X/Open's discovery responses without any objections for the reasons stated above.

2.    Protective Order

You claim that a protective order would be unworkable in this case because "it is he [your client] who must make the ultimate decisions in this case, and he cannot be expected to do so without being fully informed." That is no different than the situation in any other case. The client always makes the ultimate decisions, but that does not mean the client is entitled to

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

David L. Partlow, Esq.
Page 3

unrestricted access to the other party's highly confidential information. In almost all cases, at least some information is treated as highly confidential and restricted to outside counsel to protect the producing party's interests. Those interests are compounded in this case, where X/Open is responsible for the integrity of certain third-party confidential information. Further, it is certainly possible for you to keep your client "fully informed," as you say, without your client having access to highly confidential information.

Under the terms of our draft protective order, if you do not believe that a particular document produced by X/Open is, in fact, highly confidential, you are entitled to bring the matter to our attention and, failing agreement, move the Board to reclassify the document. We believe this procedure is a reasonable way to protect both parties' interests. We do not believe it is reasonable for you to have unrestricted access to highly confidential information simply because such access would be convenient for your client.

3.    Confirmation Agreement

You previously asked whether you could show your client the X/Open-Novell-SCO Confirmation Agreement attached to your letter of December 2. Given that this document is not only confidential to X/Open, but is also confidential to Novell and SCO (as you know, each page bears the legend "SCO-Novell-X/Open Proprietary, Not for Disclosure to Third Parties"), this document must be restricted to outside counsel. X/Open does not have the right to authorize your client to see this document for the simple reason that it contains information confidential to others.

You have stated that you must be able to show this document to your client for him to evaluate how it effects this case. However, you have not explained why you cannot describe the legal effect of this documents to your client without showing him the document or revealing the contents of the document. Nor have you provided any other justifiable reasons why this document should be disclosed to your client.

Sincerely,

Evan A. Raynes

EAR/abm

cc:    Mark Sommers, Esq.

# EXHIBIT 9

DAVID L. PARTLOW, P.A.
ATTORNEYS AT LAW

TRANSWORLD CENTER, SUITE 210
4100 WEST KENNEDY BOULEVARD
TAMPA, FLORIDA 33609-2244

(813) 287-8337 ● FAX (813) 287-8234

## FACSIMILE MESSAGE

**DATE:** February 17, 2005

**TO:**   JOHN P. MULLEN, ESQ.         **OF**   ANDERSON & KARRENBERG
**FAX NO.:**   801-364-7697           **# OF PAGES, INCLUDING COVER:**   1
**RE:**   NOVELL DEPOSITION
**FROM:**   DAVID L. PARTLOW, ESQUIRE         **FILE NO.:**   2183

THE FOLLOWING MAY BE PRIVILEGED ATTORNEY INFORMATION, AND IS INTENDED FOR THE ADDRESSEE ONLY.  IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT USE OR DISSEMINATION OF THIS INFORMATION IS NOT PERMITTED.   IF THIS COMMUNICATION HAS BEEN MISDIRECTED, PLEASE CALL THE ABOVE NUMBER IMMEDIATELY.

MESSAGE:

Do you have an individual e-mail address, or should I use the firm address on your letterhead? The confidential "Confirmation Agreement" is 3 pages, and the transmittal memo is a single page, and I could scan them.

The confidential "Confirmation Agreement" of 1996 is definitely not the Novell-SCO Asset Purchase Agreement (APA) of 1995—that document is public, and is even published, at least in large part, on SCO's website; indeed, being publicly traded, it is hard to imagine how SCO would be able to hide such a purchase from the SEC and its shareholders. It seems peculiar that any question would now arise regarding such identification. You (not I) first brought this item up in your letter of May 21, 2004 in which you stated, near the top of page 2, that you had been in contact with attorney Ryan Tibbitts of SCO, and that he was furnishing documents that would resolve Mr. Gray's claim, although you conceded that Mr. Gray might not be so convinced himself.  I also discussed it briefly with your associate, Jennifer Eshelman, in connection with the planned deposition of Novell.   You and I again discussed those two documents—together with a half-dozen others—that Novell was to search for, on or about December 3, 2004. When I didn't hear anything from you, I again called and left a message on December 16, 2004 in which I specifically referred to the permission request for showing those two documents to my client, as well as the status of the search for the very narrowly defined group of other documents.   That call was repeated again last month, and you indicated that you would get back to me within a week.

2

I don't think there was any mistake on February 15, 2005 when you gave your permission for me to show the Confirmation Agreement—referred to by that name—and its transmittal memo to my client, so long as it remained confidential and so long as the other two parties to it did not disagree. To say that it might have been mistaken for the APA is to say that X/Open had a hand in and was a party to the APA. Nonetheless, I'll try to get you a scanned copy.

# EXHIBIT 10

**From:**   Evan Raynes
**To:**     dlppa@mindspring.com
**Date:**   2/18/2005 12:58:17 PM
**Subject:** Re: UNIX opposition

---

Dear David:

We emphatically disagree that our letter of December 10 means you can show the Confirmation Agreement to your client if SCO and Novell agree. Had that been our intention, we would have said so explicitly, and we did not. In fact, we pointed out that this document is confidential to all three parties. Obviously, that includes X/Open. Nowhere in that letter, or in any other communication, have we stated that X/Open authorizes you to show this document to your client.

For you to parse the language in our letter of December 10 to mean that we have authorized you to disclose the Confirmation Agreement to your client, when we never explicitly authorized any such disclosure and reiterated that this is the case, both in our e-mail of February 16 and this e-mail, is disingenuous.

Moreover, your attempt to impose an arbitrary deadline of Friday at 5:00 to receive a response from our client (less than 48 hours) is completely unacceptable. We have not been able to obtain instructions from our client on such short notice and, once again, without X/Open's explicit authorization to show the Confirmation Agreement to your client, you are not authorized to do so.

Given your apparent intention to show this document to your client at 5:00, we request your immediate assurance that you will not do so unless and until you receive authorization from X/Open. If you do not immediately provide us with such assurance, we will request a telephone conference with the Board to obtain an emergency protective order.

We do not wish to impose any unreasonable deadlines in this matter, but given the 5:00 deadline that you have imposed yourself, we have no choice but to request an answer no later than 3:00 today, absent which we will contact the Board.

Finally, we note that, while you state you have received SCO's and Novell's authorization to show the Confirmation Agreement to your client, we have no written proof of such authorization, and request you provide such proof so we have all that facts when we discuss this matter with X/Open. Nor have we ever received any response to our request for you to articulate why your client needs access to this document, and again request you provide us with your stated justification.

We suggest that, instead of threatening to unilaterally declassify documents, you simply sign the draft protective order, which as you know would allow you to move the Board to declassify any document you believe is incorrectly classified.

We are faxing you a copy of this e-mail to ensure you receive it.

We look forward to your prompt reply.

Sincerely,


Evan A. Raynes
Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.
1300 I Street, N.W.
Washington, D.C. 20005-3315
Telephone: 202.408.4114
Facsimile: 202.408.4400

* * * * * * * * * * * * * * * * * * * * * * * * *

This email message and any attachments are for the sole use of the intended recipient and may contain confidential or privileged information.  Any unauthorized review, disclosure, or distribution is prohibited.  If you are not the intended recipient, please inform me of the error by telephone or e-mail and destroy all copies of the original message and any attachments.

* * * * * * * * * * * * * * * * * * * * * * * * *

>>> "David L. Partlow" <dlppa@mindspring.com> 02/16/05 04:42PM >>>

I believe you have already given X/Open's permission to show the documents in question to my client, contingent upon permission from the other 2 parties.  By stating that there was a "simple reason" in that the agreement contained information sensitive to the other two parties, you indicated that this was the only reservation you had. Of course, that has now been resolved in favor of disclosure.  Nonetheless, I will wait until 5:00 p.m. on Friday to accommodate your request.

/s/ David L. Partlow

# EXHIBIT 11

**From:**   John P. Mullen
**To:**     dlppa@mindspring.com
**Cc:**     Evan.raynes@finnegan.com; John P. Mullen
**Date:**   2/23/2005 2:03:26 PM
**Subject:** RE: UNIX mark

David:

You informed me that the document was subject to an attorneys eyes only condition, and that you wanted your client to see it to aid in his own case. That's fine. We agree he can see it for that purpose. We never agreed that the attorneys eyes only ban could be lifted in its entirety, only that we would allow it to be lifted for your client to look at the document so you could discuss it with him and prepare your case. "Treat it in confidence" to me means that your client doesn't disclose it to anyone else or use it for any other purpose. It stays subject to the attorneys eyes only condition, with that single exception, ie, your client can look it. Our agreement was also subject to X-Open giving its consent. If X-open hasn't consented, that is something you need to resolve. I don't want to get in the middle of this argument. You and X-Open have to work out X-Open's consent. If that consent is contingent on a Protective Order, that's not my concern.

**CONFIDENTIALITY NOTICE: Unauthorized Interception or Review is Prohibited by Federal law [Electronic Communications Privacy Act of 1986, 18 U.S.C. 2701(a) and 2702(a)] THIS E-MAIL CONTAINS CONFIDENTIAL AND PRIVILEGED COMMUNICATIONS. IF YOU ARE NOT THE INTENDED RECIPIENT, SEND THIS MESSAGE BACK TO ITS ORIGINATOR AND DELETE ALL COPIES.**
**John P. Mullen**
**jmullen@aklawfirm.com**
**801-534-1700**
**Anderson & Karrenberg**
**50 West 300 South Suite 700**
**Salt Lake City, Utah 84101**

-----Original Message-----
**From:** David L. Partlow [mailto:dlppa@mindspring.com]
**Sent:** Wednesday, February 23, 2005 11:49 AM
**To:** John P. Mullen
**Subject:** UNIX mark

*Exhibit I*

If you've just spoken to Evan Raynes, then you know that X/Open's present position is that I can't show the Confirmation Agreement to my client, although it is my position that they gave their permission, contingent upon certain conditions that have now been met, in writing on December 10, 2004. But since they have raised the issue, I have not yet shown it to my client. We had a telephonic hearing about this specific issue yesterday, and it is being briefed on a very short fuse to the TTAB now. I expect we will have a decision within about 10 days or less. SCO has given it's consent, on the terms discussed in detail below.

Have you received the electronic copy of the Confirmation Agreement and its transmittal memo that I sent to you?

Our discussions resulted in an understanding that my client could see it if (a) he agreed to treat it in confidence and (b) the other two parties to the Confirmation Agreement similarly agreed. This was conveyed to you in my faxes of Feb. 16 and 17, and again on Feb. 18, 2005 in my e-mail message to you. There was no mention of a confidentiality order either in our discussions

or in those confirming messages.  My client, Mr. Gray (the applicant in our case) understands the legal ramifications of confidentiality, and will not make any further disclosure of that document absent some other unanticipated event such as a court order requiring disclosure.  He is not about to risk his case for something like that.

It appears that Mr. Raynes is worried that the TTAB will allow my client to see the document in question, and therefore is now trying a "back door" approach through you, possibly for a second time.  After giving your permission, on behalf of Novell, on Feb. 15, I confirmed it by fax the following day, and also notified Evan Raynes of the same thing.  Then I got a faxed letter from you later the same day claiming that you had thought we had been talking about the Novell-SCO Asset Purchase Agreement, a 2-party agreement, instead of the 3-party Confirmation Agreement.  The timing certainly doesn't appear coincidental.  I replied in a 2-page fax on Feb. 17 which explained quite clearly what document was the subject of our discussion, and also reiterated quite clearly in the final paragraph the conditions under which my client could see the document.  You called back and for a second time gave permission on behalf of Novell, under the conditions specified, and I again confirmed that the following day, as noted above.  As a result of Mr. Raynes' call today, are you now backing down for a second time?

/s/ David L. Partlow

# EXHIBIT 12

**TRADEMARK LAW OFFICE 105**
**Serial Number 78/438,912**
**Mark: UNIX SYSTEM LABORATORIES**

CERTIFICATE OF MAILING

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Commissioner for Trademarks, P. O. Box 1451 Alexandria, VA 22313-1451, on August 3 , 2005.

Attorney for Applicant

**TRADEMARK APPLICATION**
Docket No.: 3412.3.1

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicant: | The SCO Group, Inc. | ) |
| | | ) |
| Serial No.: | 78/438,912 | ) |
| | | ) |
| Filed: | June 21, 2004 | ) Trademark |
| | | ) Law Office |
| Mark: | UNIX SYSTEM LABORATORIES | ) 105 |
| | | ) |
| International | | ) |
| Class No.: | 009 | ) |
| | | ) |
| Trademark Attorney: | Anne Farrell | ) |

### <u>RESPONSE TO OFFICE ACTION</u>

Commissioner for Trademarks
P. O. Box 1451
Alexandria, VA 22313-1451

Dear Sir:

The Applicant respectfully submits this paper in response to issues raised by the Examining Attorney in an Office Action mailed on February 3, 2005. In the Office Action, the Examining Attorney refused registration of the present application based upon a finding that Applicant's mark, "UNIX SYSTEM LABORATORIES" is likely to cause confusion with

Page 1 of 4



08-05-2005
U.S. Patent & TMOfc/TM Mail Rcpt Dt. #51

Registration Nos. 1390593, 1392203, 1845474, and  for the marks "UNIX" and "UNIXWARE" (herein "the cited registrations").   Additionally, the Examining Attorney also requested that the Applicant disclaim certain portions of the mark and amend the description of the goods.   By this paper, Applicant respectfully responds to the issues raised in the Office Action.   In light of this submission, Applicant's application should be passed on for publication.

## I.    DESCRIPTION OF THE GOODS

Applicant wishes to prosecute this application as multiple-class application.   Please amend the above-referenced application to include the following identification of goods and services:

> Class 9
> "Computer software, namely, computer operating system software, computer language compilers, and translators; computer networking software; transaction processing software; graphical user interface software; computer graphics software; computer applications software; data management software;  software development tools and environments; computers and computer hardware."

> Class 42
> "Providing web services, namely, providing web-based computer programs so that users or other web-based computer programs can dynamically interact with the web-based computer programs."

Applicant recognizes that the amended description of goods converts the present application into a "multi-class application."   Accordingly, Applicants have enclosed a Credit Card Payment Form in the amount of three hundred seventy five dollars ($375.00) representing the additional filing fee.   Of course, should there be any problems with the payment, the Commissioner is hereby authorized to charge any underpayment of the fees, or credit any overpayment, to Deposit Account Number 13-0763.

In light of these changes, Applicant submits that the description of goods/services is proper. Withdrawal of this objection is respectfully requested.

## II.    DISCLAIMER

Please amend the present application to include the present disclaimer:

> No claim is made to the exclusive right to use "SYSTEM LABORATORIES" apart from the mark as shown.

The above-recited disclaimer is submitted in response to the Examiner's request. Accordingly, withdrawal of this objection is respectfully requested.

