UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WAYNE R. GRAY,

      Plaintiff,

v.                      Case No. 8:06-cv-1950-T-33TGW

NOVELL, INC.; THE SCO
GROUP, INC.; and X/OPEN
COMPANY LIMITED,

      Defendants.
_____/


## ORDER

This matter comes before the Court upon consideration of Defendant X/Open's Motion for Summary Judgment on Liability and Damages (Doc. # 85), filed on June 26, 2008; Defendant Novell's Motion for Summary Judgment on Counts Three, Four, Five, Six, and Seven of Plaintiff's Complaint (Doc. # 90), filed on June 27, 2008; and Plaintiff's Motion for Partial Summary Judgment as to Liability against Defendants Novell and X/Open (Doc. # 146), filed on January 12, 2009; and the responses thereto.

**I.   Background**

**A.   Novell, X/Open, SCO, and the UNIX Trademark**

Novell, Inc., is a global software company incorporated in Delaware. (Doc. # 1 at ¶ 12.) The SCO Group is also a leading marketer of software technology and a Delaware

corporation. (Id. at ¶ 13.) X/Open Company Limited, also known as The Open Group, is a United Kingdom corporation. (Id. at ¶ 14.) X/Open is an international technology consortium that owns trademarks for various computer systems and licenses those marks to companies whose products conform to its quality control standards. (Doc. # 85 at 8.)

The original owner of the UNIX trademarks was American Telephone and Telegraph Company ("AT&T"), which registered the marks with the United States Patent and Trademark Office ("PTO") in 1986 under Registration Numbers 1,392,203 and 1,390,593. (Id. at 11.) AT&T later assigned the UNIX marks and registrations to Unix Systems Laboratories, Inc. ("USL") and the transfer was registered with the PTO in May 1990. (Id.) USL was purchased by Novell in April 1994, the trademarks were transferred to Novell, and the transfer was recorded with the PTO on July 27, 1994. (Doc. ## 1 at ¶ 24; 85 at 11.)

In October 1993, Novell, X/Open, and non-parties Digital, HP, IBM, and Sun, signed a non-binding term sheet setting forth a framework for a future definitive agreement among the named entities.[1] (Doc. # 86-5.) Pursuant to this term sheet,

_____

[1] X/Open has submitted a redacted version of this term
(continued...)

the entities agreed that, in furtherance of their joint vision of "the UNIX software business being characterized by a single specification," Novell would "license the 'UNIX' brand through X/Open" to companies whose products conform to specified quality-control standards. (<u>Id.</u> at 3-4.) The term sheet further provided that at the end of three years or less, Novell would transfer ownership of the UNIX brand to X/Open, barring certain adverse financial consequences. (<u>Id.</u> at 3.)

On May 10, 1994, Novell and X/Open executed an agreement that, according to X/Open, embodied the terms of the 1993 term sheet.[2] (Doc. ## 85 at 11; 86-6.) In the agreement, Novell (1) granted X/Open "an exclusive, perpetual, irrevocable license to use, and sub-license to third parties the use of," the UNIX trademark; (2) gave X/Open responsibility for licensing the mark to companies whose products conform to certain quality criteria; (3) authorized X/Open to use the trademark attribution statement "UNIX is a registered trade mark licensed exclusively by X/Open;" and (4) agreed to assign

---

[1](...continued)
sheet as Exhibit 4 to its Motion for Summary Judgment. (Doc. # 86-5.)

[2] X/Open has submitted a redacted version of this licensing agreement as Exhibit 5 to its Motion for Summary Judgment. (Doc. # 86-6.)

the UNIX trademark to X/Open at the end of three years "or at any time either earlier or later if Novell and X/Open agree." (Doc. # 86-6 at 1-14, 21.) This licensing agreement also obligated X/Open to "protect the integrity" of the UNIX trademark. (Id. at 10.)

Pursuant to this May 10, 1994 licensing agreement, on May 3, 1995, X-Open issued a license to SCO to use the UNIX mark.[3] (Doc. # 86-18.) X/Open asserts that, since that date, SCO's press releases, websites, and printed materials have reflected that X/Open is either the exclusive licensor or the owner of the UNIX trademark. (Doc. # 85 at 12.)

Central to this dispute is a subsequent Asset Purchase Agreement ("APA") executed by Novell and predecessor-in-interest to SCO, The Santa Cruz Operation.[4] The APA, executed in September 1995, transferred certain of Novell's assets, as listed in Schedule 1.1(a) of that agreement, to SCO. (See Doc. # 86-7, 86-8.) In Paragraph V of Schedule 1.1(a), it

_____

[3] This Trademark License Agreement certified that SCO was registered under the "X/Open Brand Program" and that certain of their software products were in conformance with the required standards for use of the UNIX trademark. (Doc. # 86-18.)

[4] Defendant SCO Group and its predecessor-in-interest The Santa Cruz Operation, Inc. will both be referred to as "SCO" in this Order.

lists as a transferred asset, "Trademarks UNIX and UnixWare as and to the extent held by [Novell] (excluding any compensation [Novell] receives with respect of the license granted to X/Open regarding the UNIX trademark)." (Doc. # 86-8 at 30.) In addition, Schedule 1.1(b), Paragraph V to the APA lists as an Excluded Asset, "all copyrights and trademarks, except for the trademarks UNIX and UnixWare." (Id. at 33.) Minutes of a September 18, 1995 meeting of Novell's Board of Directors references the 1995 APA and documents the Board's resolution to transfer to SCO its UNIX and UnixWare technology assets, excluding trademarks and copyrights "except for the trademarks UNIX and UnixWare." (Doc. # 121, Exh. 38.)