## III.    LIKELIHOOD OF CONFUSION REJECTION

In the Office Action, the Examining Attorney refused registration of the present application based upon a finding that Applicant's mark, "UNIX SYSTEM LABORATORIES" for computer software is likely to cause confusion with Registration No. 1,390,593 for UNIX, Registration No. 1,392,203 for UNIX, Registration No. 1,845,474 for UNIXWARE and Registration No. 2,241,666 for UNIXWARE. Because an owner of these marks has now become part of Applicant, this trademark application should be passed on to publication.

Registration No. 1,390,593 for UNIX had an owner of UNIX SYSTEM LABORATORIES. Registration No. 1,392,203 for UNIX had an owner of UNIX SYSTEM LABORATORIES. Registration No. 1,845,474 for UNIXWARE had an owner of UNIX SYSTEM LABORATORIES. Registration No. 2,241,666 for UNIXWARE had an owner of UNIX SYSTEM LABORATORIES. Because an owner of these marks (namely, UNIX SYSTEM LABORATORIES) has now become part of Applicant, this trademark application should be passed on to publication.

TRADEMARK LAW OFFICE 105
Serial Number 78/438,912
Mark: UNIX SYSTEM LABORATORIES

Because UNIX SYSTEM LABORATORIES is now part of the Applicant, this trademark should be sent on to publication. In 1992, Novell purchased UNIX SYSTEM LABORATORIES and all of the UNIX assets, including all trademarks owned by UNIX SYSTEM LABORATORIES. In 1995, The Santa Cruz Operation, Inc. purchased all of the UNIX assets from Novell. As part of the transaction, Novell assigned the UNIX and UNIXWARE trademarks to The Santa Cruz Operation. In 2001, The Santa Cruz Operation completed the sale of, inter alia, the UNIXWARE technologies to Caldera Systems, Inc. Caldera subsequently changed its name to The SCO Group. Because of this, the mark should be allowed to go on to publication.

## IV.    CONCLUSION

Based on the foregoing amendment and remarks, the Applicant respectfully asserts that Applicant's mark, "UNIX SYSTEM LABORATORIES", should be passed on for publication. If there remains any further impediment to registration that could be clarified in a telephone interview, the Examining Attorney is invited to initiate the same with the undersigned.

Respectfully submitted,

Wesley L. Austin
Reg. No. 42,273
Attorney for Applicant

Date: August 3, 2005

MADSON & METCALF
Gateway Tower West
15 West South Temple, Suite 900
Salt Lake City, Utah 84101
Telephone: (801) 537-1700
Fax: (801) 537-1799

# EXHIBIT 13

MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
Grant L. Kim (pro hac vice)
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

ANDERSON & KARRENBERG
Thomas R. Karrenberg, #3726
John P. Mullen, #4097
Heather M. Sneddon, #9520
700 Chase Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone: (801) 534-1700
Facsimile: (801) 364-7697

**Attorneys for Defendant and Counterclaim-Plaintiff Novell, Inc.**

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation,<br><br>    Plaintiff and Counterclaim-Defendant,<br><br>vs.<br><br>NOVELL, INC., a Delaware corporation,<br><br>    Defendant and Counterclaim-Plaintiff. | **MEMORANDUM IN SUPPORT OF NOVELL'S MOTION FOR SUMMARY JUDGMENT ON SCO'S FIRST CLAIM FOR SLANDER OF TITLE AND THIRD CLAIM FOR SPECIFIC PERFORMANCE**<br><br>*[REDACTED pursuant to the August 2, 2006 Stipulated Protective Order]*<br><br>Case No. 2:04CV00139<br><br>Judge Dale A. Kimball |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iv

I.      STATEMENT OF ISSUES ....................................................................1

II.     INTRODUCTION .................................................................................1

III.    STATEMENT OF UNDISPUTED FACTS ...........................................3

      A.      The APA Expressly Excluded "All Copyrights" from the Assets to
            be Transferred by Novell to Santa Cruz. .................................................3

      B.      Novell Deliberately Excluded Copyrights from the Transferred
            Assets to Protect its Right to Receive SVRX and UnixWare
            Royalties and its Continuing Interest in the UNIX Business.................5

      C.      The Lists of Transferred Assets Were Revised to Include a
            Copyright Exclusion and Then Exchanged By the Parties Before
            the APA Was Signed. .............................................................................9

      D.      Amendment No. 1 Made Further Revisions to the Lists of
            Transferred Assets, But Not to the Copyright Exclusion. ....................12

      E.      The Bill of Sale Transferred Only the Assets Identified in the
            APA and Amendment No. 1, Which Did Not Include Copyrights.......12

      F.      Amendment No. 2 Revised the "Excluded Assets" Provision, But
            Did Not Transfer Ownership of Copyrights or Specify Which
            Copyrights Might Be "Required" for the UNIX Business....................13

      G.      The Negotiation History of Amendment No. 2 Confirms that It
            Was Not Intended to Transfer Ownership of UNIX and UnixWare
            Copyrights..............................................................................................14

IV.     ARGUMENT.......................................................................................16

      A.      Novell Is Entitled to Summary Judgment that the APA as
            Amended by Amendment No. 1 Excluded UNIX and UnixWare
            Copyrights from the Assets Transferred to Santa Cruz by the Bill
            of Sale. ...................................................................................................16

            1.      The Plain Language of the APA and Amendment No. 1
                  Excluded "All Copyrights" from the Assets to Be
                  Transferred by Novell to Santa Cruz. .......................................17

2.      SCO's Attempt to Rewrite "All Copyrights" As "NetWare Copyrights Only" Should Be Rejected as Contrary to the Plain Language and to the Parol Evidence Rule.........................................18

3.      The Exclusion of "All Copyrights" from the Transferred Assets Was Deliberate and Consistent with the Basic Objectives of the APA. .........................................23

      a.      The scope of the transferred assets was specifically negotiated.........................................24

      b.      Novell deliberately excluded copyrights to protect its continuing interests in UNIX and UnixWare..........................25

      c.      Santa Cruz had a license to use the UNIX and UnixWare copyrights, and hence did not need to acquire ownership to implement the APA. ...................26

4.      The Other Contractual Provisions Cited by SCO Do Not Demonstrate that the UNIX and UnixWare Copyrights Transferred to Santa Cruz. .........................................29

      a.      Schedule 1.1(a) does not demonstrate that the exclusion of "all copyrights" was limited to "NetWare" copyrights.................................29

      b.      The definition of "Business" does not demonstrate that "all copyrights" means "NetWare copyrights only."........................................30

      c.      Section 1.6 and the Technology License Agreement do not demonstrate that "all copyrights" means "NetWare copyrights only."..........................31

5.      The Scope of Assets Transferred by the Bill of Sale Is Controlled by the APA and Amendment No. 1, and Not by Amendment No. 2. .........................................33

B.      Novell Is Entitled to Summary Judgment that Amendment No. 2 Does Not Constitute a Sufficient Written Instrument to Transfer UNIX and UnixWare Copyrights to Santa Cruz..................................34

1.      The Copyright Act Requires a Signed Instrument of Conveyance to Transfer Ownership of Copyrights. ..................34

2.      Amendment No. 2 Did Not Purport to Transfer Copyrights or to Retroactively Amend the Bill of Sale.................................35

3.      Amendment No. 2 Did Not Identify Which Copyrights, If Any, Should be Transferred. .......................................................................37

4.      Santa Cruz Did Not "Require" Ownership of the UNIX and UnixWare Copyrights for its Business As It Already Had a License to Use these Copyrights as Needed to Implement the APA. ..............................................................................38

C.     Novell Is Entitled to Summary Judgment on SCO's Slander of Title Claim Because SCO Cannot Demonstrate that Novell's Assertion of Copyright Ownership Was False. ......................................................38

D.     Novell Is Entitled to Summary Judgment On SCO's Claim for Specific Performance of Novell's Alleged Obligation to Transfer the UNIX and UnixWare Copyrights to SCO. ......................................................39

V.     CONCLUSION ...............................................................................................40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Blumenfeld v. R.H. Macy & Co.*,
  92 Cal. App. 3d 38 (1979) ........................................................................................21

*Community for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989) ...............................................................................................35

*Dore v. Arnold Worldwide, Inc.*,
  39 Cal. 4th 384 (2006) ............................................................................................19

*EPA Real Estate P'ship v. Kang*,
  12 Cal. App. 4th 171 (1992) ............................................................................20, 24

*Effects Assoc. v. Cohen*,
  908 F.2d 555 (9th Cir. 1990) ...........................................................................28, 34

*First Sec. Bank of Utah v. Banberry Crossing*,
  780 P.2d 1253 (Utah 1989) .....................................................................................39

*Foad Consulting Group, Inc. v. Musil Govan Azzalino*,
  270 F.3d 821 (9th Cir. 2001) .....................................................................19, 27, 28

*Gerdlund v. Electronic Dispensers Int'l*,
  190 Cal. App. 3d 263 (1987) ............................................................................21, 22

*Konigsberg Int'l, Inc. v. Rice*,
  16 F.3d 355 (9th Cir. 1994) .............................................................................35, 37

*National Ins. Underwriters v. Maurice Carter*,
  17 Cal. 3d 380 (1976) .............................................................................................30

*Pamfiloff v. Giant Records, Inc.*,
  794 F. Supp. 933 (N.D. Cal. 1992) ..................................................................35, 37

*Radio Television Espanola S.A. v. New World Entm't, Ltd.*,
  183 F.3d 922 (9th Cir. 1999) ..................................................................................35

*Wilder v. Wilder*,
  138 Cal. App. 2d 152 (1955) ..................................................................................31

## STATUTES

17 U.S.C.
  § 101 ...................................................................................................................35
  § 204 ................................................................................................2, 34, 35, 37, 38
  § 204(a) ..........................................................................................19, 33, 34, 35

Cal. Civ. Proc. Code
  § 1859 ...............................................................................................................30

Cal. Bankr. Code
  § 541(d) ..............................................................................................................8

## I.     STATEMENT OF ISSUES

SCO's First and Third Causes of Action for slander of title and specific performance, respectively, are based on SCO's assertion that Novell sold the UNIX and UnixWare copyrights to SCO's alleged predecessor, the Santa Cruz Operation ("Santa Cruz"), as part of the Asset Purchase Agreement ("APA").  This motion raises two issues related to this alleged transfer of the UNIX and UnixWare copyrights.

1.     Is Novell entitled to summary judgment that the APA expressly excluded "all copyrights" from the assets to be transferred, and hence the Bill of Sale that implemented the APA did not transfer the UNIX and UnixWare copyrights to Santa Cruz?

2.     Is Novell entitled to summary judgment that Amendment No. 2 to the APA did not transfer the UNIX and UnixWare copyrights to Santa Cruz?

This Court visited similar issues in the context of Novell's motion to dismiss filed prior to discovery in this action.  After discovery, Novell can now demonstrate that there is no genuine dispute of fact precluding judgment as a matter of law in Novell's favor on both issues.  Therefore, Novell is also entitled to summary judgment on SCO's claims for slander of title and specific performance.

## II.     INTRODUCTION

The APA, signed by Novell and Santa Cruz on September 19, 1995, explicitly excluded "all copyrights" from the assets that Novell transferred to Santa Cruz.  This copyright exclusion is found in a Schedule 1.1(b) of Excluded Assets.  It is further reinforced by express language in the contract providing that the Assets purchased "shall not include those assets ... set forth on

1

Schedule 1.1(b)." SCO has nevertheless claimed that the APA transferred the UNIX and UnixWare copyrights to Santa Cruz, which later sold these copyrights to SCO.[1]

As a matter of law, the original APA did not transfer ownership of any copyrights. The language of the APA is clear and unequivocal: "all copyrights" are excluded from the assets to be transferred. SCO's attempt to overcome this exclusion by citing extrinsic evidence that "all copyrights" does not mean "all copyrights" is unavailing. Once again in this dispute, "all" means all,[2] and parol evidence to the contrary is inadmissible. Moreover, the admissible extrinsic evidence confirms that the exclusion of all copyrights from the transferred assets was deliberate and consistent with the APA's objectives.

The APA as amended by Amendment No. 2 also did not transfer the UNIX and UnixWare copyrights to Santa Cruz. The Copyright Act, 17 U.S.C. § 204, requires a written

---

[1] SCO's position in this litigation has shifted on copyright ownership. Initially, SCO focused its ownership claim on Amendment No. 2 to the APA, a contract that was executed more than one year after the APA was signed. (*See, e.g.*, Pl.'s Memo. in Opp. to Def.'s Motion to Dismiss, filed March 4, 2004, PACER No. 13, at 7, 8 (repeatedly referring only to the "Asset Purchase Agreement, as amended" by Amendment No. 2 as having transferred the copyrights).) Subsequently, SCO argued that the original APA transferred copyrights to SCO even before Amendment No. 2 was executed. (*See, e.g.*, Pl.'s Mem. in Opp. to Def.'s Motion to Dismiss SCO's Amended Complaint, filed Oct. 1, 2004, PACER No. 52, at 7-9 (arguing that the APA, standing on its own, acted to transfer the UNIX copyrights from Novell to Santa Cruz).)

[2] SCO's position that "all copyrights" means less than "all copyrights" mirrors its interpretation of other provisions in the APA. For example, SCO claims that the APA limits Novell's broad authority under Section 4.16(b) to just certain SVRX Licenses, even though the APA expressly extends that authority to "any" and "all" SVRX Licenses. (Mem. in Support of Novell's Mot. for Partial Summary Judgment on its Fourth Claim for Relief, PACER No. 155, at 22-29; Novell's Reply to SCO's Opposition to Novell's Motion for Partial Summary Judgment on its Fourth Claim for Relief, PACER No. 237, at 4-7.) In addition, SCO claims that Novell's entitlement to SVRX Royalties extends only to some royalties from a narrow subset of licenses, even though SVRX Royalties is defined in the APA to include "all royalties, fees and other amounts" from "all SVRX Licenses." (Novell's Reply to SCO's Opp. to Novell's Mot. for Partial Summary Judgment or Preliminary Injunction, PACER No. 205, at 4-7, 9-13.)

instrument, signed by the copyright owner, to transfer copyrights.  Amendment No. 2 does not constitute such a written instrument because it did not transfer any copyrights or other assets. Rather, it merely revised the definition of "Excluded Assets," effective as of the date it was signed, to create an exception for copyrights "required" for Santa Cruz to exercise its rights regarding the UNIX business.  In addition, Amendment No. 2 did not identify which copyrights were "required," and SCO cannot demonstrate that Santa Cruz "required" ownership of the copyrights, because Santa Cruz already had a license to use the UNIX and UnixWare copyrights as needed to implement the APA.

Because neither the APA nor Amendment No. 2 transferred copyright ownership to Santa Cruz, Novell is entitled to summary judgment on SCO's slander of title claim on the ground that SCO cannot establish that Novell made "false" statements.

Because SCO has no right to obtain ownership of the UNIX and UnixWare copyrights, Novell is also entitled to summary judgment on SCO's claim for an order transferring ownership of these copyrights to SCO.