An amendment to the APA was drafted and executed on December 6, 1995 ("Amendment 1"). (Id. at Exh. 41.) The Amendment did not alter any provisions of the APA relating to trademarks or intellectual property. Also on December 6, 1995, a Bill of Sale was executed documenting the sale of the UNIX business to SCO as set forth in the 1995 APA and Amendment 1 thereto. (Id. at Exh. 42.)

Gray asserts that the language of the 1995 APA clearly establishes that the UNIX and UnixWare marks were transferred to SCO pursuant to the APA and Bill of Sale and that Novell was no longer the lawful owner of those marks after December

1995. (Doc. # 1 at ¶¶ 48-56.) X/Open disagrees, contending that the limiting language in Section 1.1(a) served to make the 1995 APA subject to the terms of the 1994 Novell-X/Open re-licensing agreement, which in turn required Novell to assign the UNIX marks to X/Open. (Doc. # 85 at 19.) As further proof of their purported intent, Defendants' have submitted a September 1996 "Confirmation Agreement" in which Novell, X/Open, and SCO all acknowledge that the 1995 APA conveyed the UNIX trademarks to SCO "subject to the rights and obligations established in a May 14, 1994 NOVELL-X/OPEN Trademark Relicensing Agreement . . . ."[5] (Doc. # 86-9 at 1.)

The 1996 Confirmation Agreement further provides that "SCO and X/Open desire to provide for the acceleration of the vesting of title in X/OPEN to the UNIX trademark, and the assignment to SCO of NOVELL's rights under the 1994 [re-licensing] Agreement." (Id.) To that end, the parties thereby agreed to X/Open's drafting and Novell's execution of appropriate assignment documents transferring legal title to the UNIX trademarks to X/Open "as soon as possible." (Id.) The Confirmation Agreement also stipulated that Novell would

_____

[5] Although the Confirmation Agreement references a "May 14, 1994," Novell-X/Open re-licensing agreement, the document submitted by Defendants and represented to be this licensing agreement is dated May 10, 1994. (See Doc. # 86-18.)

be considered the legal owner of the UNIX marks for purposes of the assignment and that such assignment would not be considered a breach of the 1995 APA between Novell and SCO. (Id.)

A second amendment to the APA ("Amendment 2") was executed on October 16, 1996. (Doc. # 121, Exh. 55.) Amendment 2 provides that, as of October 16, 1996, the Excluded Assets section of Schedule 1.1(b) of the 1995 APA is revised to exclude, "All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the [1995] Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies." (Id.) Amendment 2 did not specify which trademarks were "required for SCO to exercise its rights" and were therefore excepted from the excluded assets, but it made no revisions to the Included Assets listed in Schedule 1.1(a). (Id.) Although Amendment 2 was executed one month after the Confirmation Agreement, the Amendment did not reference the Confirmation Agreement or the parties alleged intent to allow Novell to remain the owner of the trademarks for purposes of assigning those marks to X/Open.

Over two years later, in a Deed of Assignment dated November 13, 1998, Novell purportedly assigned "all property,

right, title and interest in the [UNIX] marks with the
business and goodwill attached to the said trade marks" to
X/Open.  (Doc. ## 1 at ¶¶ 72-74; 121 at Exh. 68.)  The
assignment was recorded with the PTO in June 1999.  (<u>Id.</u>)

Gray alleges that Novell no longer owned the UNIX marks
at the time of this 1998 assignment and that both the 1996
Confirmation Agreement and the 1998 Novell-X/Open Deed of
Assignment were fraudulently created and executed after the
fact as part of an illegal scheme to conceal the true
ownership of the marks from Gray, the PTO, and the public.
(Doc. # 1 at ¶¶ 72-73, 113.)  This alleged scheme is set forth
in more detail in Part I(C) below.

**B.  Wayne Gray and the iNUX Trademark**

Plaintiff Wayne R. Gray is an individual residing in
Hillsborough County, Florida.  (Doc. # 1 at ¶ 11.)  He
represents that he has an engineering degree from University
of Florida and twenty years of experience in computer
software, hardware and real-time embedded systems
applications, development and marketing.  (<u>Id.</u>)

Gray began a computer software business in early 1998,
which was incorporated on October 6, 1998, under the name
MegaChoice, Inc.  (Doc. # 121 at 21.)  Gray thereafter began
using the product name and trademark "iNUX" to "test its

acceptance with the relevant purchasing public." (<u>Id.</u>) In
January 1999, Gray registered the domain names "iNUX.com" and
"iNUX.net" and began doing business as "iNUX." (<u>Id.</u> at 22.)
On April 29, 1999, Gray applied to register the iNUX trademark
with the PTO. (<u>Id.</u> at 23.) The company name was legally
changed to iNUX, Inc., in August 1999. (<u>Id.</u>) Gray asserts
that he introduced his first iNUX-brand product in late 1999,
began limited sales in December 1999, and began shipping
product in early 2000. (<u>Id.</u> at 24-25.)