## III.    STATEMENT OF UNDISPUTED FACTS

### A.    The APA Expressly Excluded "All Copyrights" from the Assets to be Transferred by Novell to Santa Cruz.

1.    Novell and Santa Cruz signed the APA on September 19, 1995.  Through the APA, Santa Cruz acquired "certain of the assets" comprising Novell's UNIX and UnixWare

business.  (Declaration of Kenneth W. Brakebill In Support of Novell's Motions for Summary Judgment ("Brakebill Decl."), Ex. 2, Recital B.)[3]

2.    The APA defined the "Assets" to be transferred by reference to Schedule 1.1(a), which listed assets included in the transfer; and Schedule 1.1(b), which listed assets excluded from the transfer.  In this regard, Section 1.1(a) of the APA stated:

> *Seller will sell*, convey, transfer, assign, and deliver to Buyer and Buyer will purchase and acquire from Seller on the Closing Date (as defined in Section 1.7), all of Seller's right, title and interest in and to *the assets* and properties of Seller relating to the Business (collectively the "Assets") *identified on Schedule 1.1(a) hereto. Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1(b).*

(*Id.*, Section 1.1(a) (emphasis added).)

3.    The first paragraph of the Schedule 1.1(a) list of included assets referred to "[a]ll rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare…."  (Brakebill Decl., Ex. 3, Schedule 1.1(a), Section I.)  This general reference was followed by more detailed, itemized lists of specific categories of assets.  The "Intellectual Property" category stated:

> V.    Intellectual Property — Trademarks UNIX and UnixWare as and to the extent held by Seller (excluding any compensation Seller receives with respect of the license granted to X/Open regarding the UNIX trademark).

---

[3] Novell submits the Brakebill Declaration, and the exhibits cited therein, in support of this motion, as well as three other concurrently-filed summary judgment motions: (1) Novell's Motion for Partial Summary Judgment on SCO's Non-Compete Claim in Its Second Claim for Breach of Contract and Fifth Claim for Unfair Competition; (2) Novell's Motion for Partial Summary Judgment on the Copyright Ownership Portions of SCO's Second Claim for Breach of Contract and Fifth Claim for Unfair Competition; and (3) Novell's Motion for Summary Judgment on SCO's First Claim for Slander of Title Based on Failure to Establish Special Damages.

(*Id.*, Section V.) Thus, the only "Intellectual Property" identified in the list of assets to be transferred were the UNIX and UnixWare trademarks. Neither the "Intellectual Property" category, nor any other part of Schedule 1.1(a) identified copyrights in UNIX and UnixWare (or in any other product) as an asset to be transferred. (*Id.*)

    4.    Similarly, the Schedule 1.1(b) list of "Excluded Assets" expressly excluded the following "Intellectual Property" from the sale:

> V.    Intellectual Property
>
> > A. *All copyrights* and trademarks, except for the trademarks UNIX and UnixWare.
> >
> > B. All Patents

(Brakebill Decl., Ex. 4, Schedule 1.1(b), Section V (emphasis added).) Thus, the intellectual property listed as included assets under Schedule 1.1(a) was consistent with the intellectual property excluded by Schedule 1.1(b): only the UNIX and UnixWare trademarks were included, and all patents, copyrights, and trademarks were excluded except for the UNIX and UnixWare trademarks.

    **B.**    **Novell Deliberately Excluded Copyrights from the Transferred Assets to Protect its Right to Receive SVRX and UnixWare Royalties and its Continuing Interest in the UNIX Business.**

    5.    Novell's initial goal was to sell its UNIX assets for an all-cash payment. However, because Santa Cruz did not have sufficient cash to purchase all of Novell's UNIX assets, the deal was structured so that Novell would retain certain UNIX-related rights and would receive other forms of consideration. (Brakebill Decl., Ex. 21 (Deposition of Robert Frankenberg, February 10, 2007 ("Frankenberg Dep.") at 30:19 to 33:19, 61:23 to 64:21); Declaration of David Bradford, filed herewith ("Bradford Decl."), ¶ 7, 15, 16; Declaration of Tor

Braham, filed herewith ("Braham Decl."), ¶ 7, 9-13, 18; Declaration of Jim Tolonen, filed

herewith ("Tolonen Decl."), ¶ 5-6, 11-12.)  In particular, Novell was entitled to receive 95% of

"all royalties, fees, and other amounts" that were due under licenses to the Unix System V

software Releases listed in Schedule 1.1(a) (the "SVRX Licenses").  (Brakebill Decl., Ex. 2,

Sections 1.2(b), 4.16(a); Ex. 3, Section VI.)  Novell's right to receive future SVRX revenues was

an important part of the overall consideration for the APA; Novell had received $50 million in

SVRX revenues in Fiscal Year 1995 alone.  (Bradford Decl., ¶ 15, Ex. 2.)  In contrast, the Santa

Cruz stock that Novell received under the APA had a value of approximately $50 million.

(Braham Decl., ¶ 7.)

      6.      In addition to the right to receive future SVRX revenues, Novell also retained the

right to require Santa Cruz to "amend, supplement, modify or waive any rights under" or "assign

any rights to" the SVRX Licenses as directed by Novell.  (Brakebill Decl., Ex. 2, Section

4.16(b).)  One reason for this provision was to ensure that Novell could negotiate "buy-outs" of

particular SVRX Licenses, in which the licensee made a substantial payment to obtain a "paid-

up" license in which no future royalty payments were due.  (Braham Decl., ¶¶ 6, 12, 13;

Bradford Decl. ¶ 16; Brakebill Decl., Ex. 21, Frankenberg Depo. at 88:14 to 89:3.)  Novell had

already negotiated SVRX buyouts before the APA was signed, and wanted to be able to continue

to enter buyouts after the APA was signed.  (Braham Decl., ¶ 13; Brakebill Decl., Ex. 21,

Frankenberg Dep. at 63:1 to 64:21.)

      7.      Another important consideration for Novell's sale of UNIX assets was Santa

Cruz's commitment to develop enhanced UnixWare products that were compatible with Novell's

NetWare product.  The APA required Santa Cruz to use "commercially reasonable efforts" to

develop a "Merged Product" that would combine Novell's version of the UNIX operating system

(UnixWare 2.1, or "Eiger") with Santa Cruz's flavor of UNIX ("OpenServer Release 5.1," or

"Comet").  (Brakebill Decl., Ex. 2, § 4.18.)  Development of this Merged Product was the

detailed subject of a separate "Operating Agreement," which was executed by Novell and Santa

Cruz upon the Closing.  (Brakebill Decl., Ex. 22 (further detailing SCO's obligation to develop

the Merged Product).)

   8. Novell and Santa Cruz hoped that the Merged Product, which was designed to run

on Intel 32-bit processors, would provide a commercially successful alternative to Microsoft

Windows.  (Braham Decl., ¶ 8.)  This was a very important consideration for Novell, because

Novell's flagship "NetWare" product needed an alternative operating system if it was to compete

successfully with Microsoft.  Thus, if the Merged Product successfully penetrated the Intel 32-bit

market, this would likely lead to increased sales of NetWare as well.  (Braham Decl., ¶ 8.)

Moreover, Novell also had a direct financial interest in Santa Cruz's future sale of UnixWare

products, as the APA entitled Novell to receive revenues on such sales.  (Brakebill Decl., Ex. 2,

§ 1.2(b) and Schedule 1.2(b).)

   9. Novell also had a strong interest in the development of a commercially successful

UNIX operating system that would run on Intel's next generation, 64-bit processors, as this

would further expand the market for Novell's NetWare product.  (Braham Decl., ¶ 13-14;

Bradford Decl., Ex. 1 at 1; Tolonen Decl., ¶ 12.)  Novell discussed development of a 64-bit

UNIX operating system with several companies, including Santa Cruz and Hewlett-Packard.

(Bradford Decl., Ex. 1 at 1, 3.)

   10. In sum, although Novell sold certain UNIX-related assets to Santa Cruz, Novell

retained significant rights and commercial interests in the UNIX business, including (a) the right

to collect 95% of "all" revenues due under "all" SVRX Licenses; (b) the right to negotiate

buy-outs of the SVRX Licenses; (c) the right to require Santa Cruz to develop a unified UNIX operating system for Intel 32-bit processors; (d) the right to receive revenues on Santa Cruz's sales of UnixWare products; and (e) an interest in development of a UNIX operating system for Intel 64-bit processors by Santa Cruz, Hewlett-Packard, or someone else.

11.    Robert Frankenberg, the CEO of Novell, directed his team to take steps to protect Novell's UNIX-related rights and interests under the APA.  (Brakebill Decl., Ex. 21 (2/10/2007 Frankenberg Dep. at 63:10 to 64:21).)  Novell had a specific concern about entrusting the future of UNIX to Santa Cruz.  In particular, Santa Cruz was not the most financially stable company and Novell had concerns about Santa Cruz's viability as a company.  (Braham Decl., ¶ 7*;* Bradford Decl., ¶ 8; Tolonen Decl., ¶ 12.)  After a series of executive-level discussions during the summer of 1995, David Bradford, Novell's Senior Vice-President and General Counsel, was then entasked with overseeing the negotiation and drafting of the contract between Novell and Santa Cruz to protect Novell's interests.  (Bradford Decl. ¶ 4, Tolonen Decl., ¶ 8.)

12.    Pursuant to Mr. Frankenberg's and then Mr. Bradford's instruction, Novell's legal team took several steps to protect Novell's UNIX-related interests.  First, Novell inserted a provision that "Seller is retaining all rights to the SVRX Royalties notwithstanding the transfer of the SVRX Licenses to Buyer pursuant hereto, and that Buyer only has legal title and not an equitable interest in such royalties within the meaning of Section 541(d) of the Bankruptcy Code."  (Brakebill Decl., Ex. 2, Section 1.2(b); Braham Decl. ¶ 10.)  Novell added this provision to decrease the risk that if Santa Cruz went into bankruptcy, this would interfere with Novell's receipt of SVRX revenues.  (Braham Decl., ¶ 10, Tolonen Decl. ¶ 12.)

13.    Second, Novell expressly excluded "all copyrights" from the assets to be transferred to Santa Cruz, as reflected in Schedules 1.1(a) and 1.1(b) to the APA.  (Braham

Decl., ¶¶ 18-19; Bradford Decl., ¶¶ 11-12; Tolonen Decl. ¶ 11.)  This exclusion ensured that if Santa Cruz went into bankruptcy, the UNIX and UnixWare copyrights would not be part of the bankruptcy estate, decreasing the risk that the bankruptcy trustee would assert an interest in the future SVRX revenues due to Novell under the APA.  (Braham Decl., ¶ 14; Bradford Decl., ¶ 9; Tolonen Decl. ¶ 12; *see also* Brakebill Decl., Ex. 23, ¶ 45.)

14.     Excluding copyrights from the transferred assets also protected Novell's other UNIX-related interests.  Retaining ownership of the copyrights strengthened Novell's rights to negotiate buy-outs of the SVRX Licenses and to receive future revenues.  (Braham Decl., ¶ 14; Tolonen Decl. ¶ 12.)  Retaining ownership of the copyrights also put Novell in a better position to ensure successful development of future versions of the UNIX operating system by Santa Cruz, Hewlett-Packard, or other companies.  (Braham Decl., ¶ 14; Tolonen Decl. ¶ 12; *see* Bradford Decl., ¶¶ 9, 16.)

**C.     The Lists of Transferred Assets Were Revised to Include a Copyright Exclusion and Then Exchanged By the Parties Before the APA Was Signed.**

15.     The correspondence between Novell and Santa Cruz shows that, before the APA was signed on September 19, 1995, several significant revisions were made to the lists of included and excluded assets.

16.     After receiving David Bradford's business direction to retain Novell's intellectual property rights in UNIX and UnixWare, Novell's outside legal team revised an early draft of a Schedule of Assets that had included patents, copyrights and trademarks.  (Braham Decl. ¶ 15.)  Unlike the final version of Schedule 1.1(a), this early draft of Schedule 1.1(a), which Novell's outside counsel faxed to Santa Cruz's legal representatives on September 8, 1995, included "all

patents, patent applications, copyrights…and all other intellectual property…that pertain to Unix or UnixWare." (Braham Decl. ¶ 15, Ex. 6 at NOV 31783.)

17.    Novell's outside counsel drafted a new schedule of assets to be included in the asset transfer, as well as a schedule of assets to be excluded from the transfer. (Braham Decl. ¶ 15, Ex. 7; *see generally* Tolonen Decl. ¶ 9 (discussing Braham role).) The new Schedule 1.1(a) deleted "copyrights," "patents," and "all other intellectual property" from the list of assets to be transferred. It revised Schedule 1.1(a) so that the UNIX and UnixWare trademarks were the *only* "Intellectual Property" included in the transaction. The new Schedule 1.1(b) made clear that patents and copyrights were not included as assets; instead they were specifically excluded. (*Id.*)

18.    During the negotiations, Novell transmitted drafts of Schedules 1.1(a) and 1.1(b) to Santa Cruz, including the Schedule 1.1(b) that explicitly excluded "all patents" and "all copyrights." (Braham Decl. ¶ 17 and Ex. 4 thereto.) On September 18, 1995, for example, Novell's outside counsel sent revised Schedules 1.1(a) and 1.1(b) to Santa Cruz's legal representatives. (Braham Decl. ¶ 17 and Ex. 4 thereto.) Novell proposed to alter the prior version of Intellectual Property assets to be included in the transfer — previously limited to "Trademarks UNIX and UnixWare as held by Seller" — to also include the below, underlined language:

> V.    Intellectual property — Trademarks UNIX and UnixWare as <u>and to the extent</u> held by Seller (<u>excluding any compensation Seller receives with respect of the license granted to X/Open regarding the UNIX trademark</u>).

(*Id.* at NOV 40410) Novell also proposed several other changes to the Schedule 1.1(a) list of included assets and the Schedule 1.1(b) list of excluded assets. (*Id.*, Schedule 1.1(a), at 1, 2, 4; Schedule 1.1(b), at 2.)

19.     The draft of Schedule 1.1(b) that Novell sent to Santa Cruz on September 18, 1995, expressly excluded from the assets to be transferred "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare." (*Id.*, Schedule 1.1(b).) Santa Cruz accepted this exclusion. Thus, the final version of the APA, signed on September 19, 1995, excludes "all copyrights" from the transferred assets. (Brakebill Decl., Ex. 4, Section V.)

20.     During the APA negotiations, several representatives of Novell reviewed and approved the language in the Excluded Assets provision excluding copyrights from the asset transfer: David Bradford, Tor Braham, Aaron Alter and Burt Levine. (Braham Decl. ¶ 16.)

21.     Aaron Alter of the Wilson firm specifically edited the Intellectual Property provisions of Schedules 1.1(a) and 1.1(b), confirming that only certain UNIX and UnixWare trademarks would be transferred to Santa Cruz and leaving the copyright exclusion intact. (Braham Decl. ¶ 16(c), Ex. 8.) Mr. Alter had also marked up an early term sheet, adding the handwritten notation, "already excluded," next to a Section including "Intellectual Property ... Copyrights, trademarks ... ." (Braham Decl., ¶ 16(c), Ex. 9 at NOV 39798.)