Approximately one year later, Gray received a letter from
counsel for X/Open dated February 27, 2001, identifying X/Open
as the legal owner of the UNIX trademark and insisting that
Gray provide written assurances that he would cease using the
"virtually identical" iNUX mark. (<u>Id.</u> at 25, Exh. 76.)
X/Open stated that Gray's use of the mark, name, and domain
name iNUX is "likely to cause confusion with and dilute the
distinctiveness of the UNIX mark, and constitutes federal
trademark infringement, unfair competition, and trademark
dilution under federal law . . . ." (<u>Id.</u> at Exh. 76.) X/Open
further demanded that Gray voluntarily abandon his pending PTO
application for the iNUX mark. (<u>Id.</u>)

On April 11, 2001, X/Open filed an administrative
opposition to Gray's trademark application with the Trademark

Trial and Appeal Board ("TTAB") of the PTO, entitled <u>X/Open Company Ltd. v. Gray</u>, Opposition No. 91122524, alleging that Gray's mark was confusingly similar to the valuable and famous UNIX trademark. (Doc. ## 85 at 9; 121 at 26.) Ensuing settlement discussions between Gray and X/Open regarding a negotiated phase-out of Gray's use of the iNUX mark and domain names in exchange for Gray's withdrawal of his trademark application were unsuccessful.[6]   Following these failed settlement negotiations, Gray began an independent investigation into X/Open and the UNIX trademark, in which he allegedly discovered that X/Open was not the legal owner of the UNIX trademarks and that X/Open, Novell, and SCO were engaged in a fraudulent scheme to unlawfully conceal the true owner of the mark. (Doc. ## 121 at 27; 126 at 17.)

Gray asserts that he first obtained access to an online copy of the 1995 APA and Schedule 1.1 thereto on November 1,

_____

[6] Written correspondence between counsel for X/Open and Gray reveals that Gray offered to withdraw his trademark application if X/Open agreed to allow phase-out periods of one year for Gray's use of the iNUX mark and two years for his use of the related domain names. (<u>See</u> Doc. # 121 at Exhs. 78-81.) X/Open counter-offered with one year phase-outs for use of both the mark and domain names and that Gray turn over the iNUX domain names to X/Open at the end of that period. (<u>Id.</u>) Gray then countered with one year and eighteen months, respectively, but refused to turn over the domain names to X/Open. (<u>Id.</u>) X/Open refused that settlement offer and negotiations ceased. (<u>Id.</u>)

2003. (Doc. # 1 at ¶ 106.) Once he realized that the UNIX marks had transferred to SCO in 1995 and possibly remained with SCO at the time of the purported 1998 Novell-X/Open assignment, Gray moved to file an amended answer and counterclaim in <u>X/Open v. Gray</u> that included assertions related to fraud. (<u>Id.</u> at ¶ 108.) As more information was discovered by Gray, he again amended his answer and counterclaims on January 22, 2004. (<u>Id.</u>)

After protracted discovery disputes involving, among other things, the confidential nature of certain documents and the propriety of entering a protective order in the case, the TTAB opposition proceedings were formally suspended on February 24, 2005, pending resolution of several discovery motions. (<u>Id.</u> at ¶¶ 110-136.) Gray continued to gain information through independent investigation into the chain of title of the UNIX marks and the inter-relationships between Novell, X/Open, SCO, and the UNIX marks and, based on this information, he initiated this suit in federal court on October 23, 2006. Upon application of X/Open, the TTAB opposition proceedings were thereafter suspended on or about July 17, 2007, pending resolution of this case. (Doc. ## 90 at 6; 90-8.)

### C. The Alleged Scheme

According to Gray, Novell and X/Open have engaged in an ongoing scheme since approximately October 1993 "to conceal Novell's true intentions of retaining ownership of the valuable UNIX marks and developing a proprietary and closed version of UNIX that would integrate its proprietary NetWare networking technologies," for the purpose of controlling certain UNIX and UNIX-like software markets and competing against Microsoft's software business.[7]  (Doc. # 1 at ¶¶ 2, 29, 164.)  In furtherance of this alleged scheme, Gray asserts that Novell and X/Open agreed that Novell would initiate a re-licensing enterprise through X/Open, whereby X/Open would be the exclusive licensor of the UNIX mark, and that they would "falsely imply and/or state publicly that X/Open owned the UNIX marks in and after 1993" to conceal Novell's continuing

---

[7] A software is said to be "open" when its source code is open and available to the public.  Stefano Comino and Fabio M. Manenti, <u>Open Source vs Closed Source Software: Public Policies in the Software Market</u> 2, http://opensource.mit.edu/ papers/cominomannti.pdf (June 2003).  Open source software is normally available to the public free of charge or for a nominal fee to cover shipping or online connection charges.  <u>Id.</u>  Closed software, on the other hand, is proprietary and therefore offered by a single commercial entity for a substantial price. <u>Id.</u> at 7.  Understandably, there is normally significant competition between open and closed sources of similar software.  <u>Id.</u>  Microsoft's networking products are closed source software, while Novell's UNIX products have always been open software. (<u>Id.</u> at 2; Doc. # 1 at ¶ 27.)

ownership of those trademarks. (Id. at ¶ 30.) Novell and X/Open allegedly intended to defraud their UNIX licensees, licensee's customers, government agencies, the public, and others, by using false trademark acknowledgments that omitted reference to Novell's ownership of the marks and by forcing third parties to use such false acknowledgments. (Id. at ¶¶ 3, 36, 164.)