22.     Burt Levine, a lawyer for AT&T, Unix Systems Laboratories ("USL") and Novell who then joined Santa Cruz in early 1996, also reviewed and edited the Intellectual Property provisions in Schedules 1.1(a) and 1.1(b) during the APA negotiation period. He kept UNIX and UnixWare trademarks as a category of intellectual property to be included as an asset. He did not add UNIX or UnixWare copyrights as included assets. He left intact the copyright exclusion. (Braham Decl., ¶ 16(d), Ex. 10; Brakebill Decl., Ex. 25, Levine Dep. at 74:1-75:1, 76:10-77:7.) Further, Mr. Levine's comments on Schedules 1.1(a) and 1.1(b) -- including the identification of "all copyrights" as an excluded asset -- were transmitted to Santa Cruz's legal representatives

11

during the negotiations. (Braham Decl., ¶ 17, Ex. 4; Brakebill Decl., Ex. 25, Levine Dep. at 83:20-85:9, 184:5-19.)

**D.    Amendment No. 1 Made Further Revisions to the Lists of Transferred Assets, But Not to the Copyright Exclusion.**

23.    After the APA was signed on September 19, 1995, Novell and Santa Cruz had discussions about clarifying certain provisions in the APA in the form of an Amendment No. 1. (Brakebill Decl., Ex. 17 (Madsen Dep. at 154:7-16.)

24.    Novell and Santa Cruz signed Amendment No. 1 on December 6, 1995, which is the date that the transaction closed.  (*See* Brakebill Decl., Ex. 26, Amendment 1.)  Amendment No. 1 made several clarifying amendments, including specific revisions to the Schedule 1.1(a) and Schedule 1.1(b) lists of included and excluded assets.  (*Id.*, § K, L.)  Amendment No. 1 did not, however, change the description of the Intellectual Property that was included and excluded from the transferred assets by Section V of Schedules 1.1(a) and 1.1(b).  (*Id.*)

**E.    The Bill of Sale Transferred Only the Assets Identified in the APA and Amendment No. 1, Which Did Not Include Copyrights.**

25.    The APA did not, itself, transfer any assets.  Rather, it described the assets that would be transferred *in the future* when the transaction was closed.  (*See* Brakebill Decl., Ex. 2, § 1.1(a).)  Thus, the APA contemplated that at the Closing, Novell would deliver a "bill of sale" transferring Novell's title to the "Assets" described in the APA to Santa Cruz.  (*Id.*, § 1.7(b)(iii).)

26.    Novell and Santa Cruz executed a "Bill of Sale" when the transaction was closed on December 6, 2005, which is the same day that Amendment No. 1 was signed.  (*See* Brakebill Decl., Ex. 27.)  The Bill of Sale stated that Novell "does hereby transfer, convey, sell, assign and deliver" to Santa Cruz "all of the Assets."  (*Id.*)  The Bill of Sale further stated that all capitalized

12

terms had the meanings set forth in "the Agreement," which was defined as "the Asset Purchase Agreement by and between The Santa Cruz Operation, Inc. and Novell, Inc. dated as of September 19, 1995, as amended by Amendment No. 1 to Asset Purchase Agreement dated as of December 6, 1995." (*Id.*)

27.    As noted above, Section 1.1(a) of the APA defined the "Assets" to be transferred as the assets that were included in Schedule 1.1(a), and not excluded by Schedule 1.1(b). Schedule 1.1(a) did not include any copyrights, and Schedule 1.1(b) excluded "all copyrights." Thus, the Bill of Sale did not transfer any UNIX or UnixWare copyrights to Santa Cruz.

**F.    Amendment No. 2 Revised the "Excluded Assets" Provision, But Did Not Transfer Ownership of Copyrights or Specify Which Copyrights Might Be "Required" for the UNIX Business.**

28.    On October 16, 1996, Novell and Santa Cruz executed Amendment No. 2 to the APA. (*See* Brakebill Decl., Ex. 28.)  Amendment No. 2 revised the definition of "Excluded Assets" in Section V.A of Schedule 1.1(b) to read as follows:

> All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies.

(*Id.*, Paragraph A.)

29.    Amendment No. 2 did not specify which copyrights, if any, were "required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies." (*Id.*)  Amendment No. 2 also did not contain any provision transferring ownership of copyrights or other assets from Novell to Santa Cruz. (*Id.*)

30.    Amendment No. 2 stated that the APA was amended "[a]s of the 16[th] day of October, 1996," or about thirteen months after the APA was executed on September 19, 1995,

and ten months after the transaction closed on December 6, 1995.  (*Id.*)  Thus, by its own terms, Amendment No. 2's revision to Schedule 1.1(b) did not retroactively amend the APA as of the date the APA was signed or the transaction closed.  Moreover, Novell did not execute a "Bill of Sale" or any similar document transferring copyrights from Novell to Santa Cruz in connection with Amendment No. 2.  (Declaration of Allison Amadia, filed herewith ("Amadia Decl."), ¶ 17.)

### G.    The Negotiation History of Amendment No. 2 Confirms that It Was Not Intended to Transfer Ownership of UNIX and UnixWare Copyrights.

31.    Amendment No. 2 was negotiated primarily through communications between two in-house lawyers, Allison Amadia (then Allison Lisbonne) of Novell, and Steve Sabbath of Santa Cruz.  (Amadia Decl., ¶¶ 4-5.)  During the summer of 1996, Mr. Sabbath telephoned Ms. Amadia and raised an issue relating to the UNIX and UnixWare copyrights.  He told Ms. Amadia that the Original APA explicitly excluded copyrights to UNIX and UnixWare as assets being sold by Novell to Santa Cruz and that it should not have.  He wanted Novell to amend the original APA to explicitly give Santa Cruz rights to copyrights in UNIX and UnixWare.  (*Id.*, ¶ 6.)  Mr. Sabbath was not seeking a clarification that the APA gave copyright ownership to Santa Cruz.  Rather, he wanted Novell to change the original APA to give Santa Cruz ownership of copyrights in UNIX and UnixWare because the original APA did not so provide.  (*Id.* ¶ 18.)

32.    Ms. Amadia was not involved in the negotiation and drafting of the original APA. Accordingly, after her conversation with Sabbath, Amadia undertook to find out the intent of the original APA concerning copyrights.  She confirmed that ownership of the UNIX and UnixWare copyrights did not transfer by reviewing the APA and by contacting Novell's outside counsel, Tor Braham, who was the principal drafter of the APA.  (*Id.*, ¶ 7.)

14

33.     Mr. Sabbath later sent Ms. Amadia a first draft of Amendment No. 2.  (*Id.*, ¶ 8,

Ex. 1 thereto.)  Santa Cruz proposed to revise Section V of Schedule 1.1(b) to read as follows:

> All copyrights and trademarks, except for the copyrights and
> trademarks owned by Novell as of the date of this Amendment,
> which pertain to the UNIX and UnixWare technologies and which
> SCO has acquired hereunder...

(*Id.*, Ex. 1, Paragraph A.)

34.     Santa Cruz's initial Amendment No. 2 proposal created a blanket exception for

copyrights and trademarks "owned by Novell as of the date of this Amendment, *which pertain to

the UNIX and UnixWare technologies and which SCO has acquired hereunder*."  (*Id.* (emphasis

added).)  Thus, insofar as the UNIX and UnixWare copyrights were concerned, Santa Cruz's

draft acknowledged that Novell owned them "as of the date of the amendment," and proposed

that all of them were to be transferred to Santa Cruz.  Moreover, Santa Cruz's reference to

copyrights "which SCO has acquired hereunder," indicated that its proposed amendment was

intended to transfer ownership of the UNIX and UnixWare copyrights to Santa Cruz.  (*Id.*)

35.     Novell rejected Santa Cruz's proposed amendment.  Ms. Amadia told Mr.

Sabbath that while Novell was willing to affirm that Santa Cruz had a license under the APA to

use Novell's UNIX and UnixWare copyrighted works in its business, Novell was not going to

transfer ownership of any copyrights to Santa Cruz through Amendment No. 2.  (Amadia Decl.,

¶ 10.)

36.     After further negotiations, Novell and Santa Cruz agreed to the narrower

exception in the final version of Amendment No. 2.  Instead of a blanket exception for

copyrights that "pertain to the UNIX and UnixWare technologies," the final version was limited

to copyrights that were "required for SCO to exercise its rights with respect to the acquisition of

the UNIX and UnixWare technologies."  (Amadia Decl., ¶ 11, Ex. 2, Paragraph A.)  In addition,

the final version did not include Santa Cruz's proposed reference to copyrights "which SCO has acquired hereunder," nor did it include any other reference to an "acquisition" or transfer of copyrights.  (*Id.*)  Accordingly, Jim Tolonen, the Novell executive who signed Amendment No. 2, confirms that it was never Novell's intent to transfer copyrights by way of Amendment No. 2 (or the APA), and that he would not have signed Amendment No. 2 had he believed it would do so.  (Tolonen Decl. ¶ 13-16.)

## IV.    ARGUMENT

### A.    Novell Is Entitled to Summary Judgment that the APA as Amended by Amendment No. 1 Excluded UNIX and UnixWare Copyrights from the Assets Transferred to Santa Cruz by the Bill of Sale.

As noted in the Undisputed Facts above, the Bill of Sale executed by Novell on December 6, 1995, transferred ownership to Santa Cruz of "the Assets," as defined in the APA and Amendment No. 1.  (Undisputed Facts, ¶ 23; Brakebill Decl., Ex. 27.)[4]  Thus, the scope of assets transferred by the Bill of Sale must be determined by the definition of "Assets" set forth in the APA and Amendment No. 1.

Novell is entitled to summary judgment that the Bill of Sale did not transfer the UNIX and UnixWare copyrights to Santa Cruz because:

- The plain language of the APA and Amendment No. 1 excluded "all copyrights" from the assets transferred to Santa Cruz;

---

[4]  Undisputed Facts set forth above are cited by the relevant paragraph number of the Undisputed Facts section.

- The parol evidence rule precludes SCO from relying on extrinsic evidence to rewrite "all copyrights" as "NetWare copyrights only," because the plain language is not reasonably susceptible to SCO's interpretation;

- The exclusion of "all copyrights" was deliberate and consistent with the basic objectives of the APA;

- The other contractual provisions cited by SCO do not demonstrate that "all copyrights" means "NetWare copyrights only," as some SCO witnesses have argued; and

- The "Assets" transferred by the Bill of Sale is controlled by the APA as amended by Amendment No. 1; Amendment No. 2 is irrelevant to the Bill of Sale.

1.    **The Plain Language of the APA and Amendment No. 1 Excluded "All Copyrights" from the Assets to Be Transferred by Novell to Santa Cruz.**

The APA defined the assets to be transferred by Novell to Santa Cruz by reference to lists of included and excluded assets. (Undisputed Facts, ¶ 2; Brakebill Decl., Ex. 2, Section 1.1(a).) Both schedules require the same conclusion: the transferred assets did not include the UNIX and UnixWare copyrights.

The only "Intellectual Property" identified in the Schedule 1.1(a) list of assets to be transferred are the UNIX and UnixWare trademarks. (Undisputed Facts, ¶ 3; Brakebill Decl., Ex. 3, Section V.) Schedule 1.1(a) did *not* identify the UNIX and UnixWare copyrights as an asset to be transferred. (*Id.*) Conversely, the Schedule 1.1(b) list of "Excluded Assets" expressly excluded from the transferred assets "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare." (Undisputed Facts, ¶ 4, Brakebill Decl., Ex. 4, Section V.)

17

Amendment No. 1 made some revisions to Schedules 1.1(a) and (b), but did not change the description of the Intellectual Property included and excluded from the transfer. (Undisputed Facts, ¶¶ 23-24, Brakebill Decl. Ex. 26, § K, L.) Thus, the language of the APA and Amendment No. 1 is clear: "[a]ll copyrights" were excluded from the assets to be transferred.

## 2. SCO's Attempt to Rewrite "All Copyrights" As "NetWare Copyrights Only" Should Be Rejected as Contrary to the Plain Language and to the Parol Evidence Rule.

SCO has asserted that even though the APA excluded "all copyrights" from the assets to be transferred, the "intent" of the APA was to transfer the UNIX and UnixWare copyrights to Santa Cruz. SCO has relied on declarations and deposition testimony to support its assertion that the intent of the APA was to transfer the UNIX and UnixWare copyrights. (*See* SCO's Motion for Partial Summary Judgment On Its First, Second, and Fifth Causes of Action and For Summary Judgment on Novell's First Counterclaim, filed April 9, 2007, PACER No. 259 ("SCO's Ownership MSJ 4/9/2007, PACER No. 259") at 6-16.)[5]  SCO also has relied on testimony that the Schedule 1.1(b) exclusion of "all copyrights" should be interpreted as limited to Novell's NetWare product only, and as not including UNIX and UnixWare copyrights. (*Id.* at 28, footnote 3.)

SCO's attempt to rewrite "all copyrights" as meaning "NetWare copyrights only" should be rejected because it is contrary to the plain language of the APA. Under the governing

---

[5] On April 9, 2007, SCO filed a summary judgment motion raising similar issues concerning copyright ownership. Although in this motion Novell responds to many of the arguments in SCO's motion, Novell will address some additional issues in its opposition to SCO's motion.

California law,[6] oral testimony and other extrinsic evidence are not admissible to support an interpretation of a contract that is contrary to the plain language. The critical issue is "whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006) (citation omitted). If the contract is not reasonably susceptible to the proposed interpretation, extrinsic evidence is inadmissible and does not create a triable issue of fact that would defeat summary judgment. *Id.* at 388, 391-93 (affirming summary judgment on wrongful termination claim because letter agreement that employment was "at will" and could be terminated "at any time" could not reasonably be interpreted as allowing termination for cause only, and hence contrary extrinsic evidence did not create a triable issue of fact).

The rule against considering extrinsic evidence contrary to the plain language is particularly strong for an integrated contract. As the California Court of Appeal has noted:

> The parol evidence rule generally prohibits the introduction of extrinsic evidence — oral or written — to vary or contradict the terms of an integrated written instrument … . According to this substantive rule of law, when the parties intend a written agreement to be the final and complete expression of their understanding, that writing becomes the final contract between the parties, which may not be contradicted by even the most persuasive evidence of collateral agreements. Such evidence is legally irrelevant.

---

[6] The APA provides for application of California law. (Brakebill Decl., Ex. 2, Section 9.8.) Thus, interpretation of the APA is governed by California law, except that federal law controls to the extent that California law conflicts with federal copyright law or policy. *Foad Consulting Group, Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 827-28 (9th Cir. 2001). Here, California law requires exclusion of SCO's cited parol evidence and affirmation of the plain language of the APA. Thus, California law is consistent with the strong federal policy, embodied in 17 U.S.C. § 204(a), requiring a written instrument to transfer copyrights.

*EPA Real Estate P'ship  v. Kang*, 12 Cal. App. 4th 171, 175 (1992) (citations omitted).  Thus, when a contract is integrated, "extrinsic evidence is admissible *only* to supplement or explain the terms of the agreement — and even then, only where such evidence is *consistent* with the terms of the integrated document … ."  *Id.* at 176-77 (citations omitted).

The APA includes an express integration clause, which states in relevant part:

> Entire Agreement.  This Agreement, and the Schedules and
> Exhibits hereto: (a) constitute the entire agreement among the
> parties with respect to the subject matter hereof and supersede all
> prior agreements and understanding, both written and oral, among
> the parties with respect to the subject matter hereof….