Gray contends that SCO joined the "corrupt enterprise and scheme" around September 1996 by agreeing, among other things, to conceal its September 1995 purchase of the UNIX marks and certain related assets, to conceal the enterprise's fraudulent acts, and to continue to publish false statements and implications that X/Open owned the UNIX marks. (Id. at ¶ 5.) Gray further alleges that Defendants conspired after the fact to create the Confirmation Agreement and backdate it to September 1996 to conceal Novell's continuing ownership of the trademarks in and after 1994, to contradict and undo the results of the 1995 APA, and to deceive Gray into relying on the document and abandoning his TTAB counterclaim for fraud. (Id. at ¶ 113.)

According to Gray, the November 13, 1998, Deed of Assignment was also "a backdated document created and/or executed after 1998 for the purpose of criminally influencing

the outcome of anticipated future official proceedings." (_Id._
at ¶¶ 5, 72-73.)  This fraudulent Deed of Assignment was
allegedly executed with SCO's cooperation and with the
parties' full knowledge that Novell was not the lawful owner
of the UNIX marks after 1995 and therefore could not have
assigned any business assets or rights associated with the
marks to X/Open after that time.  (_Id._ at ¶¶ 72-73.)  Gray
further alleges that the parties perpetrated a fraud on the
PTO when it recorded the false assignment with that entity on
June 22, 1999.  (_Id._ at ¶ 74; Doc. # 121, Exh. 71.)  The UNIX
trademark assignment was recorded with the PTO two months
after Gray's April 1999 iNUX trademark application was filed.
(_Id._)

Gray alleges that Defendants further concealed their
scheme by agreeing in or about 1999 to have X/Open falsely
claim ownership of the UNIX marks in trademark enforcement
letters sent to numerous business entities, and then to
initiate "objectively baseless sham UNIX mark enforcement
lawsuits" with the TTAB against many of these businesses.
(Doc. # 1 at ¶¶ 8, 78-86.)  Gray contends that he was targeted
because Defendants desired to appropriate Gray's iNUX mark and
domain names for their own use.  (_Id._ at ¶ 166.)  To this end,
Gray alleges that Defendants fraudulently induced him to

suspend his iNUX business and use his limited financial resources to defend against the sham opposition suit. (<u>Id.</u> at ¶¶ 87-88.)  It is Gray's belief that Defendants intentionally destroyed his iNUX business property and professional reputation to ensure that the iNUX mark and domain names would only be associated with products and/or services originating with one or more of the Defendants.  (<u>Id.</u> at ¶¶ 10, 166.)

### C.    The <u>SCO v. Novell</u> Lawsuit

On or about January 20, 2004, SCO initiated an unrelated civil suit against Novell in the United States District Court of Utah alleging, among other things, that Novell had breached the 1995 APA by failing to convey the copyrights for UNIX-brand software.  <u>The SCO Group, Inc. v. Novell, Inc.</u>, Case No. 2:04CV139DAK, 2007 WL 2327587, at * 1 (D. Utah Aug. 10, 2007). In an order on cross-motions for summary judgment, the Court analyzed the intent of the parties as to ownership of the UNIX and UnixWare copyrights by looking to the terms of the 1995 APA, the two amendments thereto, the related Bill of Sale, other pertinent business dealings between the two parties, and other extrinsic evidence.  <u>Id.</u> at ** 23-35.  As to the copyright ownership issue, the court ultimately concluded that the UNIX and UnixWare copyrights had not been included in the

assets that were transferred to SCO pursuant to the 1995 APA and its two amendments.  <u>Id.</u> at * 56.

As the Utah court contemplated the evidence on the copyright issue, it noted several times that trademarks were listed as intellectual property that had been included in the schedule of assets to be transferred under the APA.  At one point, in considering the language in a press release regarding the asset sale, the court observed, "It is undisputed that trademarks did transfer, which would account for a statement that intellectual property passed."  Based on this and related statements by the Utah court, Gray asserts that the issue of trademark ownership was conclusively established in <u>SCO v. Novell</u> and argues that this Court should be bound to apply that "holding" in this case.  (Doc. # 126 at 8.)

### D.   Procedural History

This lawsuit was initiated by Gray on October 23, 2006, and asserts eleven causes of action against Novell, X/Open, and SCO for: (1) violations of § 1962(c),(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 28 U.S.C. §§ 1961 et seq. (Counts I and II); (2) fraudulent federal trademark registration in violation of Sections 38 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1120, 1125(a) and a federal

criminal statute, 15 U.S.C. § 1001 (Counts III and IV); (3) unfair competition by false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count V); (4) common law fraud (Count VI); (5) conspiracy to defraud (Count VII); (6) violations of § 895.03(3),(4) of the Florida RICO Act, Florida Statutes Chapter 895 (Counts VIII and IX); and (7) violations of § 817.034(4)(a),(b) of the Florida Communications Fraud Act ("FCFA"), Florida Statutes § 817.034 (Counts X and XI). (Doc. # 1 at 64-82.) Gray seeks treble damages for past and future losses, plus interest and attorney's fees, totaling in excess of $4,500,000. (<u>Id.</u>) The case is currently stayed as to Defendant SCO due to ongoing bankruptcy proceedings. (Doc. ## 52, 53.)

X/Open filed a motion for summary judgment on liability and damages against Gray on June 26, 2008. (Doc. # 85.) X/Open contends that Gray's fraud and conspiracy claims against it must fail as a matter of law because no genuine issue of material fact exists that X/Open is the lawful owner of the UNIX trademarks. (<u>Id.</u> at 5-6.) In addition, X/Open argues that Gray's claim for damages cannot survive summary judgment because there is no evidentiary support for those claims and because any alleged losses suffered by Gray due to his decision to abandon the iNUX business in favor of

investigating and suing X/Open cannot now be attributed to X/Open.  (<u>Id.</u> at 6.)