(Brakebill Decl., Ex. 2, Section 9.5.)  Novell and Santa Cruz further agreed, in connection with the Bill of Sale, that the APA is an integrated agreement not to be altered by any other understandings:

> It is acknowledged and agreed ... that the Agreement is the
> exclusive source of the agreement and understanding between
> Seller and Buyer respecting the Assets.

(Brakebill Decl., Ex. 27.)  On the same day the Bill of Sale was executed, Santa Cruz's outside counsel sent an opinion letter to Novell's Board of Directors stating that:

**\* \* REDACTED \* \***

(Brakebill Decl., Ex. 24 at NOV 16188.)

As a matter of law, the express exclusion of "all copyrights" in Schedule 1.1(b) is not "reasonably susceptible" to SCO's proposed interpretation of "NetWare copyrights only."  The plain meaning of "all" is all.  "All copyrights" cannot reasonably be interpreted as "NetWare

copyrights only."  Nor can "all copyrights" reasonably be interpreted as "all copyrights *except for UNIX and UnixWare copyrights*."

Directly on point is the California Court of Appeal's decision in *Blumenfeld v. R.H. Macy & Co.*, 92 Cal. App. 3d 38 (1979), which rejected a similar attempt to interpret "all" as meaning "less than all."  The trial court had relied on extrinsic evidence to interpret a contract assigning "all claims against third parties relating to the [shopping] Center" as limited to claims against current tenants of the Center and excluding plaintiff's claim against Macy's, which was never a tenant, for breach of an agreement to lease key store space.  *Id.* at 41-44.  The Court of Appeal reversed, holding that the "all-inclusive language of the agreement is not reasonably susceptible of the meaning advanced."  *Id.* at 46.

Similarly, in *Gerdlund v. Electronic Dispensers Int'l*, 190 Cal. App. 3d 263 (1987), the California Court of Appeal rejected an attempt to use parol evidence to interpret "any" in a less than all-inclusive manner.  "Testimony by all parties" had established that "all had the same general intent" that the plaintiffs "would not be terminated as long as they were doing a good job."  *Id.* at 273.  Plaintiffs relied on this evidence to interpret a contract that allowed termination of employment "for *any* reason" as meaning, "for any *good* reason."  *Id.*  The Court of Appeal excluded this evidence as "totally inconsistent" with the plain language:

> The term "any reason" is plainly all-inclusive, encompassing all reasons "*of whatever kind*," good, bad, or indifferent … .  Adding the modifier "good" has a delimiting effect which changes the meaning entirely … .  The trial court admitted the evidence on the ground that "both parties have testified as to what they interpreted the contract to mean."  Testimony of intention which is contrary to a contract's express terms, however, does not give meaning to the contract: rather it seeks to substitute a different meaning.  It follows … that such evidence must be excluded.

*Id.* Based on its conclusion that the "testimony of intention" should have been excluded, the Court of Appeal reversed the jury verdict for the plaintiffs and directed that judgment be entered for the defendant. *Id.* at 267, 278.

Here, too, it is clear that the exclusion of "all copyrights" was "all-inclusive," encompassing copyrights to UNIX, UnixWare, NetWare, and any other copyrighted work. Therefore, the parol evidence offered by SCO to show that "all" means "NetWare only" must be excluded.

SCO's proposed interpretation is especially far-fetched in view of the plain language of the remainder of Section V of Schedule 1.1(b). Section V excluded from the transferred assets "[a]ll copyrights and trademarks, *except for the trademarks UNIX and UnixWare.*" (Brakebill Decl., Ex. 4, Schedule 1.1(b), Section V.A (emphasis added).) Had the parties intended to make an exception for the UNIX and UnixWare copyrights, it would have been simple to draft this clause as "all copyrights and trademarks, except for the UNIX and UnixWare trademarks *and copyrights.*" However, the parties chose not to do so. Instead, the "UNIX and UnixWare" exception was limited to trademarks only.

Moreover, if "all copyrights" were interpreted as "NetWare only," then Section V.A of Schedule 1.1(b) would effectively read, "NetWare copyrights and trademarks, except for the UNIX and UnixWare trademarks." But this interpretation would make no sense. "NetWare trademarks" do not include UNIX and UnixWare trademarks. If "all copyrights and trademarks" were limited to "NetWare only," the exception for UNIX and UnixWare trademarks would be superfluous. Thus, the exception for UNIX and UnixWare trademarks logically implies that "*all*" copyrights and trademarks means "*all*" copyrights and trademarks, including UNIX and UnixWare.

The bizarre nature of SCO's proposed interpretation is further demonstrated by the next clause of Section V of Schedule 1.1(b), which excludes "All Patents" from the assets to be transferred.  (Brakebill Decl., Ex. 4, Section V.B.)  SCO's own witnesses have admitted that the exclusion of "all" patents excludes "all" patents from the transfer, including patents related to UNIX and UnixWare.[7]  SCO thus proposes two conflicting interpretations of "all": (1) "all patents" means "all patents, including UNIX and UnixWare patents"; but (2) "all copyrights" means "NetWare copyrights only."  SCO's attempt to interpret "all" in two different ways in the same paragraph of the same contract is an untenable distortion of the plain language.

### 3.     The Exclusion of "All Copyrights" from the Transferred Assets Was Deliberate and Consistent with the Basic Objectives of the APA.

SCO has argued that there is no evidence that the parties intended to exclude the UNIX and UnixWare copyrights from the transferred assets, and that this exclusion would render the APA meaningless by preventing Santa Cruz from pursuing its UNIX business.  SCO is wrong on both points.  In fact, the parties specifically negotiated the scope of the transferred assets, and Novell deliberately excluded the UNIX and UnixWare copyrights to protect its UNIX-related rights.  Moreover, Novell's sale of its UNIX and UnixWare products to Santa Cruz necessarily conferred a license on Santa Cruz to use the copyrights as needed to implement the APA.

---

[7]  For example, Duff Thompson, a current member of SCO's Board and head of its litigation committee, admitted in the declaration submitted by SCO that patents were expressly excluded from the assets transferred to Santa Cruz.  (Declaration of R. Duff Thompson, filed November 9, 2006, ¶ 9 (attached as Exhibit 10 to Declaration of Edward Normand In Support of SCO's Ownership MSJ 4/9/2007, PACER No. 260)).  Similarly, Burt Levine, a former paid SCO litigation consultant who was represented by SCO's counsel at his deposition, testified that Novell's UNIX patents were not transferred to Santa Cruz.  (Brakebill Decl., Ex. 25, Deposition of Burt Levine, March 23, 2007 ("Levine Dep.") at 146:22 to 149:9, 185:9-23.)

### a. The scope of the transferred assets was specifically negotiated.

SCO has asserted that there is no evidence that the parties intentionally excluded the UNIX and UnixWare copyrights from the assets to be transferred by Novell to Santa Cruz. However, the best evidence of the parties' intent is the language of the APA itself. The language of the APA could not be clearer: "all copyrights" are excluded.

In any event, SCO's assertions regarding intent conveniently overlook the very written communications exchanged between the parties at the time the APA was being negotiated. Counsel for Novell and Santa Cruz exchanged specific communications about the precise scope of the assets to be transferred.

On September 8, 1995, Novell's counsel sent a first draft of Schedule 1.1(a) to Santa Cruz's counsel on September 8, 1995, along with a draft of the APA. This initial draft *included* "all patents, patent applications, copyrights…and all other intellectual property…that pertain to Unix or UnixWare" in the assets to be transferred to Santa Cruz.[8] (Undisputed Facts, ¶ 16; Braham Decl., ¶ 15, Ex. 6 thereto.) However, Novell then revised Schedule 1.1(a) to *delete* the reference to patents and copyrights, leaving UNIX and UnixWare trademarks as the *only* "Intellectual Property" identified as assets. (Undisputed Facts, ¶ 17; Braham Decl., ¶ 15, Ex. 7 thereto.)

---

[8] As noted above, extrinsic evidence is inadmissible to contradict the plain language of an integrated contract, but is admissible "to supplement or explain the terms of the agreement," where "such evidence is *consistent* with the terms of the integrated document." *EPA Real Estate P'ship*, 12 Cal. App. 4th at 176-77 (emphasis in original; citations omitted). Because the APA explicitly excludes "all copyrights" from the transfer, the Court need not consider extrinsic evidence to decide the meaning of the APA. However, the extrinsic evidence cited in support of this motion is consistent with the plain language of the APA, and hence may be properly considered if the Court wishes to do so. In contrast, the extrinsic evidence cited by SCO is not admissible because the APA is not "reasonably susceptible" to SCO's proposed interpretation.

Further, on September 18, 1995, Novell's counsel sent revised Schedules 1.1(a) and 1.1(b) to Santa Cruz's counsel.  (Undisputed Facts, ¶ 18; Braham Decl., ¶ 17 and Ex. 4 thereto.) These drafts made redlined revisions to the included and excluded assets, including to the Section V list of included and excluded "Intellectual Property."  However, the revised Schedule 1.1(b) continued to exclude "all copyrights" from the transferred assets.  (Undisputed Facts, ¶¶ 19, 22; Braham Decl., Ex. 4.)  The description of "Intellectual Property" in the final versions of Schedules 1.1(a) and (b) attached to the APA were identical to Novell's drafts of September 18, 1995, confirming that Santa Cruz accepted Novell's proposed revisions.  (*Compare* Braham Decl., Ex. 4 *with* Brakebill Decl. Exs. 3, 4.)

In sum, the negotiation history demonstrates that counsel to Novell and Santa Cruz specifically considered and revised the lists of included and excluded assets.  Novell provided advance written notice that Novell had decided to *delete* copyrights and patents from the included assets, and instead proposed to *exclude* all copyrights and patents from the transferred assets.  Santa Cruz accepted this exclusion, and SCO — as the successor-in-interest to Santa Cruz — is in no position to attempt to reverse that concession.

> **b.      Novell deliberately excluded copyrights to protect its continuing interests in UNIX and UnixWare.**

As noted above, Novell's initial goal was to sell its UNIX assets for an all-cash payment. (Undisputed Facts, ¶ 5.)  However, because Santa Cruz did not have sufficient cash, the transaction was structured so that Novell would retain significant UNIX-related rights.  In particular, Novell retained the right to receive 95% of future "SVRX" revenues collected by Santa Cruz under licenses to the UNIX System V operating system.  (*Id.*)  Novell also retained the right to modify the SVRX Licenses, so that Novell could, *inter alia*, negotiate "buy-outs" of

the SVRX revenue stream. (*Id.*, ¶ 6.) In addition, Novell obtained a commitment from Santa Cruz to develop an enhanced version of UnixWare that was intended to increase the market for Novell's "NetWare" product, as well as the right to receive royalties on Santa Cruz's future sales of UnixWare products. (*Id.*, ¶¶ 7-8.) Novell also had a strong interest in the development of a UNIX operating system that would run on Intel's 64-bit processor, to further expand the market for Novell's NetWare product. (*Id.*, ¶ 9.)

Robert Frankenberg, Novell's CEO, directed his team to take steps to protect Novell's UNIX-related rights and interests. (Undisputed Facts, ¶ 11.) To implement this instruction, Novell's legal team decided to exclude the UNIX and UnixWare copyrights from the assets transferred to Santa Cruz. (*Id.*, ¶¶ 12-13.) This exclusion ensured that the UNIX and UnixWare copyrights would not be part of the bankruptcy estate if Santa Cruz went into bankruptcy, and thus made it less likely that the bankruptcy trustee would assert an interest in these copyrights or in the related revenue streams. (*Id.*, ¶ 14.) Retaining ownership of the UNIX and UnixWare copyrights also strengthened Novell's legal basis for receiving royalties and negotiating buy-outs of SVRX Licenses, and put Novell in a better position to ensure development of future versions of the UNIX operating system. (*Id.*)

> **c.    Santa Cruz had a license to use the UNIX and UnixWare copyrights, and hence did not need to acquire ownership to implement the APA.**

SCO has asserted that excluding UNIX and UnixWare copyrights from the transferred assets would be inconsistent with the APA's purpose because Santa Cruz allegedly could not pursue its UNIX business unless it owned these copyrights. However, as noted above, this exclusion was consistent with the goal of protecting the UNIX-related rights retained by Novell, which were a critical part of the consideration for Novell's sale of most of its UNIX assets.

26

Moreover, contrary to SCO's assertion, Santa Cruz did not need to own the UNIX and UnixWare copyrights to pursue its UNIX business. It is well-established that a contract involving copyrighted works confers an implied license to use the copyrights as needed to implement the transaction, even if the contract does not expressly refer to a license. For example, in *Foad Consulting Group, Inc. v. Musil Govan Azzalino*, 270 F.3d 821 (9th Cir. 2001), defendant's predecessor paid $175,000 to plaintiff to prepare a preliminary plot plan and final engineering drawings for a proposal to build a shopping center. *Id.* at 824. When defendant hired a different firm to complete the project using a modified version of plaintiff's plan, plaintiff claimed that defendant had no right to use and modify plaintiff's copyrighted drawings. *Id.* at 824-25. The Ninth Circuit rejected this claim, holding that the contract granted "an implied license to use the revised plot plan to build the project." *Id.* at 828. The Ninth Circuit emphasized that "[t]he central purpose of the contract" was the production of engineering documents for the shopping center. Given this purpose and the amount of money paid, "it would have been surprising if the parties had intended for [defendant] to seek [plaintiff's] permission before using the plans to build the project. *Id.*

Here, while copyrights were excluded from the transferred assets, Santa Cruz did acquire ownership of other rights in multiple versions of UNIX and UnixWare. (Brakebill Decl., Ex. 3, Schedule 1.1(a), Section I (list of "UNIX Source Code Products," "Binary Product Releases," "Products Under Development," and "Other Technology" included in the sale).) Moreover, a "central purpose" of the APA was to enable Santa Cruz to develop and distribute an improved version of UNIX that combined Novell's "UnixWare" product with Santa Cruz's "OpenServer." (Undisputed Facts, ¶¶ 7-8.) Implementing this purpose required Santa Cruz to copy, modify, distribute, and sublicense the copyrighted code in Novell's UnixWare products. Thus, Novell's

27

sale of its UNIX and UnixWare products necessarily conferred a license on Santa Cruz to use the related copyrights as needed to carry out the business activities contemplated by the APA, including the development of derivative works such as the Merged Product. *See Foad*, 270 F.3d at 828; *see also Effects Assoc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) (plaintiff's delivery of special effects sequence conferred an implied copyright license to use the sequence in a movie, because plaintiff "created a work at defendant's request and handed it over, intending that defendant copy and distribute it").

The conclusion that Santa Cruz had a license to the UNIX copyrights is reinforced by the fact that Santa Cruz indisputably did not acquire ownership of Novell's UNIX-related patents. (*See supra*, footnote 7.)  Santa Cruz needed to use these patents to be able to distribute and modify UNIX products.  Therefore, Novell's sale of its UNIX products to Santa Cruz necessarily conveyed a license to use the patents as needed to implement the APA.  As noted by Burt Levine, a former paid consultant to SCO and in-house attorney for AT&T, USL, Novell, and Santa Cruz, the APA "convey[ed] enough of a patent license under Novell's patents that would be necessary for SCO to conduct its business."  (Brakebill Decl., Ex. 25, Levine Dep. at 185:17-23; *see id.* at 7-24, 148-49.)