Gray argues that X/Open's summary judgment motion must be denied because (1) the clear language of the 1995 APA, as well the Utah district court's interpretation of that document in the <u>SCO v. Novell</u> litigation, shows that Novell transferred ownership of the UNIX marks to SCO in 1995; (2) X/Open is unable to produce any documents showing that SCO subsequently transferred the UNIX marks back to Novell or on to X/Open; (3) Novell had no rights in the UNIX marks to transfer to X/Open in 1998 and therefore the 1998 Deed of Assignment from Novell to X/Open was meaningless; (4) because X/Open was not the lawful owner of the UNIX marks, X/Open had no standing to challenge Gray's application to register his iNUX trademark with the PTO; (5) X/Open is unable to show an absence of material issue of fact as to Gray's conspiracy claims; and (6) Gray has suffered legally cognizable injury from Defendants' actions and there are genuine issues of material fact as to the amount of those damages.  (Doc. # 126 at 4-19.)

On June 27, 2008, Novell filed its motion for summary judgment, seeking judgment in its favor on Counts III-VII of Gray's complaint.  (Doc. # 90.)  Novell asserts that Gray's Lanham Act claims fail because he cannot establish that Novell

procured a trademark registration through fraudulent
statements or that Novell made misrepresentations likely to
cause confusion as to the origin of goods or services. (Id.
at 2.) Further, Gray's claims under 18 U.S.C. § 1001 must
fail because he cannot assert a private cause of action under
that criminal statute. (Id.) Finally, Novell seeks summary
judgment as to Gray's claims of fraud and conspiracy to
defraud because Gray has no admissible evidence showing that
Novell made a knowing misrepresentation that caused any
detrimental reliance by Gray. (Id. at 3.)

In response, Gray asserts that his claims under Section
38 of the Lanham Act must survive summary judgment because
courts interpret Section 38 broadly to include fraud in
connection with both registration and maintenance of a
trademark, and Gray was injured by Novell's action of falsely
recording an assignment of the UNIX marks to X/Open. (Doc. #
123 at 6-9.) In addition, Gray argues that he has stated a
valid cause of action under Section 43(a) of the Lanham Act
because Defendants misrepresented the origin of goods or
services by falsely claiming that X/Open owned the UNIX marks
and Gray was damaged by that conduct when X/Open instituted
sham litigation against Gray's registration of his iNUX
trademark. (Id. at 11-14.) As to the claims referencing 18

U.S.C. § 1001, Gray asserts that he is "not suing directly under [S]ection 1001" and that the statute is only mentioned to show that false statements made to the PTO are criminal offenses. (<u>Id.</u> at 9 n. 25.)  Lastly, Gray argues that his fraud and conspiracy charges are supported by evidence of Defendants' false public statements and sham opposition to Gray's trademark registration application, which were made in part to induce Gray's reliance on the false statements so that he would give up the iNUX trademark and domain names. (<u>Id.</u> at 16-20.)

Gray's motion for summary judgment, filed on January 12, 2009, was brought pursuant to Federal Rule of Civil Procedure 56(d) and seeks an order of this Court determining the issue of ownership of the UNIX trademarks or, in the alternative, an order determining the material facts not genuinely at issue in this case. (Doc. # 146 at 4.)  For the same reasons set forth in his opposition to X/Open's summary judgment motion, Gray asserts that the record evidence clearly establishes that SCO has been the lawful owner of the UNIX trademarks since execution of the 1995 APA.  Gray again refers the Court to the opinion issued in the Utah case <u>SCO v. Novell</u> and argues that "this Court should follow that court's ruling that [SCO] owned

Novell's Unix trademarks, on and after December 6, 1995."
(<u>Id.</u> at 26-27.)

X/Open responded in opposition to Gray's motion, and
Novell joined in that opposition (Doc. # 154), asserting that
the Utah litigation is not relevant to the trademark issue and
is not binding on this Court, and that the record evidence in
this case raises no issue of material fact that X/Open is the
lawful owner of the UNIX trademarks.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving
party is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(c). A factual dispute alone is not enough to
defeat a properly pled motion for summary judgment; only the
existence of a genuine issue of material fact will preclude a
grant of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a
reasonable jury could return a verdict for the nonmoving
party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742
(11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g</u>

<u>Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary

judgment.  <u>Samples ex rel. Samples v. City of Atlanta</u>, 846
F.2d 1328, 1330 (11th Cir. 1988) (citing <u>Augusta Iron & Steel</u>
<u>Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856
(11th Cir. 1988)).  However, if the non-movant's response
consists of nothing "more than a repetition of his
conclusional allegations," summary judgment is not only
proper, but required.  <u>Morris v. Ross</u>, 663 F.2d 1032, 1034
(11th Cir. 1981).

## III. Analysis

The Court begins its analysis with the issue of ownership
of the UNIX trademarks, as that issue is potentially
dispositive of the entire case.

X/Open's motion for summary judgment asserts that all of
Gray's claims are founded on his allegations that X/Open never
owned the UNIX trademarks and that Defendants have conspired
to hide the trademarks' true owner from Gray and the public.
X/Open contends that there is no genuine issue of material
fact regarding X/Open's ownership of the UNIX marks and
therefore Gray's claims must fail as a matter of law.