Similarly, because Santa Cruz needed to use the UNIX and UnixWare copyrights to distribute and modify UNIX products, the APA conferred a license on Santa Cruz to use the copyrights as needed to implement the APA.  (Braham Decl., § 20.)  As Burt Levine testified:

> Q.    Assuming that the copyrights had been retained by Novell
>       in the transaction, SCO would have had a license to use
>       those copyrights in the business, correct?
>
> A.    Correct.

28

(Brakebill Decl., Ex. 25, Levine Dep. at 89:7-11; *see id.* at 88:5-89:2 (Santa Cruz "absolutely, absolutely" would have had a license to use copyrights in its business; there would be an "inherent" license to do "anything necessary to practice the copyright in the transferred asset").) Mr. Levine testified further: "My understanding is similarly to my stand on copyrights that the grant of the whole business carries with it at least licenses under the patents needed to carry on the business to the extent that Novell had them." (*Id.* at 87:2-6; *see also id.* at 185:9-23.)

> **4.    The Other Contractual Provisions Cited by SCO Do Not Demonstrate that the UNIX and UnixWare Copyrights Transferred to Santa Cruz.**

SCO has asserted that other provisions of the APA demonstrate that the APA was intended to transfer ownership of the UNIX and UnixWare copyrights, despite the Schedule 1.1(b) exclusion of "all copyrights." None of the provisions cited by SCO support this assertion.

> **a.    Schedule 1.1(a) does not demonstrate that the exclusion of "all copyrights" was limited to "NetWare" copyrights.**

SCO contends that UNIX and UnixWare copyrights were included in the assets to be transferred to Santa Cruz, because Schedule 1.1(a) refers to "[a]ll rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare…." (*See, e.g.*, SCO's Ownership MSJ 4/9/2007, PACER No. 259, at 2.) SCO fails to mention, however, that Schedule 1.1(a)'s description of the "Intellectual Property" to be transferred identified only UNIX and UnixWare *trademarks*, and did not include any copyrights. (Undisputed Facts, ¶ 3; Brakebill Decl., Ex. 3, Section V.)

Moreover, even if Schedule 1.1(a) were deemed to include "UNIX and UnixWare copyrights" as an asset to be transferred, this would have been overridden by Schedule 1.1(b)'s exclusion of "all copyrights." (Undisputed Facts, ¶ 3; Brakebill Decl., Ex. 3, Section V.) The

APA initially defined the "Assets" to be transferred by reference to Schedule 1.1(a), but then

added a critical qualification: "*Notwithstanding the foregoing*, the assets to be so purchased

*shall not include* those assets (the 'Excluded Assets') set forth on Schedule 1.1(b)." (Brakebill

Decl., Ex. 2, Section 1.1(a) (emphasis added).) This "notwithstanding" clause makes clear that

the Schedule 1.1(b) exclusion of "all copyrights" controls over any contrary language in

Schedule 1.1(a). (Braham Decl., ¶ 19.) *See National Ins. Underwriters v. Maurice Carter*, 17

Cal. 3d 380, 384-86 (1976) (specific exclusion of insurance coverage when airplane is operated

by an unqualified pilot prevails over general definition of "insured" as including "any person

while using or riding in the aircraft").

> **b.      The definition of "Business" does not demonstrate that
>           "all copyrights" means "NetWare copyrights only."**

SCO also relies on the APA's general references to the "Business" to support its

argument that the APA transferred all copyrights. (*See, e.g*., SCO's Ownership MSJ 4/9/2007,

PACER No. 259, at 21.) SCO cites, for example, Recital A of the APA, which defined the

"Business" as Novell's business in developing UNIX and UnixWare, selling binary and source

code licenses to these products and to directly related products, and supporting these products.

(Brakebill Decl., Ex. 2, at 1.) SCO also relies on references in Recital B and Section 1.3(a)(i) to

the parties' intent to sell "the Business."

These provisions do not support SCO's position because the specific assets to be

transferred were defined in Section 1.1(a) and Schedules 1.1(a) and (b), and not in Recitals A

and B or Section 1.3. "[W]hen a general and particular provision are inconsistent, the latter is

paramount to the former." *National Ins. Underwriters*, 17 Cal. 3d at 86 (quoting Cal. Civ. Proc.

Code § 1859). Schedule 1.1(b)'s specific exclusion of "all copyrights" from the assets to be

transferred prevails over the general definition of "Business" in other parts of the APA.  *See id.*

(holding that "[t]he specific language of the pilot exclusion clause overrides the general coverage

provisions of the insuring clause"); *Wilder v. Wilder*, 138 Cal. App. 2d 152, 157-58 (1955)

(where settlement agreement stated an intent to settle "all property rights" but then identified the

specific obligations that were settled, the settlement was limited to the itemized list).

**c.    Section 1.6 and the Technology License Agreement do
not demonstrate that "all copyrights" means "NetWare
copyrights only."**

SCO contends that the "license back" contemplated by Section 1.6 of the APA and

implemented by the Technology License Agreement implies that Novell transferred the UNIX

and UnixWare copyrights to Santa Cruz, because this license would have been unnecessary if

Novell retained ownership of the UNIX and UnixWare copyrights.  (SCO's Ownership MSJ

4/9/2007, PACER No. 259, at 22.)  The Technology License Agreement stated that Novell

"retains" a license to the "Licensed Technology," which was defined in the APA as:

> (i)    all of the technology included in the Assets and
>
> (ii)   all derivatives of such technology included in the Assets,
>        including the "Eiger" product release … .

(Brakebill Decl. Ex. 2, Section 1.6, and Ex. 5, TLA, Section II.A.)

SCO's argument fails because the "Licensed Technology" included valuable rights that

were distinct from Novell's "UNIX and UnixWare copyrights."  "Technology" is a broad

concept, which encompasses trade secrets and know-how, in addition to copyrights and patents.

Schedule 1.1(b) excluded copyrights and patents from the assets transferred to Santa Cruz, but

did not exclude trade secrets or software know-how.  Thus, Novell needed a license to be able to

31

use trade secrets and know-how related to the UNIX and UnixWare products that Novell sold to Santa Cruz. (Braham Decl., ¶ 23.)

Further, "Licensed Technology" was defined to encompass "derivatives" of the technology included in the Assets. The APA contemplated that Santa Cruz would create derivative works, including a "Merged Product" that was an enhanced version of Novell's UnixWare product. (Undisputed Facts, ¶¶ 7-8.) Although Novell retained ownership of the UnixWare copyrights, Santa Cruz would own the copyrights in any new code written for the "Merged Product." Thus, to be able to use any new code in the "Merged Product" and other enhanced versions of UnixWare, Novell needed a license to Santa Cruz's copyrights in derivative works. (Braham Decl., ¶ 23.)

A further defect in SCO's argument is that the same "logic" would imply that Novell transferred ownership of UNIX-related patents because Novell would not have needed a license to these patents if it retained ownership. However, it is undisputed that Novell did *not* transfer ownership of the patents to Santa Cruz. (*See supra,* footnote 7.) This admission refutes SCO's argument that the Technology License Agreement implies that Novell must have transferred ownership of all UNIX-related technology to Santa Cruz.[9]

---

[9] SCO previously made a similar "argument-by-implication" that Novell's representation in Section 2.10 of the APA that Novell owns or has rights to the UNIX-related copyrights and patents identified in the attached schedules implies that Novell must have transferred ownership. SCO appears to have abandoned this argument, as it does not appear in SCO's Ownership MSJ 4/9/2007, PACER No. 259. In any event, these schedules support the *opposite* conclusion. Had the parties intended to transfer the UNIX copyrights, they easily could have done so by referring to the UNIX copyright list. However, not only did Schedule 1.1(a) fail to refer to this list, Schedule 1.1(b) expressly *excluded* "all copyrights" from the transfer. Moreover, as noted above, the APA conferred a license on Santa Cruz to Novell's UNIX copyrights and patents. Novell's representation in Section 2.10 that it owned or had rights to the UNIX copyrights and patents served the purpose of ensuring that Novell had the right to grant this license.

     **5.**       **The Scope of Assets Transferred by the Bill of Sale Is Controlled by the APA and Amendment No. 1, and Not by Amendment No. 2.**

SCO has argued that the exclusion of "all copyrights" in Schedule 1.1(b) of the APA "does not exist for purposes of construing the APA," because this exclusion was modified by Amendment No. 2. (SCO's Ownership MSJ 4/9/2007, PACER No. 259, at 2.) At the same time, however, SCO contends that the alleged transfer of the UNIX and UnixWare copyrights was "effectuated" by the Bill of Sale executed by Novell on December 6, 1995. (*Id.* at 1, 27.) SCO is forced to rely on the Bill of Sale because the Copyright Act requires a signed "instrument of conveyance" to transfer copyright ownership. 17 U.S.C. § 204(a). The APA does not constitute an "instrument of conveyance," because it merely describes the assets that Novell "will" sell and transfer *in the future*, and does not actually transfer such assets. (Undisputed Facts, ¶ 22.)

SCO's argument suffers from a fatal defect: the Bill of Sale transferred the "Assets" as defined by "the Agreement," which the Bill of Sale defines as the APA and Amendment No. 1. (Undisputed Facts, ¶ 22.) The Bill of Sale did not transfer the "Assets" as defined by the APA *and Amendment No. 2.* Indeed, the Bill of Sale did not mention Amendment No. 2. This is not surprising, since the Bill of Sale was executed on December 6, 1995, or ten months *before* Amendment No. 2 was signed on October 16, 1996. When the Bill of Sale was executed, it obviously could not and did not transfer the "Assets" as defined by an amendment that did not even exist. Moreover, Amendment No. 2 was *not* retroactive and did not purport to transfer any copyrights or other assets. (Undisputed Facts, ¶¶ 29, 30; *see infra*, Section IV.B.2.)

Thus, contrary to SCO's assertion, Schedule 1.1(b)'s exclusion of "all copyrights" is highly relevant — indeed, dispositive — in determining whether the Bill of Sale transferred the UNIX and UnixWare copyrights. Conversely, Amendment No. 2 is irrelevant in determining the

legal effect of the Bill of Sale.  Of course, there is a *separate* issue as to whether Amendment No. 2, standing alone, transferred the UNIX and UnixWare copyrights.  As demonstrated in the following section, however, Amendment No. 2 did not transfer the copyrights.

>    **B.    Novell Is Entitled to Summary Judgment that Amendment No. 2 Does Not Constitute a Sufficient Written Instrument to Transfer UNIX and UnixWare Copyrights to Santa Cruz.**

The APA as amended by Amendment No. 2 did not transfer the UNIX and UnixWare copyrights because (1) the Copyright Act requires a signed "instrument of conveyance" to transfer copyright ownership; (2) Amendment No. 2 did not include any provisions transferring ownership of copyrights, nor did it purport to retroactively amend the Bill of Sale to transfer copyrights; (3) Amendment No. 2 did not specifically identify which copyrights, if any, should be transferred; and (4) Santa Cruz did not "require" ownership of the UNIX and UnixWare copyrights for its business, as Santa Cruz already had a license to use these copyrights as needed to implement the APA.

>    **1.    The Copyright Act Requires a Signed Instrument of Conveyance to Transfer Ownership of Copyrights.**

The Copyright Act requires a signed written instrument to transfer ownership of copyrights.  Section 204(a) states: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).

The "instrument of conveyance" required by Section 204 "enhances predictability and certainty of copyright ownership," which was Congress's "paramount goal" when it amended the Copyright Act in 1976.  *Effects Assoc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (citing

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 749-50 (1989)).  Consistent with

this purpose, Section 204 has been strictly applied to bar claims due to the absence of the

required "instrument of conveyance."  *Konigsberg Int'l, Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir.

1994) (dismissing claim for breach of exclusive copyright license due to the absence of a signed

final contract); *Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 926

(9th Cir. 1999) (granting summary judgment on claim for breach of exclusive copyright license

due to the absence of a signed contract).[10]  Section 204 is a substantive prerequisite to a valid

transfer of copyright ownership, and not merely an evidentiary rule; a transfer of copyright is

simply "not valid" without the required written instrument.  *Konigsberg Int'l,* 16 F.3d at 357.

Further, unlike a statute of frauds, Section 204 is not subject to equitable defenses such as

estoppel, as allowing such defenses would "undermine the goal of uniformity and predictability

in the field of copyright ownership and transfer."  *Pamfiloff v. Giant Records, Inc.*, 794 F. Supp.

933, 937 (N.D. Cal. 1992).

     Amendment No. 2 does not constitute the "instrument of conveyance" required by

Section 204(a) for three independent reasons, as discussed below.

### 2.    Amendment No. 2 Did Not Purport to Transfer Copyrights or to Retroactively Amend the Bill of Sale.

     The first reason that Amendment No. 2 does not satisfy Section 204(a) is that it did not

include any provision that purported to transfer ownership of copyrights.  Amendment No. 2 did

---

[10]  Both of these cases involved exclusive licenses, but were governed by Section 204(a) because the Copyright Act defines "transfer of ownership" as an "assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of any of the exclusive rights comprised in a copyright…but not including a nonexclusive license."  17 U.S.C. § 101. Thus, a signed writing is required for either a transfer of copyright ownership or an exclusive license, but not for a nonexclusive license.

not state that copyrights "are hereby transferred," "have been transferred," or even "will be

transferred." Rather, it merely revised the definition of the "Intellectual Property" category of

"Excluded Assets" under Schedule 1.1(b) by adding an exception for copyrights "required" for

Santa Cruz to exercise its rights. (Undisputed Facts, ¶ 24; Brakebill Decl., Ex. 28.)

Amendment No. 2's failure to include a provision transferring copyrights is particularly

significant in view of its negotiation history. Santa Cruz's first draft of Amendment No. 2

referred to copyrights "which pertain to UNIX and UnixWare technologies *and which SCO has

acquired hereunder.*" (Undisputed Facts, ¶¶ 33-34; Amadia Decl., Ex. 1 (emphasis added).)

This was clearly intended to transfer the UNIX and UnixWare copyrights to Santa Cruz.

However, Novell rejected Santa Cruz's proposed amendment, explaining that Novell was willing

to confirm that Santa Cruz had a license to use the UNIX and UnixWare copyrights, but was not

willing to transfer ownership of the copyrights. (Undisputed Facts, ¶ 35.) As a result, the final

version of Amendment No. 2 did not refer to SCO's "acquisition" of any copyrights.

(Undisputed Facts, ¶ 36.)

Further, unlike the APA, Amendment No. 2 was *not* accompanied by a separate "Bill of

Sale" or similar document that transferred additional assets. (Undisputed Facts, ¶ 30) Nor did

Amendment No. 2 purport to retroactively change the scope of assets transferred by the Bill of

Sale that was previously executed in connection with the APA. On the contrary, Amendment

No. 2 stated that it "amended" the APA "[a]s of the 16th day of October, 1996," which was

thirteen months *after* the APA was signed on September 19, 1996, and ten months after the Bill

of Sale was executed on December 6, 1995. (*Id.*) Thus, Amendment No. 2 did not retroactively

cause the Bill of Sale to transfer copyrights that were expressly excluded from transfer by the

APA and Amendment No. 1.