The Court finds that the documentary evidence in this
case supports Novell and X/Open's contentions that Novell
granted X/Open an exclusive license for the UNIX mark in May
1994, that it intended to transfer ownership of the marks to

X/Open at some time thereafter, that SCO documented its agreement to that transfer in the 1996 Confirmation Agreement, and that the marks were lawfully transferred to X/Open by operation of the 1998 Deed of Assignment.

The language of the May 10, 1994 licensing agreement between Novell and X/Open clearly grants X/Open "an exclusive, perpetual, irrevocable license to use, and sub-license to third parties the use of," the UNIX trademarks and documents Novell's intent to transfer the marks to X/Open in the future. (Doc. # 86-6 at 2, 7, 11.) The agreement further obligates X/Open to actively promote use of the trademarks and to "protect the integrity" of the marks. (Id. at 10, 14.)

Subsequent to this licensing agreement, Novell sold certain of its assets to SCO. The terms of the 1995 APA, as amended and adopted on December 6, 1995, state that it transfers to SCO all of Novell's "right, title and interest in" the assets listed in Schedule 1.1(a). (Doc. # 86-7 at 10-11.) Schedule 1.1(a)(V) names the UNIX and UnixWare marks as intellectual property transferred, "as and to the extent held by Seller (excluding any compensation Seller receives with respect of the license granted to X/Open regarding the UNIX trademark)." (Doc. # 86-8 at 30.) It has not been asserted, and the Court does not find, that Amendment 2 to the APA

altered the rights or obligations of the parties with respect to the UNIX trademarks.  (Doc. # 121, Exh. 55.)

The parties vehemently disagree about the meaning and effect of the phrase "as and to the extent held by Seller." X/Open argues that the limiting language in Schedule 1.1(a), which expressly references the earlier license granted to X/Open, clearly expressed the parties' understanding that the "1995 APA was subject to the 1994 Novell-X/Open [licensing] agreement," which required Novell to assign the UNIX trademark to X/Open within a few years.  (Doc. # 85 at 19.)  According to X/Open, this understanding was confirmed by execution of the 1996 Confirmation Agreement among Novell, SCO, and X/Open, which provided that X/Open was entitled to receive full ownership of the UNIX trademarks pursuant to the terms of the 1994 licensing agreement.  X/Open contends that the terms of the Confirmation Agreement expressly provided for Novell to be considered the owner of legal title to the UNIX mark for the purpose of assigning such title to X/Open and, therefore, the 1998 Deed of Assignment legally transferred ownership of the UNIX mark to X/Open.

Upon consideration of the pertinent documents, the Court finds that the 1995 APA as modified or supplemented by the 1996 Confirmation Agreement granted Novell the legal authority

to transfer ownership of the UNIX trademark to X/Open in the 1998 Deed of Assignment. It is an established rule of contract law that the parties to a valid contract are free to vary its terms by executing a subsequent agreement that modifies, supplements, or discharges the prior contract, in whole or in part. 17A <u>Am. Jur. 2d Contracts</u> §§ 500, 513 (1995); <u>St. Joe Corp. v. McIver</u>, 875 So.2d 375, 382 (Fla. 2004) ("It is well established that the parties to a contract can discharge or modify the contract, however made or evidenced, through a subsequent agreement"). To effectively cancel or alter a contract fairly made, all parties to the original contract must consent to the modification. 17A <u>Am. Jur. 2d Contracts</u> § 500.

Here, the Confirmation Agreement specifically referenced the terms of the 1995 APA and stated that the prior contract had transferred the UNIX trademark to SCO "subject to rights and obligations established in a May 14, 1994 NOVELL-X/OPEN Trademark Relicensing Agreement, as amended . . . ." (Doc. # 86-9 at 2.) The 1996 Agreement went on to say that <u>SCO agreed</u> that, "notwithstanding any agreements to the contrary," it would not be considered a breach of the 1995 APA for Novell to be considered owner of the UNIX mark for purposes of transferring title to the mark to X/Open. (<u>Id.</u>) The 1996

agreement also expressly provided that the parties intended its terms to supersede all previous agreements and understandings and, together with relevant portions of the 1994 licensing agreement, were to "constitute the entire understanding among the parties relating to the subject matter of this Agreement." This subsequent Confirmation Agreement was signed by all the parties to the original 1995 contract.

Thus, upon execution of the Confirmation Agreement, the terms of the 1995 APA relating to the UNIX trademarks were superseded to the extent that title to the UNIX marks remained with Novell for the purpose of assigning those marks to X/Open. Regardless of whether the language of the subsequent agreement is thought to merely clarify, or completely alter, the prior agreement, the result is the same. Consequently, based on the clear and unambiguous language of the 1996 Confirmation Agreement, the Court concludes that the subsequent 1998 Deed of Assignment validly passed ownership of the UNIX trademark to X/Open as of November 13, 1998.

Gray's argument that the Court's consideration of the 1996 Agreement is barred under the parol evidence rule is unavailing, as that rule does not apply to evidence of subsequent agreements or modifications. 11 Williston on Contracts § 33:23 (1995) ("all courts agree that [under the

parol evidence rule] subsequent agreements may be shown, and are not rendered ineffective by the prior writing"); see e.g. Broxson v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 446 F.2d 628, 630 (9th Cir. 1971) (noting that the parol evidence rule "does not prevent proof of an agreement which is made subsequent to a prior written contract however much the latter contradicts the terms of the former"); Litman v. Mass. Mut. Life Ins. Co., 739 F.2d 1549, 1558 (11th Cir. 1984) (stating that the parol evidence rule "does not encompass oral modifications made subsequent to the execution of a written contract").