### 3. Amendment No. 2 Did Not Identify Which Copyrights, If Any, Should be Transferred.

Another reason why Amendment No. 2 fails to constitute the required "instrument of conveyance" that it did not specify which copyrights, if any, should be transferred. The written instrument required by Section 204 should contain sufficient information "to serve as a guidepost for the parties to resolve their disputes," thereby enabling the parties to resolve disputes by examining "the writing that sets out their respective rights." *Konigsberg Int'l,* 16 F.3d at 357. Consistent with Section 204's goal of "enhanc[ing] the predictability and certainty of copyright ownership," the written instrument must "(1) reasonably identify the subject matter of the agreement, (2) be sufficient to indicate the parties have come to an agreement, and (3) state with reasonable certainty the essential terms of the agreement." *Pamfiloff*, 794 F. Supp. at 936-37.

Santa Cruz's first draft of Amendment No. 2 referred to copyrights "*which pertain to UNIX and UnixWare technologies* and which SCO has acquired hereunder." (Undisputed Facts, ¶ 30; Amadia Decl., Ex. 1 (emphasis added).) However, because Novell objected to this draft, the final version referred to copyrights "required for SCO to exercise its rights with respect to the acquisition of the UNIX and UnixWare technologies." (Undisputed Facts, ¶ 33.)

SCO now contends that Santa Cruz "required" ownership of all of Novell's UNIX and UnixWare copyrights to exercise its rights regarding the UNIX assets that Santa Cruz acquired under the APA. Novell, in contrast, contends that Santa Cruz did not need to own these copyrights, because Santa Cruz already had a license to the copyrights. The questions that Amendment No. 2 leaves open are legion, including what particular rights as to which of the many versions and releases of UNIX and UnixWare were transferred. Thus, it is clear that there was no "meeting of the minds" regarding which copyrights, if any, were required for Santa Cruz to exercise its rights.

**4.    Santa Cruz Did Not "Require" Ownership of the UNIX and UnixWare Copyrights for its Business As It Already Had a License to Use these Copyrights as Needed to Implement the APA.**

A final reason that Amendment No. 2 does not constitute an "instrument of conveyance" under Section 204 is that Santa Cruz did not "require" ownership of Novell's UNIX and UnixWare copyrights to exercise its rights under the APA.  In fact, because the APA excluded "all copyrights" from the transfer, Santa Cruz indisputably did not own the copyrights during the ten months between the execution of the Bill of Sale at the closing on December 6, 1995, and entry of Amendment No. 2 on October 16, 1996.  Nevertheless, Santa Cruz was able to pursue its UNIX business during this time period without any problems caused by its lack of ownership of the copyrights.

Santa Cruz was able to pursue its UNIX business without owning the UNIX and UnixWare copyrights because, as discussed above, the APA conferred a license on Santa Cruz to use Novell's copyrights as needed to implement the purposes of the APA.  (*See supra*, Section IV.A.3.c.)  Because Santa Cruz already had a license, Santa Cruz did not "require" ownership of the copyrights.  Therefore, even if Amendment No. 2 had stated that it "hereby transfers" all copyrights required by Santa Cruz for its UNIX business (which it did not), Amendment No. 2 would not have transferred any copyrights as no copyrights were "required."

**C.    Novell Is Entitled to Summary Judgment on SCO's Slander of Title Claim Because SCO Cannot Demonstrate that Novell's Assertion of Copyright Ownership Was False.**

SCO's first claim in its Second Amended Complaint alleges that Novell has slandered SCO's title by falsely and maliciously asserting that Novell, not SCO, owns the copyrights in UNIX and UnixWare.  (Brakebill Decl., Ex. 1, Second Amended Complaint, filed February 3,

2006, PACER No. 96, ("Second Am. Compl., PACER No. 96") at ¶¶ 91-92.)  To prevail on its

slander of title claim, SCO must establish:

1.      Novell published a slanderous statement disparaging SCO's title;

2.      the statement was false;

3.      the statement was made with malice; and

4.      the statement caused actual or special damages.

*First Sec. Bank of Utah v. Banberry Crossing*, 780 P.2d 1253, 1256-67 (Utah 1989).

As demonstrated above, the Bill of Sale did not transfer the UNIX and UnixWare

copyrights from Novell to Santa Cruz, because the APA excluded "all copyrights" from the

transferred assets.  Amendment No. 2 also did not transfer the copyrights for multiple reasons.

Therefore, Novell is entitled to summary judgment on SCO's slander of title claim because SCO

cannot establish that Novell's assertion that it owned the copyrights was false.

**D.      Novell Is Entitled to Summary Judgment On SCO's Claim for Specific Performance of Novell's Alleged Obligation to Transfer the UNIX and UnixWare Copyrights to SCO.**

SCO's third claim in its Second Amended Complaint alleges that the "purpose and

effect" of the APA was to transfer title to the UNIX and UnixWare copyrights to SCO's

predecessor, Santa Cruz, and that the APA required Novell to take all actions necessary to

effectuate this purpose.  (Brakebill Decl., Ex. 1, Second Am. Compl., PACER No. 96, at

¶¶ 103-04.)  SCO claims that it is entitled to an order directing Novell to specifically perform its

obligations under the APA by executing all documents needed to transfer ownership of the copyrights to SCO.[11]  (*Id.*, ¶¶ 107-08.)

As demonstrated above, neither the original APA nor Amendment No. 2 entitled Santa Cruz to obtain ownership of the UNIX and UnixWare copyrights.  Therefore, Novell is entitled to summary judgment on SCO's claim for specific performance because SCO cannot establish that Santa Cruz had the right to obtain title to the copyrights.

## V.    CONCLUSION

The APA explicitly excluded "all copyrights" from the assets to be transferred by Novell to Santa Cruz.  SCO's attempt to rewrite "all copyrights" as "some copyrights" fails because it is contrary to the plain language and to the parol evidence rule.  SCO's reliance on Amendment No. 2 is also misplaced, because Amendment No. 2 did not transfer ownership of any copyrights, and Santa Cruz already had a license and hence did not "require" ownership of the UNIX and UnixWare copyrights.

For all of these reasons, Novell requests the Court to enter summary judgment that neither the APA nor Amendment No. 2 transferred ownership of the copyrights to Santa Cruz, and that SCO's slander of title and specific performance claims fail as a matter of law.

---

[11] SCO has also requested that this court require Novell to transfer to SCO "the UNIX and UnixWare business, without subjecting any portion of that business, other than the SVRX binary royalty stream, to Sections 4.16, 1.2(b), and 1.2(f)."  (*Id.*, ¶ 108.)  This appears to be an unjustified attempt to place a binary limitation on Novell's authority and rights under Sections 1.2(b), 1.2(b) and 4.16 of the APA.  This attempt fails for the reasons set forth in Novell's pending Motion for Partial Summary Judgment on its Fourth Claim for Relief (PACER No. 155) and pending Motion for Partial Summary Judgment or Preliminary Injunction (PACER No. 148).  Therefore, Novell is entitled to summary judgment on the "Section 4.16" portion of SCO's Third Claim for specific performance.

DATED:   April 20, 2007

ANDERSON & KARRENBERG

By: _____ */s/  Heather M. Sneddon* _____

Thomas R. Karrenberg
John P. Mullen
Heather M. Sneddon

-and-

MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice)
Kenneth W. Brakebill (pro hac vice)
Grant L. Kim (pro hac vice)

**Attorneys for Defendant and
Counterclaim-Plaintiff Novell, Inc.**

41

# EXHIBIT 14

## Wayne R. Gray

**From:**      "Raynes, Evan" <evan.raynes@finnegan.com>
**To:**        <dlppa@mindspring.com>
**Cc:**        "Sommers, Mark" <mark.sommers@finnegan.com>; "Coe_George" <gcoe@bsfllp.com>;
               "Mullen_John P_Esquire" <jmullen@aklawfirm.com>
**Sent:**      Tuesday, April 10, 2007 12:23 PM
**Subject:**   RE: Gray v. Novell et al.

David:

We have spoken with our client about your request to declassify the September 4, 1996 Confirmation Agreement.

X/Open believes that entering into a standing protective order would make more sense than dealing with confidentiality issues on a piecemeal basis. However, to accommodate Gray's immediate request, X/Open agrees that Gray may see the Confirmation Agreement, provided that he agrees to the same restrictions that would apply to CONFIDENTIAL documents pursuant to a standing protective order, and provided that the other defendants do not object.

Specifically, X/Open will provide you with a copy of the Confirmation Agreement marked CONFIDENTIAL under the conditions that:

1. Other than outside counsel, only Gray can see the agreement.

X/Open contemplates that outside experts would also be permitted to see CONFIDENTIAL documents under a standing protective order if they sign a Secrecy Agreement concerning the use of such documents, but only once a protective order is signed.

2. The Confirmation Agreement will be used only for the purpose of preparing and conducting this litigation, including any mediation related to this litigation, and will not be used by or on behalf of any party or person to whom it is disclosed for any other purpose whatsoever, including but not limited to any business, commercial, competitive, financial, informational, personal, or other purpose, or other litigation in any forum, including any administrative forum. In particular, the Confirmation Agreement, including the existence of the agreement, may not be disclosed, disseminated, or revealed to or discussed with any third party, in full or summary form, in general or specific terms, or directly or indirectly, including without limitation: customers, licensees, retailers, wholesalers, distributors, and members of the parties; trade, industry, professional, or personal contacts of any kind; correspondents or other personnel from the print or electronic press, including members of the trade press and the legal press; websites to which content of any type can be added; electronic or print publications of any type; secretarial and clerical personnel of persons permitted access to the Confirmation Agreement, unless they have been informed of the above obligations and verbally agree to such obligations; and outside experts or consultants, or prospective experts or consultants, unless they sign the Secrecy Agreement attached to the standing protective order that will be entered into in this case, whether retained or not.

3. The Confirmation Agreement and all court filings (or portions of such filings) discussing the contents of the Confirmation will be filed under seal.

4. The above restrictions will apply in perpetuity, including after the conclusion of this case.

5. All copies of the Confirmation Agreement, whether in print or electronic form, will be returned within 30 days of the conclusion of this case. Alternatively, Gray may destroy all copies of the Confirmation Agreement and provide sworn confirmation of the destruction within 30 days of the conclusion of this case.

Please confirm that Gray agrees to the above conditions. Once we receive your confirmation, we will provide you with a copy of the Confirmation Agreement marked CONFIDENTIAL, again, provided that the other defendants do not object.

Please note that this accommodation does not apply to any other documents, and that all other confidential

documents provided in this case will be produced only pursuant to a standing protective order.

Sincerely,

Evan A. Raynes
Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Telephone: 202.408.4114
Facsimile: 202.408.4400
E-mail: evan.raynes@finnegan.com

---

**From:** Raynes, Evan
**Sent:** Monday, April 09, 2007 4:26 PM
**To:** 'dlppa@mindspring.com'
**Cc:** Sommers, Mark; Guerrant_William C.; Coe_George; Mullen_John P_Esquire
**Subject:** RE: Gray v. Novell et al.

David:

We are perfectly willing to discuss any discovery issue with you in good faith, but giving us 24 hours to declassify the Confirmation Agreement is unreasonable, particularly given that our client is based in England. Further, we do not see the need to file a motion tomorrow given that your responses to our discovery requests are not due until May 2, 2007 and that discovery does not close until July 29, 2008.

We believe that some accommodation can be reached as to the treatment of this and hopefully other confidential documents based on strict limitations on the use of confidential information by your client and the defendants, provided of course that the other defendants agree to such an approach. However, we have not yet had an opportunity to talk to our client about this issue in view of the short notice. We have contacted our client about this, and will get back to you as soon as possible, hopefully tomorrow.

Sincerely,

Evan A. Raynes
Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Telephone: 202.408.4114
Facsimile: 202.408.4400
E-mail: evan.raynes@finnegan.com

---

**From:** David Partlow [mailto:dlppa@mindspring.com]
**Sent:** Monday, April 09, 2007 10:04 AM
**To:** Raynes, Evan; Sommers, Mark
**Cc:** Dyer_Karen; Coe_George; Guerrant_William C.; McClure, Fredrick H.L.; Thompson, E. Colin; Mullen_John P_Esquire; Sneddon_Heather
**Subject:** Gray v. Novell et al.

We are experiencing some difficulty in formulating discovery due to the fact that Wayne Gray has not been permitted to view the 1996 Confirmation Agreement furnished to me by SCO and termed by Novell to be dispositive of the TTAB case, which has been classified "Highly Confidential--Attorneys Eyes Only." I'm sure you will remember that Novell and

SCO previously granted that permission in the underlying TTAB case, but we have a difference of opinion as to whether or not you also granted that permission. I have decided to file a motion not later than tomorrow morning to completely declassify that document, unless I can show it to him now. Please let me know your present position.

/s/ David L. Partlow

# EXHIBIT 15

## Wayne R. Gray

| | |
|---|---|
| **From:** | "David Partlow" <dlppa@mindspring.com> |
| **To:** | "Coe_George" <gcoe@bsfllp.com>; "Dyer_Karen" <kdyer@BSFLLP.com>; "Guerrant_William C." <wguerrant@hwhlaw.com>; "Karrenberg_Thomas R." <tkarrenberg@aklawfirm.com>; "McClure, Fredrick H.L." <fredrick.mcclure@dlapiper.com>; "Mullen_John P_Esquire" <jmullen@aklawfirm.com>; "Sneddon_Heather" <HeatherSneddon@aklawfirm.com>; "Sommers_Mark" <mark.sommers@finnegan.com>; "Raynes, Evan" <evan.raynes@finnegan.com>; "Thompson, E. Colin" <Colin.Thompson@dlapiper.com> |
| **Sent:** | Friday, May 11, 2007 4:20 PM |
| **Subject:** | Declassifying the 1996 Confirmation Agreement |

I have carefully considered your objections to and comments on my proposals concerning the 1996 Confirmation Agreement, and I have thoroughly discussed them with my client. In addition, we have taken a rather close look at the law concerning confidentiality of documents such as this, and I have compared that research to this simple document.

The 1996 Confirmation Agreement appears to be a rather benign document in and of itself, unless fraud was involved. However, counsel for Novell has previously advised me that it was to be considered dispositive of the trademark issues. The more I look at our fraud claims in the present case, the more I am inclined to agree with Novell's position, but probably not in the way that the statement was intended. In any event, it clearly deals directly with the trademark issues.

Although we were able to promulgate a considerable amount of the discovery inquiries which we desired, we were not able to go into everything that we wanted because I was not able to discuss this with my client, and not able to freely use the 1996 Confirmation Agreement.

We have never been informed of any substantial business reason whatsoever why this document should be confidential, let alone "Highly Confidential" as has been claimed. In addition, it is over 10 years old at this point, and without rather extreme specific justification, essentially on a line-by-line basis, courts do not tend to treat such documents as confidential in any way whatsoever unless trade secrets are involved.