Gray also questions the validity and authenticity of both the Confirmation Agreement and the Deed of Assignment. Among other things, Gray asserts that the Confirmation Agreement is "highly suspicious" and "may be an after-the-fact attempt to avoid the impact of the actual transfers [to SCO] in 1995." (Doc. # 126 at 10.) However, Gray offers absolutely no evidence to support his allegation that Defendants fraudulently created these documents after the fact and back-dated them in an effort to validate the 1999 recording of

assignment with the PTO.  Mere suspicions and unsupported theories are not enough to create a triable issue of fact.[8]

Gray also argues that the Utah district court's "holding" in SCO v. Novell, to the effect that the 1995 APA effectively transferred the UNIX trademarks to SCO, should be binding on this Court as proof that Novell had no title to pass to X/Open in 1998.  (Doc. # 126 at 8.)  The Court rejects this contention.  The relevant issue before the Utah court was "whether the UNIX and UnixWare copyrights were transferred to SCO" pursuant to the APA; the Court was not deciding whether the trademarks were transferred.  SCO v. Novell, 2007 WL 2327587, at * 24 (emphasis added).  Although the court discussed the APA at length and at one point noted that "it is undisputed that trademarks did transfer" under the APA, that

---

[8] Gray also makes much of the fact that the licensing agreement submitted by Defendants is dated May 10, 1994, while the Confirmation Agreement refers to the licensing agreement as the "May 14, 1994 NOVELL-X/OPEN Trademark Relicensing Agreement."  Gray admits that counsel for Defendants has explained that the Confirmation Agreement mistakenly referenced the date May 14, 1994, instead of the actual May 10, 1994 execution date.  (Doc. # 126 at 12.)  The Court finds it highly unlikely that two licensing agreements were executed four days apart and, in any event, the Confirmation Agreement specifically references that provision of the licensing agreement that it seeks to effectuate: "the vesting of title in X/OPEN to the UNIX trademark." (Doc. # 86-9 at 2.)  Thus, the validity and effect of the Confirmation Agreement are not disturbed by this discrepancy in dates.

statement was not necessary to the decision in that case and therefore is non-binding dicta. Id. at * 7.

In addition, the Utah court's general observation to the effect that some trademarks were transferred to SCO in 1995 is not contradicted by this Court's finding. Defendants do not dispute that the UnixWare trademarks, as well as some limited rights in the UNIX marks, passed to SCO as part of the 1995 asset sale. (Doc. # 151 at 15-16.) In any case, it is not necessary for this Court to determine to what extent the rights in the UNIX marks transferred to SCO under the 1995 APA, because this Court has already determined that the subsequent Confirmation Agreement superseded the terms of the APA on this issue and therefore Novell's 1998 assignment of the marks to X/Open was valid.

Although, as asserted by Gray, the language of the APA was not specific regarding what limitations on transfer of the UNIX marks were intended by the phrase "to the extent held by Seller," the parties to that contract clarified the issue in their subsequent agreement.[9]   Importantly, there is no

_____

[9] Gray argues that there is no rational reason for the parties to have transferred anything less than Novell's entire rights and interest in the UNIX marks to SCO. (Doc. # 146 at 17-19.) However, Novell and X/Open have provided plausible explanations for the limitations placed on the transfer of
(continued...)

evidence of any dispute between SCO and Novell after execution of the 1995 APA regarding interpretation of the "to the extent held by Seller" language. SCO never challenged Novell's 1998 assignment of the UNIX marks to X/Open or X/Open's subsequent recording of that assignment with the PTO. In fact, the evidence shows that SCO publicly acknowledged X/Open's ownership of the UNIX mark after that time. (<u>See e.g.</u> Doc. # 121, Exh. 61, 1997 press release of SCO stating that UNIX is a registered trademark of X/Open.) Even in the present case, SCO has not disputed X/Open's lawful ownership of the marks. (<u>See</u> Doc. # 27 at 12 n. 18, SCO's Motion to Dismiss, stating "there is no doubt that X/Open is, in fact, the registrant of certain UNIX marks. . .")

Because the Court finds that Novell's 1998 assignment of the UNIX marks to X/Open was lawful and valid, it follows that Novell's recording of that assignment with the PTO in June 1999 was also valid. Accordingly, it is appropriate to grant summary judgment in Defendants' favor on Counts III and IV of

---

[9](...continued)
UNIX trademarks to SCO. (Doc. # 151 at 15-17.) Gray's arguments are even less persuasive in light of the fact that he was not a party or an intended beneficiary to these contracts and therefore has no standing to challenge Defendants' assertions as to their intent in entering the subject contracts.

the complaint, which allege fraud on the PTO in connection
with statements made by Novell in recording the assignment of
the UNIX trademarks.

Furthermore, Gray's claims alleging injuries stemming
from X/Open's fraudulent opposition to his registration of a
confusingly similar trademark must also fail because, as owner
of the UNIX trademarks as of November 13, 1998, X/Open had the
right to protect those marks by challenging Gray's iNUX
registration in April 2001.[10]  Summary judgment against Gray
is therefore granted on Count VI for common law fraud and
Count VII for conspiracy to defraud.