Accordingly, it is now our position that there should be no restrictions whatsoever placed upon the use of the 1996 Confirmation Agreement. If we do not receive agreement with this proposal by noon on Wednesday, May 16, 2007, I intend to file the appropriate motion. I look forward to your respective responses.


/s/ David L. Partlow

# EXHIBIT 16

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

X/OPEN COMPANY LIMITED,

      Opposer,

vs.

                               Opposition No.:  91122524

WAYNE R. GRAY,
                               Application Serial No.:  75/680,034

      Applicant.

_____/

## LETTER OF INQUIRY

      Applicant respectively requests an update as to the status of the Board's consideration of the pending motions, in view of the fact that X/Open's Unix marks in suit are about to expire. Registration No. 1390593 will expire April 22, 2006 and No. 1392203 will expire May 6, 2006. These expirations may result in cancellation prior to the Board ruling in the pending motions.

      Over a year ago, on February 24, 2005, Opposition No. 91122524 proceeding was suspended pending disposition of Applicant's Motions to Compel and Test Admissions, except for parties' responses to discovery requests duly served prior to pending Motion filings. The Board's letter suspending these proceedings also states, "The parties should not file any paper which is not germane to the Motion to Compel." Applicant respectively submits that the following issues are germane to Applicant's pending discovery motions and the Board's consideration thereof.

      **Docket error**

Prior to the Board's February 24, 2005 suspension of these proceedings, counsel for

X/Open and Applicant participated in a recorded telephonic conference with the interlocutory attorney on or about February 22, 2005 relating to a document X/Open refers to as a "1996 Confirmation Agreement" ("1996 Agreement") between them, Novell, Inc. and Santa Cruz Operation, Inc., and at issue in Applicant's Motion to Compel. At the conclusion of the conference it was agreed X/Open and Applicant would submit briefs not to exceed five pages in support of their arguments relating to X/Open classifying the 1996 Confirmation Agreement as "highly confidential" and X/Open would submit to the Board a copy of the "1996 Confirmation Agreement". Both parties to this opposition submitted under seal their respective briefs and it is believed X/Open submitted under seal a copy of the 1996 Agreement, yet the docket record does not reflect the briefs and 1996 Agreement.

Applicant respectively requests the Board correct the docket record and reflect entry of the briefs and entry of the 1996 Agreement, albeit the documents themselves are under seal.

### Unix Marks Registration Status

The Unix marks in suit, Registration Nos. 1390593 and 1392203 will expire April 22, 2006 and May 6, 2006 respectively, and cancellation may result in dismissal of this proceeding, which of course affects consideration of the pending discovery motions. Applicant's counsel has requested that X/Open's counsel reveal X/Open's intent regarding renewal of the Unix mark registrations and any issues relating thereto, yet they have not responded. If X/Open has any concerns or issues relating to renewal of the Unix marks in suit, including but not limited to renewal during suspension of these proceedings, they should be required to bring these to the attention of the TTAB and Applicant now, not after mark cancellation.

If X/Open intends to allow expiration and cancellation of the Unix marks by the PTO without Applicant's consent, it is only appropriate they notify the Board and Applicant of their intent, thus allowing the Board to proceed with entry of an uncontested judgment against X/Open after mark cancellation, pursuant to TBMP 602.02(b), and not cause the Board the expenditure of unnecessary resources in continuing their consideration of Applicant's pending motions.

2

However, Applicant has reason to believe it is X/Open's intent to knowingly and voluntarily allow expiration and cancellation of the Unix marks in suit without Applicant's consent, and then plead a showing of good and sufficient cause to this Board as to why cancellation or failure to renew the Unix marks should not be deemed to be the equivalent of a cancellation by request of X/Open without the consent of Applicant and should not result in entry of judgment against them. The Board should not allow X/Open to engage in such gamesmanship.

Considering X/Open has had and continues to have significant time to address any concerns or issues that could possibly impede their renewal of the Unix marks registrations, Applicant respectively requests that the Board require X/Open to immediately state their intentions concerning registration renewal of the Unix marks, as X/Open's intent bears directly upon the Board's consideration of the pending motions.

### Unix Marks Chain of Title

Applicant has made multiple requests of X/Open, as an alleged Unix marks assignee, to produce and submit a sworn Unix marks chain of title affidavit with documentary evidence to Gray and the PTO relating to their ownership claims, as required by TMEP §502.01 ("…in order to request or take action in a patent or trademark matter, the assignee must establish its ownership of the patent or trademark property of paragraph (a) of this section to the satisfaction of the Director.") X/Open has continually declined to do so.  This request relates to Applicant's discovery requests predating his Motion to Compel and Motion to Test Admissions filings and pursuant to the Boards February 24, 2005 order, the current proceedings suspension is not a valid reason for X/Open's continuing refusal to respond to this and Gray's other discovery requests.

Considering X/Open's five year refusal to comply with TMEP §502.01 in this proceeding, Applicant respectively requests the Board order X/Open to produce forthwith a sworn Unix marks chain of title affidavit with documentary evidence, or in the alternative, permit Applicant to file a motion requesting the same. If X/Open cannot or will not produce a sworn chain of title affidavit it is only appropriate that the Board suspend consideration of Applicant's

3

pending Motion to Compel and Motion to Test Admissions, and enter an uncontested judgment against X/Open.

**CONCLUSION**

Applicant respectively requests the Board expedite its response (due to the impending expiration of both registrations at issue) and order X/Open's reply as set forth above prior to expiration of the Unix marks, as these issues are germane to Applicant's pending discovery motions.

Respectfully submitted,

David L. Partlow, FBN 239682
Josiah E. Hutton, FBN 793851
David L. Partlow, P.A.
4100 W. Kennedy Blvd., Suite 210
Tampa, FL 33609-2244
(813) 287-8337; FAX (813) 287-8234
Counsel for Applicant

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been furnished by *FAX & U.S. mail* to Evan A. Raynes, Esquire, at Finnegan, Henderson, Farabow, Garrett, & Dunner, L.L.P., 901 New York Ave., N.W., Washington, D.C. 20001-4413, this *14th* day of *April*, 20*06*.

David L. Partlow

# EXHIBIT 17

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

|  |  |  |
|---|---|---|
| X/OPEN COMPANY LIMITED, | ) | |
| | ) | |
| Opposer/Respondent, | ) | |
| | ) | Opposition No. 91122524 |
| v. | ) | Application Serial No. 75/680,034 |
| | ) | Mark: INUX |
| WAYNE R. GRAY, | ) | |
| | ) | |
| Applicant/Petitioner. | ) | |

## X/OPEN'S MOTION TO STRIKE
## GRAY'S "LETTER OF INQUIRY" OR, IN THE ALTERNATIVE,
## GRANT X/OPEN'S REQUEST FOR EXTENSION OF TIME TO RESPOND

Gray's "Letter of Inquiry," filed on April 14, 2006, is far more than a simple inquiry into the status of these proceedings. Gray's letter contains numerous allegations and requests judgment against X/Open, and is far outside the scope of the Board's suspension order of February 24, 2005. As such, X/Open respectfully requests Gray's "Letter of Inquiry" be stricken from the record. In the alternative, X/Open requests that it be given thirty (30) days from the resumption of these proceedings to respond to Gray's "Letter of Inquiry."

### I.    Facts

On February 24, 2005, the Board suspended these proceedings pending its ruling on Gray's motions to compel. In its order, the Board stated that "The parties should not file any paper which is not germane to the Motion to Compel." Also pending at the time was X/Open's motion for an emergency protective order to prevent Gray's counsel from disclosing to his client a document confidential to X/Open and two third parties.

On April 14, 2006, Gray filed a paper with the Board, styled a "Letter of Inquiry." The first sentence, and only the first sentence of Gray's letter, is an inquiry into the status of these proceedings.[1] The remaining three pages of the letter contained numerous unsupported allegations

---

[1] Letter of Inquiry at 1.

concerning X/Open's conduct and requests for Board actions against X/Open, including entry of judgment against X/Open.[2]  For example, Gray states that:

- He has "reason to believe it is X/Open's intent to knowingly and voluntarily allow expiration and cancellation of the Unix marks in suit."[3]

- He has made "multiple requests" for X/Open to produce "a sworn Unix marks chain of title affidavit with documentary evidence" of X/Open's ownership of its UNIX marks.[4]

- X/Open has "refused" to produce "a sworn Unix marks chain of title affidavit with documentary evidence" for the last five years,[5] and if X/Open fails to produce such an affidavit, the Board should enter judgment against X/Open.[6]

- "[T]he current proceedings suspension is not a valid reason for X/Open's continuing refusal to respond" to Gray's discovery requests.[7]

Contrary to the clear wording of the Board's suspension order, Gray's allegations and requests have nothing to do with Gray's motion to compel, which was based on the premise that X/Open somehow waived its objections to Gray's discovery requests and should respond without regard to those objections.  Gray's allegations and requests also far exceed the scope of any permissible "Letter of Inquiry," as they are not inquiries.

On April 19, 2006, X/Open called the Board, pursuant to TBMP § 502.06(a), to request a telephone conference on the issue of whether Gray's "Letter of Inquiry" violates the Board's suspension order, and therefore does not require any response from X/Open, and if the Board determines this is not the case, whether X/Open is permitted to respond to the accusations and requests in Gray's letter.  At that time, the Board indicated it would take X/Open's request under advisement.

---

[2] Letter of Inquiry at 1-4.

[3] Letter of Inquiry at 3.

[4] Letter of Inquiry at 3.

[5] Letter of Inquiry at 3-4.

[6] Letter of Inquiry at 3-4.

[7] Letter of Inquiry at 3.

On May 2, 2006, X/Open again called the Board about its request for a telephone conference under TBMP § 502.06(a).

Not having received a response as of today's date (20 days after the service of Gray's "Letter of Inquiry" and 15 days after X/Open's initial request for a telephone conference), X/Open is left with no choice but to file this motion to preserve its rights.

## II.    Argument

As set forth above, Gray's "Letter of Inquiry" does far more than merely inquire about the status of the opposition. Gray's letter makes numerous allegations in complete disregard of the facts and tries to convince the Board that it should rule against X/Open based on those allegations. Moreover, none of Gray's allegations or requests have anything to do with his motion to compel. The thrust of that motion was Gray's allegation that X/Open somehow waived its right to object to Gray's discovery requests and should therefore respond without regard to its objections.[8] Gray's motion had nothing to do with the renewal of X/Open's registrations for UNIX, Gray's request for a "sworn Unix marks chain of title affidavit with documentary evidence," or X/Open's alleged refusal to produce documents during the suspension of these proceedings.

Given that Grays' "Letter of Inquiry" is far outside the scope of the Board's suspension order,[9] as well as any permissible "Letter of Inquiry," X/Open does not believe a response should be necessary. However, given Gray's past behavior, X/Open is concerned that, if the *Board* does not strike Gray's "Letter of Inquiry" from the record, Gray will subsequently argue that X/Open admitted his allegations or failed to contest his requests. X/Open is also concerned that, even if the Board indicates that no response to Gray's "Letter of Inquiry" is necessary, not striking the "Letter of Inquiry" will cloud the public record in this case by leaving Gray's version of events in the record, but not X/Open's.

X/Open denies all of Gray's allegations and objects to all of his requests as contrary to the facts and without any merit whatsoever. Nevertheless, they are substantive allegations and, unless

---

[8] Applicant's Brief in Support of Motion to Compel Discovery at 1.

[9] Nor does Gray's "Letter of Inquiry" have anything to do with his Motion to Test Sufficiency of Opposer's Response[s] to Admission Requests.

- 3 -

stricken, will require a detailed, substantive response in order to correct the record and avoid any prejudice to X/Open.

As such, X/Open respectfully requests Gray's "Letter of Inquiry" be stricken from the record so that X/Open need not respond to Gray's unsupported allegations and requests. In the alternative, X/Open requests that it be given thirty (30) days from the resumption of these proceedings to respond to Gray's "Letter of Inquiry."

Respectfully submitted,

Date: May 4, 2006                     By: _____

Mark Sommers
Linda K. McLeod
Evan A. Raynes
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413

Attorneys for Opposer/Respondent

- 4 -

# EXHIBIT 18

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

X/OPEN COMPANY LIMITED,

        Opposer/Respondent,

vs.

WAYNE R. GRAY,

        Applicant.

_____/

Opposition No.: 122,524

Application Serial No.: 75/680,034

## APPLICANT'S OPPOSITION TO OPPOSER'S MOTION TO STRIKE

      X/Open's Motion to Strike Applicant's Letter of Inquiry should be denied as it is inappropriate, without merit and procedurally flawed.

**ARGUMENT:**

      Under the Federal Rules of Civil Procedure, only certain types of documents are pleadings. Rule 7(a), Fed.R.Civ.P. A motion to strike applies only to pleadings. Rule 12(f), Fed.R.Civ.P. Similarly in the TTAB Rules, motions to strike are only appropriate relating to pleadings (TBMP §506.01), briefs on motions (TBMP §517), a notice of reliance (TBMP §532), trial testimony (TBMP §533) and brief on case (TBMP §539). Applicant's letter of inquiry is not any of these, and accordingly Opposer's motion is not appropriate and should therefore be denied.

      Applicant denies all X/Open's allegations, and objects thereto. At issue and under consideration at this time are simply Applicant's Motion to Compel discovery and Motion to Test the Sufficiency of Answers to Admissions Requests, together with the issue of X/Open classifying as "highly confidential" a document known as a "Confirmation Agreement," limiting disclosure of the document and refusing to allow Applicant to view the document. X/Open's counsel's request to discuss a protective order was specifically refused by the interlocutory attorney as not at issue during the February 2005 telephonic conference.

X/Open is correct that the Board's Suspension Order states: "The parties should not file any paper which is not germane to the Motion to Compel." However, unless "germane" no longer means "pertinent" and "relevant", the Letter of Inquiry is squarely on point, and it clearly discusses the relevance of each inquiry issue to the pending motions. Applicant's Letter of Inquiry is just that, an inquiry of issues currently under consideration, and is not a motion.

Applicant denies all X/Open's allegations in their improper motion to strike. Since Applicant's Letter of Inquiry is not a motion, no response from Opposer is appropriate or required, and Opposer's motion to strike should be denied.

**CONCLUSION:**

Gray respectively requests the Board deny X/Open's Motion to Strike as it is inappropriate, without merit and procedurally flawed. In the alternative, should the Board convert Applicant's letter to a motion, he requests the he be given thirty (30) days from the date of such decision to refile his letter as a motion with supporting brief.

Respectfully submitted,

David L. Partlow, FBN 239682
Josiah E. Hutton, FBN 793851
David L. Partlow, P.A.
P.O. Box 82963
Tampa, FL 33682-2963
(813) 287-8337; FAX (813) 287-8234
Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been furnished by *FAX & U.S. mail* to Evan A. Raynes, Esquire, at Finnegan, Henderson, Farabow, Garrett, & Dunner, LLP, 901 New York Ave., N.W. Washington, D.C. 20001-4413, this 24th day of *may*, 20 06.

2