Based on the Court's findings, Gray lacks standing to
bring the remaining Lanham Act claim in Count V of his
complaint alleging unfair competition by false designation of
origin under 15 U.S.C. § 1125(a).  Section 1125(a) provides a
cause of action to "any person who believes that he or she is
or is likely to be damaged" by false designations of origin or
false or misleading representations of fact.  Even if this
Court were to find that prior to 1998 Defendants falsely

---

[10] Even if ownership of the UNIX marks had not been
legally transferred to X/Open in 1998, X/Open still would have
had the authority to challenge Gray's iNUX mark under the
terms of the 1994 licensing agreement, which obligated X/Open
to protect the UNIX marks.  (Doc. # 86-6 at 10.)

represented the ownership of the UNIX marks, that conduct cannot be said to have caused any damage to Gray relating to unfair competition with his use of the iNUX name and related business enterprise that was begun in late 1998. (See Doc. # 121 at ¶ 163.)

Gray's claims in Counts I, II, VIII, IX, X, and XI are brought pursuant to RICO, the Florida RICO Act, and the FCFA, and are based on Defendants' alleged fraudulent scheme to conceal the true owner of the UNIX marks from Gray and the public by falsely implying or proclaiming that X/Open owned those marks. As stated above, X/Open was the lawful owner of the UNIX marks after 1998. Based on the record evidence, it appears that Defendants' conduct prior to that time was also consistent with their assertions regarding ownership and use of the UNIX marks, and thus the Court does not find evidence of any fraudulent concealment of that ownership.

Gray alleges that after the licensing agreement was executed in 1994, Defendants falsely represented to the public that "UNIX is a registered trademark in the United states and other countries, licensed exclusively through X/Open Company Ltd." (Doc. # 1 at ¶¶ 36-39, 41-46.) There is nothing fraudulent about that statement because UNIX was a registered trademark and the 1994 agreement granted X/Open an exclusive

right to sub-license the UNIX marks.  In addition, the 1994 licensing agreement expressly authorized X/Open to utilize that trademark attribution statement.

Gray further alleges that, starting in 1997, Defendants began using acknowledgments that stated that X/Open was the lawful owner and/or registrant of UNIX.  (Id. at ¶ 60-71.) The Court can find only one such acknowledgment among the many documents that Gray has submitted.  That document apparently is a reproduction of a portion of a Novell web page that states, "UNIX is the registered trademark of The Open Group." (Doc. # 121, Exh. 59.)  Given Defendants' 1996 agreement to honor the terms of the 1994 licensing agreement and to accelerate transfer of ownership of the UNIX marks to X/Open "as soon as possible," as well as Gray's very limited evidence on this issue, the Court finds no basis to conclude that Defendants engaged in a course of fraudulent conduct designed to mislead the public as to the UNIX marks' true owner.

Regardless of the Court's conclusions on this issue, however, Gray's RICO and FCFA claims cannot be maintained because Gray has not shown that he suffered any injury as a result of any of Defendants' alleged conduct, before or after the 1998 deed of assignment, and he therefore lacks standing to assert these claims.  Claims under RICO, the Florida RICO

Act, and the FCFA all require Gray to establish injury as a result of reasonable reliance on the alleged fraudulent communications. Fla. Stat. §§ 772.102-04, 817.034(4)(a), 895.05(6) (allowing a person to bring a civil RICO or FCFA claim if "he has been injured by reason of" any violation of those laws); <u>See</u> <u>Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co.</u>, 336 F. Supp. 2d 1239, 1262-64 (S.D. Fla. 2004), <u>aff'd</u> 470 F.3d 1036 (11th Cir. 2006) (finding that RICO, the Florida RICO Act, and the FCFA all require the plaintiff to establish reasonable reliance in order to meet proximate cause requirements).

Even if Gray could establish that Defendants fraudulently concealed ownership of the UNIX trademarks prior to 1998, Defendants' alleged interference with Gray's use of the iNUX name did not begin until X/Open's February 2001 letter to Gray. Therefore, Gray cannot establish that he relied to his detriment on any conduct by Defendants that occurred prior to 1998. Likewise, Gray cannot show that he suffered injury as a result of reliance on any fraudulent conduct by Defendants during or after the 2001 opposition, because the Court has determined that X/Open lawfully owned the trademarks at that point in time. Thus, there is no issue of material fact that

precludes summary judgment in Defendants' favor on Counts I, II, VIII, IX, X, and XI of Gray's complaint.

Upon due consideration of the record evidence and the arguments of each party, the Court finds that summary judgment should be granted in favor of Defendants and against Gray on all eleven counts of Gray's complaint. Thus, it is appropriate to grant both X/Open and Novell's motions for summary judgment and to deny Gray's motion for partial summary judgment, and to dismiss this case.

Accordingly, it is hereby

**ORDERED, ADJUDGED, and DECREED**:

(1) Defendant X/Open's Motion for Summary Judgment on Liability and Damages (Doc. # 85) is **GRANTED.**

(2) Defendant Novell's Motion for Summary Judgment on Counts Three, Four, Five, Six, and Seven of Plaintiff's Complaint (Doc. # 90) is **GRANTED.**

(3) Plaintiff's Motion for Partial Summary Judgment as to Liability against Defendants Novell and X/Open (Doc. # 146) is **DENIED.**

(4) The Clerk is directed to enter judgment in favor of all Defendants and against Plaintiff Wayne R. Gray, to terminate any pending motions, and to close the case.

**DONE** and **ORDERED** in chambers in Tampa, Florida, this <u>20th</u> day of February, 2009.

Virginia M. Hernandez Covington
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:  All Counsel of Record